M HN

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

ERICH SPECHT, an individual, and )
doing business as )
ANDROID DATA CORPORATION, and )
THE ANDROID'S DUNGEON INCORPORATED, )
 Illinois corporations )
                       Plaintiffs )
            )
              v. )
            )
GOOGLE INC., a Delaware corporation, )
OPEN HANDSET ALLIANCE, )
China Mobile Communications Corporation, )
KDDI CORPORATION,  NTT DoCoMo, Inc. )
SOFTBANK MOBILE Corp., Sprint Nextel, )
T-Mobile, Telecom Italia, Telefónica, Vodafone, )
AKM Semiconductor, Audience, ARM, )
Atheros Communications, Broadcom Corporation, )
Ericsson, Intel Corporation,  Marvell Semiconductor, Inc., )
NVIDIA Corporation, Qualcomm Inc., )
SiRF Technology Holdings, Inc., Synaptics, Inc., )
Texas Instruments Incorporated, )
ASUSTeK Computer Inc., HTC Corporation, )
Huawei Technologies, LG Electronics, Inc., )
Motorola, Inc.,  Samsung Electronics, Sony Ericsson, )
Toshiba Corporation, Ascender Corp., )
eBay Inc., LivingImage LTD., )
Myriad, Nuance Communications, Inc., )
OMRON SOFTWARE Co, Ltd.,  PacketVideo (PV), )
SkyPop, SONiVOX,  Aplix Corporation, )
Borqs, Noser Engineering Inc., )
TAT - The Astonishing Tribe AB, Teleca AB, )
Wind River, and Garmin International, Inc. )
            )
              Defendants )

NO.   09 CV 2572

JUDGE LEINENWEBER

MAGISTRATE JUDGE
COLE

F I L E D
5- 4- 2 0 0 9
MAY - 4 2009

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## PLAINTIFFS' MOTION
## FOR A TEMPORARY RESTRAINING ORDER
## AND PRELIMINARY INJUNCTION

-1-

NOW COME your plaintiffs, Erich Specht, Android Data Corporation and the Android's Dungeon incorporated and in support of their motion for a temporary restraining order and preliminary injunction state:

1.  Plaintiffs are the registered owner of the **Android Data** Trademark under United States Patent and Trademark Office ("PTO") Registration Number 2639556. A copy of the Register is attached as Plaintiffs' Exhibit B. (Note: Exhibits which are also attached to the complaint will be given the same number as in the complaint).

2.  Under the Trademark Principal Register "no claim is made to the exclusive right to use "Data", apart from the mark as shown". The stated purpose is for computer e-commerce software to allow users to perform electronic business transactions via a global computer network, in class 9, software;hardware.

3.  For all times relevant hereto, plaintiffs' registration 2639556 was live.

4.  On October 31, 2007 Google applied to the PTO for registration of the Android mark in connection with it's software products under class 9, software;hardware.

5.  The PTO  denied Google's application and subsequent requests for review on the grounds of a likelihood of confusion with plaintiffs' Android Data mark. A copy of the PTO's final action is attached as plaintiffs Exhibit F.

6.  Because the term **data** was disclaimed, the PTO found that the "dominant mark" **Android** in plaintiff's register was identical to Google's proposed mark.

7.  The PTO found that Google's stated use in its original application was so broad that it included plaintiff's stated use of the Android Data mark. It also found that Google's

amended stated use was even more broad than it's original application.

8.  The PTO determined that with the contemporaneous use of highly similar marks that share the same dominant term **ANDROID**, consumers are likely to conclude that the goods are related and originate from a single source, and that any doubt regarding a likelihood of confusion is resolved in favor of the prior registrant, in this case plaintiffs.

9.  Plaintiff began marketing its Android Data software in commerce in 1999.

10. Defendants began marketing their software and related products under the name Android in November, 2007.

11. Defendants have created and control a vast network of companies and internet presence that they are using to promote their ANDROID products over the internet, on television, in print advertising, and brochures in stores.

12. As of April 30, 2009 Google was still representing that "Android" is a trademark owned by Google, Inc.  See Plaintiffs' Exhibit 1 attached hereto.

13. Based upon information and belief, many of the defendants have or are planning product releases under or using the Android mark, including " Android based Garmin, Motorola, and Acer cell phones.  See Plaintiffs Exhibit 3.

14. Google has announced their "largest developer gathering" for May 27 and May 28, 2009. In their announcement, they have stated that they expect thousands of web developers will come together to learn how to develop web applications with Android and other products.  See Plaintiff's Exhibit 2.

15. On April 27, 2009 the ABC television show "Who wants to be a millionaire," the following question was asked of a contestant:

For $16,000, touted as a rival to the i-phone, what much hyped operating

system for mobile devices was introduced by Google in 2008

a. Stealth      b. Viper   c. Dynamite     or  d. Android

16. The defendants have gotten the attention of the computer world, mobile phone users, and now television show producers and viewers and the message they are conveying is that they own Android name and all.

17. The affidavit of Erich Specht is attached hereto and made a part of this motion.

18. Defendants actions represent a serious infringement of Plaintiffs trademark rights.

19. The recent television coverage, upcoming product releases and developer's conference are creating the likelihood that many innocent third parities, i.e. developer's and companies preparing product releases will be injured by Google and the Open Handset Alliance's representation that Android is a trademark of Google.

20. Aside from it's inherent equitable powers, the Court has the authority to grant injunctive relief pursuant to §34 of the Lanham Act. 15 U.S.C. § 1116.

**WHEREFORE**, plaintiffs move this Honorable Court for a temporary restraining order followed by a preliminary injunction: restraining and enjoining  the defendants from :  (a) using the Android Data trademark depicted in Exhibit B, or any colorable imitation thereof; (b) using any trademark, including Android,  that imitates or is confusingly similar to or in anyway similar to Plaintiff's trademark Android Data, or that is likely to cause confusion, mistake, deception, or public misunderstanding as to the origin of Plaintiff's products or their connectedness to Defendant.  In the alternative plaintiffs move this court for a temporary restraining order and preliminary injunction enjoining defendants Google and the Open Handset Alliance from

representing that **Android** is a trademark of Google without disclosing in the same location, type

and print, that ownership of the trademark Android is the subject of litigation and that any use

may subject the user to damages as provided by law.

RESPECTFULLY SUBMITTED,
Erich   Specht,   Android   Data
Corporation,   and   The   Android's
Dungeon Incorporated

By: _____
Their Attorney

Martin J Murphy
2811 RFD
Long Grove, IL 60047
312-933-3200
Fax 773-338-9913
email: martym@villageinvestments.com

-5-

**AFFIDAVIT OF ERICH SPECHT**

The undersigned Erich Specht does hereby swear and affirm that the following statements are true and correct to the best of his knowledge, and if called as a witness I would testify as to the following facts:

1.    I currently reside at 114 N Ashland Avenue, Palatine, County of Cook, Illinois.

2.    I am the sole shareholder, officer and director of Android Data Corporation, an Illinois corporation, in good standing, incorporated on December 30, 1998, by me.

3.    I, together with my wife, Megan Specht,, are the sole officers, shareholders and directors of The Android's Dungeon Incorporated, an Illinois corporation, in good standing, incorporated March 5, 2001 by me.

4.    On June 4, 2000, I, under the name Android Data Corporation, applied for the registration of the trademark Android Data, serial number 78011167.

5.    On October 22, 2002 registration of the Android Data trademark was granted, registration number 2639556.

6.    On April 22, 2009, a section 8 affidavit of continued use was filed with the PTO.

7.    I have and continue to use the Android Data mark in commerce.

8.    I have no intention of abandoning the mark.

9.    I currently own and operate a website named www.android-data.com. I am actively furthering development of the software as well.

10.    On April 20, 2009, I first learned that Google's "Android" product was a software based product and not a mobile phone device as I had previously thought.

11.    After learning that Google's Android product was software based, I immediately

took action to preserve my trademark rights.

Further Affaint sayeth naught.

Signed:

Erich Specht

Subscribed and sworn to before me
this 30th day of April 2009

Notary Public

OFFICIAL SEAL
EUGENE FAHEY
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 6-4-2012

–7–

Int. Cl.: 9

Prior U.S. Cls.: 21, 23, 26, 36 and 38

## United States Patent and Trademark Office

Reg. No. 2,639,556
Registered Oct. 22, 2002

## TRADEMARK
### PRINCIPAL REGISTER

## ANDROID DATA

ANDROID DATA CORPORATION (ILLINOIS
    CORPORATION)
114 NORTH ASHLAND AVENUE
PALATINE, IL 60067

FOR: COMPUTER E-COMMERCE SOFTWARE
TO ALLOW USERS TO PERFORM ELECTRONIC
BUSINESS TRANSACTIONS VIA A GLOBAL COM-
PUTER NETWORK, IN CLASS 9 (U.S. CLS. 21, 23, 26,
36 AND 38).

FIRST USE 1-1-1999; IN COMMERCE 1-1-1999.

NO CLAIM IS MADE TO THE EXCLUSIVE
RIGHT TO USE "DATA", APART FROM THE
MARK AS SHOWN.

SER. NO. 78-011,167, FILED 6-4-2000.

FLORENTINA BLANDU, EXAMINING ATTORNEY

# UNITED STATES PATENT AND TRADEMARK OFFICE

**SERIAL NO:**   77/318565

**MARK:** ANDROID

**CORRESPONDENT ADDRESS:**
    GOOGLE INC.
    GOOGLE INC.
    1600 AMPHITHEATRE PKWY
    MOUNTAIN VIEW, CA 94043-1351

# *77318565*

**RESPOND TO THIS ACTION:**
http://www.uspto.gov/teas/eTEASpageD.htm

**GENERAL TRADEMARK INFORMATION:**
http://www.uspto.gov/main/trademarks.htm

**APPLICANT:**   Google Inc.

**CORRESPONDENT'S
REFERENCE/DOCKET NO:**
    N/A
**CORRESPONDENT E-MAIL ADDRESS:**
    trademarks@google.com

## OFFICE ACTION

TO AVOID ABANDONMENT, THE OFFICE MUST RECEIVE A PROPER RESPONSE TO THIS OFFICE ACTION WITHIN 6 MONTHS OF THE ISSUE/MAILING DATE.

**ISSUE/MAILING DATE:** 8/20/2008

**THIS IS A FINAL ACTION.**

This letter responds to the applicant's communication filed on August 14, 2008. The applicant (1) argued against the refusal to register the mark under Section 2(d), (2) amended the identification of goods, and (3) stated that the term ANDROID has no meaning other than as a trademark.

The following requirement has been satisfied: (1) Significance of the Mark. TMEP §§713.02, 714.04.

The following requirement has been satisfied: (1) Significance of the Mark.  TMEP §§713.02, 714.04.

For the reasons set forth below, the refusal under Trademark Act Section 2(d) is now made **FINAL** with respect to U.S. Registration No. 2639556. *See* 15 U.S.C. §1052(d); 37 C.F.R. §2.64(a).  In addition, the following requirement is now made **FINAL**: (1) Identification of Goods.  *See* 37 C.F.R. §2.64(a).

## Refusal: Section 2(d) – Likelihood of Confusion Refusal

Registration was refused under Trademark Act Section 2(d), 15 U.S.C. Section 1052(d), because the mark for which registration is sought so resembles the mark shown in U.S. Registration No. 2639556 as to be likely, when used in connection with the identified goods, to cause confusion, or to cause mistake, or to deceive.

The examining attorney has considered the applicant's arguments carefully but has found them unpersuasive. For the reasons below, the refusal under Section 2(d) is maintained and is now made **FINAL**.

The applicant applied to register the mark ANDROID in standard character form for "mobile device hardware and peripherals; operating system software; software for use in developing, executing, and running other software on mobile devices, computers, computer networks, and global communication networks; computer software development tools; computer software for use in transmitting and receiving data over computer networks and global communication networks; computer software for managing communications and data exchange among and between mobile devices and desktop computers; computer middleware, namely, software that mediates between the operating system of a mobile device and the application software of a mobile device; computer application software for mobile devices." The registered mark is ANDROID DATA in typed form for "computer e-commerce software to allow users to perform electronic business transactions via a global computer network."

Taking into account the relevant *du Pont* factors, a likelihood of confusion determination in this case involves a two-part analysis.  The marks are compared for similarities in their appearance, sound, connotation and commercial impression. TMEP §§1207.01, 1207.01(b).  The goods and/or services are compared to determine whether they are similar or commercially related or travel in the same trade channels. *See Herbko Int'l, Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 1164-65, 64 USPQ2d 1375, 1380 (Fed. Cir. 2002); *Han Beauty, Inc. v. Alberto-Culver Co.*, 236 F.3d 1333, 1336, 57 USPQ2d 1557, 1559 (Fed. Cir. 2001); TMEP §§1207.01, 1207.01(a)(vi).

## Comparison of the Marks

Regarding the first prong of the test, although a disclaimed portion of a mark certainly cannot be ignored, and the marks must be compared in their entireties, one feature of a mark may be more significant in creating a commercial impression. Disclaimed matter is typically less significant or less dominant when comparing marks. *See In re Dixie Rests. Inc.*, 105 F.3d 1405, 1407, 41 USPQ2d 1531, 1533-34 (Fed. Cir. 1997); *In re Nat'l Data Corp.*, 753 F.2d 1056, 1060, 224 USPQ 749, 752 (Fed. Cir. 1985); TMEP §1207.01(b)(viii), (c)(ii). Here, the registrant has disclaimed the wording DATA. Therefore, the examining attorney must closely examine the dominant portion of the registrant's mark against the applicant's mark.

The dominant portion of the registrant's mark and the applicant's mark are the identical term

ANDROID. Thus, the dominant portion of the registrant's mark and the applicant's mark are identical with respect to sound, appearance, and commercial impression. Marks may be confusingly similar in appearance where there are similar terms or phrases or similar parts of terms or phrases appearing in both applicant's and registrant's mark. *See Crocker Nat'l Bank v. Canadian Imperial Bank of Commerce*, 228 USPQ 689 (TTAB 1986), *aff'd sub nom. Canadian Imperial Bank of Commerce v. Wells Fargo Bank, Nat'l Ass'n*, 811 F.2d 1490, 1 USPQ2d 1813 (Fed. Cir. 1987) (COMMCASH and COMMUNICASH); *In re Phillips-Van Heusen Corp.*, 228 USPQ 949 (TTAB 1986) (21 CLUB and "21" CLUB (stylized));*In re Corning Glass Works*, 229 USPQ 65 (TTAB 1985) (CONFIRM and CONFIRMCELLS); *In re Collegian Sportswear Inc.*, 224 USPQ 174 (TTAB 1984) (COLLEGIAN OF CALIFORNIA and COLLEGIENNE); *In re Pellerin Milnor Corp.*, 221 USPQ 558 (TTAB 1983) (MILTRON and MILLTRONICS); *In re BASF A.G.*, 189 USPQ 424 (TTAB 1975) (LUTEXAL and LUTEX); TMEP §1207.01(b)(ii)-(iii).

The question is not whether people will confuse the marks, but whether the marks will confuse people into believing that the goods they identify come from the same source. *In re West Point-Pepperell, Inc.*, 468 F.2d 200, 201, 175 USPQ 558, 558-59 (C.C.P.A. 1972); TMEP §1207.01(b). For that reason, the test of likelihood of confusion is not whether the marks can be distinguished when subjected to a side-by-side comparison. The question is whether the marks create the same overall impression. *See Recot, Inc. v. M.C. Becton*, 214 F.2d 1322, 1329-30, 54 USPQ2d 1894, 1899 (Fed. Cir. 2000); *Visual Info. Inst., Inc. v. Vicon Indus. Inc.*, 209 USPQ 179, 189 (TTAB 1980). The focus is on the recollection of the average purchaser who normally retains a general rather than specific impression of trademarks. *Chemetron Corp. v. Morris Coupling & Clamp Co.*, 203 USPQ 537, 540-41 (TTAB 1979); *Sealed Air Corp. v. Scott Paper Co.*, 190 USPQ 106, 108 (TTAB 1975); TMEP §1207.01(b).

Considering the above, the marks are sufficiently similar to cause a likelihood of confusion under Trademark Act Section 2(d).

## Comparison of the Goods

Turning to the second prong of the test, the goods of the parties need not be identical or directly competitive to find a likelihood of confusion. *See Safety-Kleen Corp. v. Dresser Indus., Inc.*, 518 F.2d 1399, 1404, 186 USPQ 476, 480 (C.C.P.A. 1975); TMEP §1207.01(a)(i). Rather, they need only be related in some manner, or the conditions surrounding their marketing are such that they would be encountered by the same purchasers under circumstances that would give rise to the mistaken belief that the goods come from a common source. *In re Total Quality Group, Inc.*, 51 USPQ2d 1474, 1476 (TTAB 1999); TMEP §1207.01(a)(i); *see, e.g., On-line Careline Inc. v. Am. Online Inc.*, 229 F.3d 1080, 1086-87, 56 USPQ2d 1471, 1475-76 (Fed. Cir. 2000); *In re Martin's Famous Pastry Shoppe, Inc.*, 748 F.2d 1565, 1566-68, 223 USPQ 1289, 1290 (Fed. Cir. 1984).

The registrant is providing e-commerce software. This software can be used on the applicant's mobile device hardware and peripherals. Furthermore, the registrant's software may be executed by the applicant's "software for use in developing, executing, and running other software on mobile devices, computers, computer networks, and global communication networks." Thus, the goods are related and conditions surrounding their marketing are such that they would be encountered by the same purchasers under circumstances that would give rise to the mistaken belief that the goods come from a common source.

Furthermore, the applicant's "computer software for use in transmitting and receiving data over computer networks and global communication networks" is broad enough to include the applicant's e-commerce software. Likelihood of confusion is determined on the basis of the goods and/or services as they are identified in the application and registration. *Hewlett-Packard Co. v. Packard Press Inc.*, 281 F.3d 1261, 1267-68, 62 USPQ2d 1001, 1004-05 (Fed. Cir. 2002); *In re Shell Oil Co.*, 992 F.2d 1204, 1207 n.4, 26 USPQ2d 1687, 1690 n.4 (Fed. Cir. 1993); TMEP §1207.01(a)(iii). In this case, applicant's goods are identified broadly. Therefore, it is presumed that the application encompasses all goods of the type described, including those in the registrant's more specific identification, that they move in all normal channels of trade, and that they are available to all potential customers. *See* TMEP §1207.01(a)(iii); *see, e.g., In re Americor Health Servs.*, 1 USPQ2d 1670, 1670-71 (TTAB 1986); *In re Equitable Bancorporation*, 229 USPQ 709, 710 (TTAB 1986).

Finally, the Trademark Trial and Appeal Board has held that computer hardware products are related to computer software products, such that their marketing under the same or similar marks may be likely to cause source confusion. *See In re Emulex Corp.*, 6 USPQ2d 1312 (TTAB 1987) (holding JAVELIN for computer peripheral software storage unit likely to be confused with JAVELIN for "prerecorded computer programs in machine readable form"); *In re TIE/Commc'ns, Inc.*, 5 USPQ2d 1457 (TTAB 1987) (holding DATA STAR likely to cause confusion when used in connection with both registrant's "computer programs recorded on magnetic media" and applicant's "voice/data communications terminals and parts thereof"); *In re Digital Research Inc.*, 4 USPQ2d 1242 (TTAB 1987) (holding CONCURRENT PC-DOS likely to be confused with CONCURRENT TECHNOLOGIES CORPORATION for "printed electronic circuit boards");*In re Epic Sys. Corp.*, 228 USPQ 213 (TTAB 1985) (holding EPIC for computer software for use in health care facilities likely to be confused with EPIC DATA for "electronic data collection terminals and electronic data collection units");*In re Teradata Corp.*, 223 USPQ 361 (TTAB 1984) (holding Y NET for computer hardware likely to be confused with XYNET for computer software); *In re Compagnie Internationale Pour L'Informatique-Cii Honeywell Bull*, 223 USPQ 363 (TTAB 1984) (holding QUESTAR for computer hardware likely to be confused with QUESTAN for computer programs); *In re Graphics Tech. Corp.*, 222 USPQ 179 (TTAB 1984) (holding AGILE for computer programs likely to be confused with AGILE for computer data terminals); *Alpha Indus., Inc. v. Alpha Microsystems*, 220 USPQ 67 (TTAB 1983) (holding ALPHA MICRO for digital computer equipment and programs likely to be confused with ALPHA MICROWAVE for microwave components and sub assemblies); *see also Octocom Sys. Inc. v. Houston Computer Servs., Inc.*, 918 F.2d 937, 16 USPQ2d 1783 (Fed. Cir. 1990) (affirming TTAB decision on summary judgment that found computer modems and computer programs highly related); *cf. In re Quadram Corp.*, 228 USPQ 863 (TTAB 1985).

## Applicant's Arguments

The applicant argues that no likelihood of confusion exists because the registrant is no longer using the mark as evidenced by their lack of presence currently on the Internet. Furthermore, the applicant has provided documents showing that the registrant's corporate entity was involuntarily dissolved in May, 2004.

However, while these statements may be true, a trademark or service mark registration on the Principal Register is prima facie evidence of the validity of the registration and the registrant's exclusive right to use the mark in commerce in connection with the specified goods and/or services. *See* 15 U.S.C. §1057(b); TMEP §1207.01(d)(iv). Evidence that constitutes a collateral attack on a cited registration, such as statements about a registrant's nonuse of its mark, is not relevant to a likelihood of confusion

determination in ex parte examination. *See In re Dixie Rests.*, 105 F.3d 1405, 1408, 41 USPQ2d 1531, 1534-35 (Fed. Cir. 1997); *In re Peebles Inc.*, 23 USPQ2d 1795, 1797 n.5 (TTAB 1992); TMEP §1207.01(d)(iv). Such evidence may, however, be pertinent to a formal proceeding before the Trademark Trial and Appeal Board to cancel the cited registration.

## Conclusion

The applicant's mark must be refused registration under Trademark Act Section 2(d). The applicant's mark is highly similar to the registrant's mark with respect to sound, appearance, and commercial impression. Both marks share the dominant term ANDROID. Furthermore, the applicant's goods are closely related to the registrant's goods and commonly emanate from the same source as the registrant's goods. As such, the refusal is maintained and is now made **FINAL**.

### Requirement: Identification of Goods

The examining attorney informed the applicant that the identification of goods was indefinite and must be clarified because it was too broad. It was noted that applicant may adopt the following identification, if accurate:

**International Class 009:** *Computer* hardware; *Computer* software *for {specify the function of the programs, e.g., use in database management, use as a spreadsheet, word processing, etc. and, if software is content- or field-specific, the content or field of use}.*

The applicant responded and amended the identification to the following:

**International Class 009:** Mobile device hardware and peripherals; operating system software; software for use in developing, executing, and running other software on mobile devices, computers, computer networks, and global communication networks; computer software development tools; computer software for use in transmitting and receiving data over computer networks and global communication networks; computer software for managing communications and data exchange among and between mobile devices and desktop computers; computer middleware, namely, software that mediates between the operating system of a mobile device and the application software of a mobile device; computer application software for mobile devices.

However, the identification of goods remains indefinite because portions of the identification are too broad. Applicant may adopt the following identification of goods, if accurate:

**International Class 009:** Mobile device hardware and peripherals, *namely, {state the specific hardware and peripherals, i.e. devices for hands-free use of mobile phones, mobile phones, etc.};* operating system software; software for use in developing, executing, and running other software on mobile devices, computers, computer networks, and global communication networks; computer software development tools; computer software for use in transmitting and receiving data over computer networks and global communication networks; computer software for managing communications and data exchange among and between mobile devices and desktop computers; computer middleware, namely, software that mediates between the operating system of a mobile device and the application software of a mobile device; computer application software for mobile devices, *namely mobile phones.*

Identifications of goods can be amended only to clarify or limit the goods; adding to or broadening the scope of the goods is not permitted. 37 C.F.R. §2.71(a); *see* TMEP §§1402.06 *et seq.*, 1402.07. Therefore, applicant may not amend the identification to include goods that are not within the scope of the goods set forth in the present identification.

For assistance with identifying and classifying goods and/or services in trademark applications, please see the online searchable *Manual of Acceptable Identifications of Goods and Services* at

http://tess2.uspto.gov/netahtml/tidm.html. *See* TMEP §1402.04.

Since the applicant failed to provide an acceptable identification of goods, this requirement is maintained and is now made **FINAL**.

## Response Guidelines

If applicant does not respond within six months of the mailing date of this final Office action, the application will be abandoned. 15 U.S.C. §1062(b); 37 C.F.R. §2.65(a). Applicant may respond to this final Office action by:

> (1)     Submitting a response that fully satisfies all outstanding requirements, if feasible; and/or

> (2)     Filing an appeal to the Trademark Trial and Appeal Board, with an appeal fee of $100 per class.

37 C.F.R. §§2.6(a)(18), 2.64(a); TBMP ch. 1200; TMEP §714.04.

In certain rare circumstances, a petition to the Director may be filed pursuant to 37 C.F.R. §2.63(b)(2) to review a final Office action that is limited to procedural issues. 37 C.F.R. §2.64(a); TMEP §714.04; *see* 37 C.F.R. §2.146(b); TBMP §1201.05; TMEP §1704 (explaining petitionable matters). The petition fee is $100. 37 C.F.R. §2.6(a)(15).
If applicant has questions about its application, please telephone the assigned trademark examining attorney directly at the number below.

> /Seth A. Rappaport/
> Seth A. Rappaport
> Trademark Examining Attorney
> Law Office 103
> Phone: (571) 270-1508
> Fax: (571) 270-2508

**RESPOND TO THIS ACTION:** Applicant should file a response to this Office action online using the form at http://www.uspto.gov/teas/eTEASpageD.htm, waiting 48-72 hours if applicant received notification of the Office action via e-mail. For *technical* assistance with the form, please e-mail TEAS@uspto.gov. For questions about the Office action itself, please contact the assigned examining attorney. **Do not respond to this Office action by e-mail; the USPTO does not accept e-mailed responses.**

If responding by paper mail, please include the following information: the application serial number, the mark, the filing date and the name, title/position, telephone number and e-mail address of the person signing the response. Please use the following address: Commissioner for Trademarks, P.O. Box 1451, Alexandria, VA 22313-1451.

 **Google Permissions**

Home

About Google

Google Permissions
  Guidelines
  Maps/Earth Guidelines
  Brand Terms

Press Center
Contact Us

## Guidelines for Third Party Use of Google Brand Features

### Use of Google Brand Features

#### General Information

Although we'd like to accommodate all the requests we receive from users who want to add a touch of Google to their sites, we are passionate about protecting the reputation of our brand as an objective and fair provider of search results. That means we have to turn down many requests because sites imply that Google is endorsing them or is otherwise affiliated with them. The same applies if Google's trademarks, logos, web pages, screen shots, or other distinctive features ("Google Brand Features" or "Brand Features") are associated with objectionable material, as determined by Google.

These Brand Features can be used only pursuant to these Guidelines, our Terms and Conditions, and for the specific purposes for which Google has given permission. If you have a written agreement with Google that specifically addresses how you may use its Brand Features, you don't need to go through the approval process here unless you want to do something other than what has been authorized in your existing agreement. Otherwise, the only time you can use Brand Features without advance written permission is if there is clear and express language on our website stating that you can use those Brand Features without first obtaining permission, such as is the case with our search boxes.

When you use any of our Brand Features, you must always follow the Rules for Proper Usage included in these Guidelines. In addition, Google may provide you with written requirements as to the size, typeface, colors, and other graphic characteristics of the Google Brand Features. If we provide these requirements to you at the time of our approval, you must implement them before using our Brand Features. If we provide these requirements to you after we initially gave our permission, you must implement them within a commercially reasonable timeframe.

### Trademark Basics

#### What is a trademark?

A trademark is a word, name, symbol or device (or a combination thereof) that identifies the goods or services of a person or company and distinguishes them from the goods and services of others. A trademark assures consumers of consistent quality with respect to those goods or services and aids in their promotion.

#### Why is it important to use marks correctly?

Rights to a trademark can last indefinitely if the owner continues to use the mark to identify its goods and services. If trademarks are not used properly, they may be lost and one of the company's most important assets may lose all of its value. Rights may be lost not only because of a trademark owner's improper use of the mark, but through improper use of the trademark by the public.

### Rules for Proper Usage

#### Things to do:

- If you are using a Google trademark, distinguish the trademark from the surrounding text in some way. Capitalize the first letter, capitalize or italicize the entire mark, place the mark in quotes, use a different type style or font for the mark than for the generic name.

- If you do not capitalize the entire mark, always spell and capitalize the trademark exactly as they are shown in the Google Trademarks and Suggested Accepted Generic Terms below

TT's Exhibit 1

- Use the trademark only as an adjective, never as a noun or verb, and never in the plural or possessive form.

- Use a generic term following the trademark, for example: GOOGLE search engine, Google search, GOOGLE web search.

- Use only Google-approved artwork when using Google's logos.

- If you are using a Google logo on a web page, there must exist a minimum spacing of 25 pixels between each side of the logo and other graphic or textual elements on your web page

- Normally, an unregistered Google Brand Feature should be followed by the superscripted letters TM or SM to give notice that the company claims trademark rights in the term. A registered Google Brand Feature should be followed by the symbol ® to identify the term as a registered trademark. In advertising copy, notice of trademark rights may be provided in a footnote format – e.g., by placing an asterisk adjacent to the Google Brand Feature and placing an appropriate notice at the bottom of the page on which the asterisk appears. Example: *GOOGLE is a trademark of Google Inc.

### Things You Can't Do

- One of the conditions for all uses is that you can't mess around with our marks. Only we get to do that. Don't remove, distort or alter any element of a Google Brand Feature. That includes modifying a Google trademark, for example, through hyphenation, combination or abbreviation, such as: Googliscious, Googlyoogly, GaGooglemania. Do not shorten, abbreviate, or create acronyms out of Google trademarks.

- Don't display a Google Brand Feature as the most prominent element on your web page

- Don't display a Google Brand Feature in any manner that implies a relationship or affiliation with, sponsorship, or endorsement by Google, or that can be reasonably interpreted to suggest editorial content has been authored by, or represents the views or opinions of Google or Google personnel.

- Don't display a Google Brand Feature on any web site that contains or displays adult content, promotes gambling, involves the sale of tobacco or alcohol to persons under twenty-one years of age, or otherwise violates applicable law.

- Don't display a Google Brand Feature in a manner that is in Google's sole opinion misleading, unfair, defamatory, infringing, libelous, disparaging, obscene or otherwise objectionable to Google.

- Don't display a Google Brand Feature on a site that violates any law or regulation

- Don't frame or mirror any Google page (including the page that appears in response to a click on the Google logo or Google search box).

- Don't incorporate Google Brand Features into your own product name, service names, trademarks, logos, or company names.

- Don't copy or imitate Google's trade dress, including the look and feel of Google web design properties or Google brand packaging, distinctive color combinations, typography, graphic designs, product icons, or imagery associated with Google

- Don't adopt marks, logos, slogans, or designs that are confusingly similar to our Brand Features

- Don't register Google trademarks as second-level domain names.

- Don't use Google trademarks in a way that suggests a common, descriptive, or generic meaning.

- Trademark rights vary from country to country. Some countries have severe criminal and civil

penalties for improper use of the registration symbol. Therefore, don't use the registration symbol (®) in countries where the mark has not been registered.

If there is any question about usage, requests for clarification or permission may be submitted through the process outlined at: http://www.google.com/permissions/.

## Google Trademarks and Suggested Accepted Generic Terms

The following are some of the trademarks owned by Google Inc. and the suggested generic terms for those trademarks.

- AdSense™ advertising service
- AdSense For Content™ program
- AdSense For Domains™ program
- AdSense For Print™ program
- AdSense For Search™ program
- AdWords™ advertising service
- AdWords Authorized Resellers™ program
- AdWords Editor™ campaign management application
- Android™ mobile technology platform
- Blogger™ web publishing service
- Broadcast Yourself™ service
- Citizentube™ channel
- Claim Your Content™ content monitoring tool
- Closed Log Avails™ tool
- Dalvik™ virtual machine
- Dmarc™ advertising service
- Dodgeball™ social networking service
- Feedburner™ services
- Feedflare™ service
- Gmail™ webmail service
- Goog 411™ service
- Google™ search or search engine
- Google Ad Manager For Advertisers™ service
- Google Adsense™ advertising program
- Google Advertising Professionals™ program
- Google Adwords™ advertising program
- Google Alerts™ email update service
- Google Analytics™ web analytics service
- Google Answers™ research service
- Google App Engine™ platform
- Google Apps™ service

- Google Audio Ads™ service
- Google Base™ online database
- Google Blog™ weblog
- Google Blog Search™ service
- Google Book Search™ service
- Google Calendar™ calendaring service
- Google Catalogs™ catalog search
- Google Chart Api™ product
- Google Checkout™ payment and billing service
- Google Code™ open source developer site
- Google Code Search™ search engine
- Google Compute™ feature
- Google Content Network™ service
- Google Co-Op™ platform
- Google Custom Search™ service
- Google Custom Search Engine™ service
- Google Dashboard Widgets™ software
- Google Data Api™ protocol
- Google Desktop™ searching software
- Google Desktop Search™ search tool
- Google Diary™ product
- Google Directory™ web directory
- Google Docs™ program
- Google Earth™ mapping service
- Google Enterprise™ products
- Google Extensions™ for Firefox software
- Google Finance™ financial information service
- Google Foundation™ non-profit organization
- Google Friend(S) ™ newsletter
- Google Gadget Ads™ technology
- Google Gadget Center™ web page
- Google Gadgets™ technology
- Google Gears™ open source browser
- Google Glossary™ glossary service
- Google Grants™ program
- Google Groups™ usernet discussion forums
- Google Health™ program
- Google Image Search™ service

- Google Labs™ research division
- Google Mail™ webmail service
- Google Maps™ mapping service
- Google Mars™ mapping service
- Google Message Discovery™ email product
- Google Message Encryption™ email product
- Google Message Filtering™ email product
- Google Message Security™ email product
- Google Mini™ hardware
- Google Mobile™ wireless service
- Google Mobile Ads™ service
- Google Mobile Updater™ application
- Google Music Search™ service
- Google Music Trends™ service
- Google News™ news service
- Google News Alerts™ service
- Google Notebook™ tool
- Google Pack™ software download service
- Google Page Creator™ tool
- Google Patent Search™ service
- Google Personalized Search™ service
- Google Print Ads™ advertising program
- Google Product Search™ price comparison service
- Google Profiles™
- Google Reader™ feed reader
- Google Ride Finder™ taxi service
- Google Safe Browsing™ api
- Google Safesearch™ filtering
- Google Scholar™ scholarly texts search
- Google Search Appliance™ hardware
- Google Sets™ set prediction service
- Google Sidebar™ software
- Google Site Search™ service
- Google Sitemaps™ service
- Google Sites™ web application
- Google Sky™ program
- Google Sms™ mobile messaging service
- Google Store™ online store

- Google Suggest™ suggestion service
- Google Talk™ instant messaging service
- Google Toolbar™ search bar
- Google Transit™ trip planning service
- Google Translate™ translation service
- Google Trends™ tool
- Google TV Ads™ advertising program
- Google Updater™ application
- Google US Government Search™ service
- Google Video™ video search
- Google Voice™ communications service
- Google Web Accelerator™ software
- Google Web Alerts™ service
- Google Web Search™ features
- Google Web Security™ for Enterprise product
- Google Web Toolkit™ open source Java software development framework
- Google Webmaster Central™ landing page
- Google Website Optimizer™ tool
- Google Zeitgeist™ report
- Google ノートブック™ product
- Google 노트™ product
- Google 笔记本™ product
- Google 筆記本™ product
- Google 问答™ feature
- Google.Org™ non-profit foundation
- Googleモバイル 検索メール™ product
- Google 热榜™ service
- Google 网站导航™ product
- Grandcentral™ communications service
- iGoogle™ personalized homepage
- I'm Feeling Lucky™ search service
- Jaiku™ service
- Joga™ online community
- Keyhole™ mapping service
- Knol™ project or website
- Listen In™ feature
- Maestro™ audio systems
- Measure Map™ web analytics service

- One Number...For Life™ service
- Open Handset Alliance™ business alliance
- Opensocial™ developer api
- Orkut™ online community
- Pagerank™ algorithm
- Panoramio™ photo-sharing community
- Picasa™ photo organizing software
- Postini™ email solutions
- Recharge It™ Google.org car program
- Ringshare™ feature
- Sketchup™ sketching software
- Songnow™ channel
- Trendalyzer™ software
- Universal Search™ vision
- Urchin™ web analytics service
- YouTube™ user-generated content website
- YouTube Screening Room™ program
- Zingku™ service
- 出口易™ product
- 来吧™ product
- 生活搜索™ product
- 谷歌搜索联盟™ feature
- 谷歌来吧™ product
- 谷歌热榜™ service
- 谷歌生活搜索™ product

©2009 Google - Home - About Google





**May 27 - 28, 2009 Moscone Center, San Francisco**

About

Sessions

Speakers

Developer Sandbox

Location

Register

FAQ

### Join us at Google's largest developer gathering

For two days in May, thousands of web developers will come together to learn how to develop web applications with Google and open technologies. Learn from product experts about Android, App Engine, Chrome, Google Web Toolkit, AJAX APIs and more. Engage with a community of excited developers just like you.

Register

©2009 Google Code Home - Terms of Service - Privacy

# GPS Obsessed

GPS, Location-Based Apps, And Everything Else Navigational
Search for:

- Home
- Store
- About
- Forum

## Garmin Android Handsets Coming In 2H 2009

**GPS Personal Tracking**
Track autos or loved ones with the most affordable
GPS on the market
www.globaltrackinggroup.com

**Garmin Nuvi - Big Sale**
Stop! Don't pay too much on your new Garmin Nuvi
System. Save Now
Garmin.Become.com/Nuvi

**REI Sale: Up to 30% off**
Storewide savings - May 1-10. Plus Members save
20% on 1 non sale item
www.REI.com

Ads by Google

0
tweets

retweet

GARMIN

Digitimes is reporting that Garmin is planning on releasing Android handset
in the second half of 2009. It's no surprise really. Recently the world's number one selling portable
navigation device maker joined the Android-supporting Open Handset Alliance. The company will also be
releasing the long-delayed Garmin nuviphone in the first quarter of 2009 as it attempts to increase its
product roster as PND prices crash through the floor. According to Garmin's Asia Pacific marketing
director Tony An, the Android handsets will be self-developed but the hardware manufacturing will be
outsourced. No partners were named nor were any specs detailed but it's likely given current market forces
that they'll be touchscreen devices heavily focused on GPS navigation.

Despite the fact that Garmin is a new player in the smartphone market, its timing may be just right. The
nuviphone will run on a low-cost Linux-based operating system and its Android handsets should cost
virtually nothing to produce. Even a year ago, the costs for Garmin to enter the mobile market would have
been substantially higher.

And while some will likely argue that Garmin doesn't have the experience to develop a user-friendly
handset like the iPhone, remember that the user interface used on Garmin's nuvi line is incredibly intuitive

and attractive. It's also very likely that Garmin's handsets will feature navigational specs that Apple's iPhone or T-Mobile's Android-based G1 don't currently offer--like turn-by-turn directions.

The terms of using Apple's SDK have prevented the addition of turn-by-turn directions to GPS applications--TomTom had an app in the works before the 3G iPhone's release and never made it into the app store. T-Mobile's G1 also doesn't have turn-by-turn directions built though recently an app called AndNav2 was released in alpha providing the feature. But I have no idea how effective it is.

I think that Garmin could be a force to be reckoned with in mobile.

ShareThis

## Related Points Of Interest

- December 22, 2008 -- Garmin Says Digitimes Got The Android Facts Wrong
- February 4, 2009 -- Garmin, ASUS form an alliance to produce nuviphone line. first nuviphone redubbed Garmin-ASUS nuviphone G60, another on the way
- January 5, 2009 -- Garmin nuviphone screenshot gallery...
- December 15, 2008 -- Garmin's nuviphone Cuts Through FCC Like A Knife. AT&T Looks To Be The Carrier
- December 2, 2008 -- Mio Launching GPS-Packin' WinMo Handset. Mobile Internet Device 2009

Ads by Google

# <u>Find Todays Top GPS Deals</u>

We search the web to find deals on Garmin Gps Systems

### dealnews.com/gps-deals

Tags: garmin android, garmin nuviphone

This entry was posted on Monday, December 22nd, 2008 at 11:52 am and is filed under Android, Garmin, Mobile. You can follow any responses to this entry through the RSS 2.0 feed. You can leave a response, or trackback from your own site.



## Add New Comment



# BusinessWeek

TELECOMMUNICATIONS April 30, 2009, 6:40PM EST

# Motorola: Android Help on the Way

By yearend, the U.S. handset maker plans to roll out several smartphones based on the Android operating system spearheaded by Google

By Olga Kharif

Motorola's first-quarter results gave investors scant cause for glee. In the period that ended in March, Motorola smarted from a lack of customer-pleasing handsets and a loss of market share to rivals.

But Motorola (MOT) executives tried to reassure analysts and shareholders that hope is on the way—in the form of handsets sporting software created by a Google-led consortium. Before yearend, Motorola plans to introduce several mid- to high-end smartphones based on the Android operating system developed by the Google (GOOG)-backed Open Handset Alliance. "We remain on track to having Android devices in the fourth quarter, for the holiday season," Motorola co-CEO Sanjay Jha said during a conference call with investors.

The right handsets could be a salve for a company that for several years has failed to follow its best-selling Razr with equally enticing devices. Specs and photos of several handsets believed to be Motorola's Android prototypes have recently surfaced on the Web. One, reportedly code-named Calgary, features a slide-out Qwerty keyboard and a touchscreen. Another, called Ironman, is a BlackBerry-like messaging device. "Some of the devices that have leaked to the Net are pretty compelling," says Ramon Llamas, a senior research analyst at consultant IDC. "To borrow a quote from the auto industry, 'This is not your father's Oldsmobile.' [These phones aren't] Razrs anymore."

## NO CONFIRMATION ON CALGARY

They better not be. Motorola declined to confirm that the Calgary and the Ironman are its new Android-based phones. "It is Motorola's policy not to comment on rumor or speculation," says spokeswoman Danielle McNally. However, Jha said during the call that Motorola's Android prototypes are getting a warm reception. "We are in detailed discussions with multiple carriers around the world about a few of our Android cell phones," Jha said. He added that the carriers that have seen the devices have provided "very positive" feedback.

Whether Motorola's bet on Android pays off should become clear in late 2009 or early 2010, says Mark McKechnie, an analyst at American Technology Research. "If they miss on Android, then the [money-losing] handset division is done," McKechnie says.

Motorola had to put on hold its plans to spin off the handset unit. The company is losing share to iPhone maker Apple (AAPL) and Research In Motion (RIMM), manufacturer of the BlackBerry. Competition will only stiffen in June, after the introduction of the widely anticipated Pre, by Treo maker Palm (PALM). Evidence of the share losses was widespread during the first quarter, when sales fell 28%, to $5.4 billion, missing analyst forecasts. Motorola's handset market share plummeted to 6%, based on figures released by the company. Two years ago, Motorola's global market share was about 18%.

Copyright 2000-2009 by The McGraw-Hill Companies Inc. All rights reserved.

The McGraw-Hill Com

 hTC

## Vodafone and HTC unveil Android-powered HTC Magic

- Vodafone extends world-class range of Internet phones with latest Android™-powered smartphone from HTC
- HTC Magic smartphone exclusive to Vodafone customers initially in UK, Spain, Germany and France (SFR) and non-exclusively in Italy. More countries to follow.
- Online registration for early information on pricing and availability now open for customers
- Android platform gives customers easy-to-access downloads from Vodafone and Android Market™

**BARCELONA — Feb 17, 2009 —** Vodafone and HTC Corporation today announced the HTC Magic smartphone, Vodafone's first Android-powered mobile, which will be available in the spring.

The stylish new handset is exclusive to Vodafone in the UK, Spain, Germany and France (SFR) and available on a non-exclusive basis in Italy. Customers can ensure that they are the first to receive information about the HTC Magic's availability, pricing and pre-ordering by registering their interest via their local Vodafone website from today.

The introduction of the HTC Magic is the result of a successful relationship between Vodafone and HTC, and Vodafone's joining, late last year, of the Open Handset Alliance.

A tablet-style device, with a sleek design and unprecedented compactness for a smartphone featuring the Android platform, the HTC Magic enables a superior mobile internet experience, providing broad flexibility for personalisation via the application-rich Android Market. Available in white in the UK, Spain and France, black in Germany and in both colours in Italy, the HTC Magic will be for sale in several other Vodafone markets over the next few months.

"Delivering an unbeatable mobile internet experience for our customers is a priority for Vodafone, so we are very excited to be introducing our first Android-powered smartphone in the spring," says Patrick Chomet, Global Director of Terminals, Vodafone Group. "Following our joining of the Open Handset Alliance, we have worked very closely with HTC to bring this cool new phone to the market. Our customers want to access a wide range of the most attractive mobile devices to help them make the most of their time - the HTC Magic helps meet that need."

"The HTC Magic embodies the compact style and sophistication for which HTC has come to be known, with the powerful and intuitive internet experience for which the Android platform was designed," says Peter Chou, president and CEO, HTC Corporation. "We are proud of our partnership with Vodafone and excited about making the Android-powered HTC Magic available to Vodafone customers in Europe."

"The announcement of the HTC Magic is an important step for Android and the Open Handset Alliance," says Andy Rubin, Senior Director of Mobile Platforms at Google. "With it, Vodafone is opening up the mobile web for consumers across Europe and giving more third-party developers a platform on which they can build the next wave of killer applications."

Available for free on various price plans, the HTC Magic has a 3.2" HVGA touch screen display and features a trackball and navigational buttons for quick, easy access. The HTC Magic includes a variety of email options such as Google Mail™, POP3 and IMAP as well as Google Talk™ for instant messaging.

The HTC Magic has a variety of powerful mobile internet capabilities beginning with an Android-optimised Webkit browser. It also features the popular Google™ applications, Google Maps™ and Google Search™ as well as favourites like YouTube™. In addition, Android Market allows for quick and easy downloading of games and applications utilising Vodafone's fast and reliable network.

Full details of availability and pricing will be available in the future in local Vodafone markets.

-ends-

**For further information please contact:**

Vodafone Group
Media Relations
Tel: 00 44 1635 664444

Image available on request and available for download from www.vodafone.com

Get daily updates at our Mobile World Congress Blog (http://barcelonablog.vodafone.com)
Visit our mobile site at http://vodafone.mobi

HTC Media Relations
Cristina Whittington (On behalf of HTC)
+442072294400
htcpr@nelsonbostock.com
Note: HTC Stand @ Mobile World Congress, 1B22 Hall 1
www.htc.com

Android, Android Market, YouTube, Google, Google Search, Google Maps, and Gmail are trademarks of Google Inc. All other company and product names may be trademarks of the companies with which they are associated.





# Acer Working on Several Android Devices

**Acer will ship an Android-based smartphone this year and is testing the software on several other devices**

## Dan Nystedt, IDG News Service
Wednesday, April 29, 2009 02:30 AM PDT



Acer is already working on several different devices using Google's Android operating system and software, and plans to launch a smartphone using the software later this year.

"The entire industry is looking at Android," said Acer president and CEO Gianfranco Lanci at the company's first-quarter investor's conference in Taipei on Wednesday.

"We are testing Android on a lot of different solutions," he said. "We are working on an Android solution for the smartphone, [but] I think it's too early to say if we're going to see Android on a netbook in the near future "

He said Android is "very, very good for communication and Web access and so on," but he's not sure yet if it's right for traditional PCs.

A smartphone with Android makes a lot more sense than a netbook with the OS, he said.

Google's Android software has become a popular topic due to its success so far in smartphones.

T-Mobile USA, the first mobile network operator globally to launch an Android handset, the G1 has sold one million of the smartphones in the first six months since it went on the market.

Although that's far less than the number of iPhones Apple sold in its first two quarters on the market, it's still a big start for a brand new operating system.

Several more Android smartphones have been announced recently, including a few more from the G1's developer, High Tech Computer (HTC), the first one from Samsung Electronics, and two for Far EasTone, a Taiwanese mobile network operator.

Netbooks are a new frontier for Android.

Hewlett-Packard earlier this year confirmed rumors that it had been testing Android on netbooks and China's Guangzhou Skytone Transmission Technologies said its Android netbook is undergoing final testing before it launches.

Developed by Google, Android is a smartphone operating system that is meant to make Web browsing easy, especially on Google sites such as YouTube and Google Maps. The majority of netbooks today use Microsoft's Windows XP OS.

*1998-2009, PC World Communications, Inc.*