**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ERICH SPECHT, an individual and doing business as ANDROID DATA CORPORATION, and THE ANDROID'S DUNGEON INCORPORATED, | ) ) ) | |
| | ) | Civil Action No. 09-cv-2572 |
| Plaintiffs/Counter-Defendants, | ) | |
| | ) | Judge Harry D. Leinenweber |
| v. | ) | |
| | ) | Magistrate Judge Jeffrey Cole |
| GOOGLE INC., | ) | |
| | ) | |
| Defendant/Counter-Plaintiff. | ) | |

**GOOGLE INC.'S ANSWER TO SECOND AMENDED COMPLAINT,
AFFIRMATIVE DEFENSES AND COUNTERCLAIMS**

Defendant GOOGLE INC. ("Google"), by and through its attorneys, hereby answers the

Second Amended Complaint ("SAC") of Plaintiffs ERICH SPECHT ("Specht"), an individual,

and doing business as ANDROID DATA CORPORATION ("ADC"), and THE ANDROID'S

DUNGEON INCORPORATED ("ADI"), collectively referred to hereinbelow as "Plaintiffs," as

follows:

**THE PARTIES**

1.      Plaintiff Specht is a resident of the Village of Palatine, Illinois.  ADC and ADI are

Illinois domestic corporations organized and existing under the laws of the State of Illinois and

having a principal place of business in the Village of Palatine, Illinois.

**ANSWER:**    Google has neither knowledge nor information sufficient to form a belief

as to the allegations of this paragraph and consequently denies same.

2.      Defendant Google is a Delaware corporation registered to do business as a foreign

corporation in Illinois.

**ANSWER:**    Admitted.

## JURISDICTION AND VENUE

3.      This is a civil action alleging trademark infringement and unfair competition arising under §§32 and 43 of the Lanham Act, 15 U.S.C. §§1114(1) (trademark infringement), 1125(a) (unfair competition), as well as a violation of the Illinois Deceptive Trade Practices Act, 815 ILCS 510/2, common law trademark infringement and contributory infringement.

**ANSWER:**   Google admits that this is a civil action and that the SAC purports to state claims under 15 U.S.C. §§ 1114(1) and 1125(a) and 815 ILCS 510/2, and claims for common law trademark infringement and contributory infringement, but denies that such claims have any basis in fact or law.

4.      This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. §1338(a), 28 U.S.C. §1338(b) and supplemental jurisdiction over the state law claims alleged herein under 28 U.S.C. §1367(a).  The court also has subject matter jurisdiction pursuant to 28 U.S.C.A. § 1332, because this action is between citizens of different States and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

**ANSWER:**   Google admits that this Court has subject matter jurisdiction over the claims asserted by Plaintiffs in the SAC.

5.      This Court has personal jurisdiction over Google because it maintains an office in Chicago, Illinois, has transacted business in this State, and it is registered to do business in Illinois.  The Court also has jurisdiction over Google pursuant to the Illinois long arm statute 735 ILCS 5/2-209(a)(2).

**ANSWER:**   Google admits that this Court has personal jurisdiction over it.

6.      Venue is proper in this district under 28 U.S.C. §1391(b) and (c).

**ANSWER:**   Without regard to specific subsection, Google Admits that venue is currently proper pursuant to 28 U.S.C. §1391.

## FACT COMMON TO ALL COUNTS

7.      Plaintiff ADC is an Illinois corporation in good standing.  It was incorporated on December 30, 1998, by Specht, its sole officer, director and shareholder.  At all relevant times, Specht has been an officer of ADC.

**ANSWER:**    Google has neither knowledge nor information sufficient to form a belief as to the allegations of this paragraph and consequently denies same.

8.      Plaintiff ADI is an Illinois corporation in good standing.  It was incorporated on March 5, 2001, by Specht, its sole shareholder.  At all relevant times, Specht has been an officer of ADI.

**ANSWER:**    Google has neither knowledge nor information sufficient to form a belief as to the allegations of this paragraph and consequently denies same.

9.      Plaintiff Specht is a software developer and internet application service provider.

**ANSWER:**    Google has neither knowledge nor information sufficient to form a belief as to the allegations of this paragraph and consequently denies same.

10.      Since at least 1999, Specht has developed and offered for sale computer software and hardware related products and services under the trademarks "Android Data," "Android Server" and "Android Data Web Editor" (collectively, the "Android Marks").  Plaintiffs hold copyrights filed with the United States Copyright Office on Android Server software and Android Data Web Editor software, which are versions of Specht's Android Data software suite, as well as Android Data - Version 5, the current version of the Android Data software product line.  Specht's Android Data software suite (the "Android Software") enables the remote administration of websites including secure data transfer, management and categorization of products, image processing, online surveys, email campaigns, document transformation, and the

like.  Computer hardware and software services offered by Plaintiffs include web page design, custom software application development, and consulting on software and hardware issues.

**ANSWER:**    Google has neither knowledge nor information sufficient to form a belief as to the allegations of this paragraph and consequently denies same.

11.    Plaintiff Specht, through his wholly owned corporation ADI, continues to use, develop and offer for sale the Android Software and related services under the Android Marks.

**ANSWER:**    Upon information and belief, Google denies the allegations in this paragraph.

12.    The Android Software implements advanced caching algorithms that allow for greater efficiency of web and database servers, and integrates on-line and off-line database servers.

**ANSWER:**    Google has neither knowledge nor information sufficient to form a belief as to the allegations of this paragraph and consequently denies same.

13.    Beginning in 1999, the Android Software was intended to and has been used in commerce by customers who transact hundreds of millions of dollars in worldwide transactions, including tens of millions in e-commerce over the worldwide web using the Android Software.

**ANSWER:**    Google has neither knowledge nor information sufficient to form a belief as to the allegations of this paragraph and consequently denies same.

14.    Specht chose the word "Android" for the Android Marks to communicate the seamless, almost robotic-like, bi-directional communication of data between a client and a data center in a remote location.

**ANSWER:**    Google has neither knowledge nor information sufficient to form a belief as to the allegations of this paragraph and consequently denies same.

15.     "Android Data" and the other Android Marks are inherently distinctive and/or have acquired distinctiveness through use.

**ANSWER:**   Denied.

16.     Specht is and has been further developing the Android Software as well as preparing to release additional software products in the near future under one or more of the Android Marks.

**ANSWER:**   Google has neither knowledge nor information sufficient to form a belief as to the allegations of this paragraph and consequently denies same.

17.     On June 4, 2000, Specht, on behalf of ADC, filed an application with the United States Patent and Trademark Office (the "PTO") for the mark "Android Data" (Serial No. 78011167).  A copy of the application is attached hereto as Exhibit A.

**ANSWER:**   Google has neither knowledge nor information sufficient to form a belief as to the allegations of this paragraph and consequently denies same.

18.     On October 22, 2002, the PTO granted ADC's registration of the mark "Android Data" on the Principal Register, Registration No. 2,639,556.  Registration No. 2,639,556 is prima facie evidence of the validity and ownership of, and is constructive notice of ownership of the Android Data mark as provided by 15 U.S.C. §§1057(b) and 1072.  As a condition of approval, the PTO required that the following language be inserted into the application: "No claim is made to the exclusive right to use 'Data,' apart from the mark as shown." This language indicates that the dominant word in the mark is "Android" with "Data" being a descriptive or non-dominant word.  As stated in Registration No. 2,639,556, the Android Data mark identifies "computer e-commerce software to allow users to perform electronic business transactions via global

computer network," in International Class 9 (U.S. Classes 21, 23, 26, 36, and 38).   A copy of Registration No. 2,639,556 is attached hereto as Exhibit B.

**ANSWER:**   Google has neither knowledge nor information sufficient to form a belief as to the allegations of this paragraph and consequently denies same.

19.   Effective on or about December 26, 2002, ADC transferred ownership of the Android Software and Android Marks to ADI.

**ANSWER:**   Denied.

20.   On December 1, 2003, thirteen months after the PTO granted Registration No. 2,639,556 for the Android Data mark, Andy Rubin ("Rubin") founded a company called Fotofarm, Inc., for the purpose of creating a digital camera.   On February 12, 2004, Fotofarm, Inc. registered to do business in the State of California.   Unable to secure venture capital funding, Rubin tabled the digital camera idea and went to work on an open source platform for mobile phone devices which he called Android (the "Android Platform").

**ANSWER:**   Google admits that Andy Rubin founded a company called FotoFarm, Inc. for the purpose of creating a platform for cameras.   Google denies any other allegations of this paragraph.

21.   In 2004, Rubin assembled a group of engineers including Andrew McFadden ("McFadden") and Chris White ("White"), whom Rubin had worked with at Web TV, and product planners including Nick Sears ("Sears") and Rich Miner ("Miner"), whom Rubin had worked with while he was at Danger, Inc. (the foregoing individuals are collectively referred to herein as the "Android cofounders").   On or about June 18, 2004, Fotofarm, Inc. changed its name to Android Research, Inc.   On or about April 6, 2005, Android Research, Inc. changed its

name to Android, Inc.  At all times, Rubin was the Chief Executive Officer of Android, Inc. and its predecessor companies (hereinafter, "Android, Inc.").

**ANSWER:**   Google admits that Andy Rubin, Chris White, Nick Sears and Rich Miner were involved with the founding of Android, Inc.; that Fotofarm, Inc. changed its name to Android Research, Inc.; that Android Research, Inc. changed its name to Android, Inc.; and that Andy Rubin was the Chief Executive Office of Android, Inc.   Google denies any other allegations of this paragraph.

22.    Beginning in 2004, Android Research, Inc. began using the Android name in commerce when it solicited funding in the form of venture capital for Android, including $100,000 invested by Steve Perlman, whom Rubin, White and McFadden had previously worked with at Web TV; negotiated a partnership deal with Clearwire, a wireless broadband internet service provider, and its CEO, Craig McCaw; and negotiated a sale of the Android Platform to Google.  In or about July, 2005, Google acquired Android, Inc. and, thereafter, the Android cofounders went to work for Google.

**ANSWER:**   Google admits that it acquired Android, Inc. in or about July 2005 and that the "Android cofounders" thereafter worked for Google.   Google denies the remaining allegations of this paragraph.

23.    In addition to their share of the sale price and the employment given to them at Google, the Android cofounders were able to continue their work on the Android Platform.

**ANSWER:**   Google admits that the "Android cofounders" worked on the Android OS platform while employed by Google.  Google denies the remaining allegations of this paragraph.

24.    As part of its purchase of Android Inc., Google acquired assets and liabilities from Android, Inc. including, without limitation, its software source code, goodwill, internet

domain names, intellectual property rights and liabilities and key employees, including engineers and product planners.

**ANSWER:**   Admitted.

25.   Google has since used these same assets in violation of Plaintiffs' rights.

**ANSWER:**   Denied.

26.   At Google, Rubin is responsible for managing the development of the Android Platform.   Rubin has overseen and has personal knowledge regarding all aspects of the development of the Android Platform by Google, including the acquisition of Android, Inc. and the creation of the Android Platform.

**ANSWER:**   Google admits that Rubin is responsible for managing the development of the ANDROID OS platform and that he has overseen and has personal knowledge regarding the development thereof.  Google denies the remaining allegations of this paragraph.

27.   Sears is responsible for Google's business development concerning the Android Platform.

**ANSWER:**   Denied.

28.   Miner is a group manager for Google, with duties concerning the Android Platform.

**ANSWER:**   Denied.

29.   McFadden is a senior software architect for the Android Platform.

**ANSWER:**   Denied.

30.   White left the employ of Google in October 2006.  While at Google, his duties were primarily those of a software engineer in the development of the Android Platform.

**ANSWER:**   Google admits that Chris White left the employ of Google in October 2006, and denies the remaining allegations of this paragraph.

31.     In or about, October 2007, and before it filed its trademark application for the mark "Android," Google hired a private contractor to perform a trademark search.  The search result disclosed Plaintiffs' ownership of the Android Data mark and Plaintiffs' contact information.

**ANSWER:**   Denied.

32.     On October 31, 2007, Google filed an application with the PTO for the mark "Android," Serial No. 77318565 (the "Google Application").  A copy of the Google Application is attached hereto as Exhibit C.  The goods and services identified under the Google Application were International Class 9, computer hardware and software.  The Google Application asserted an "intent to use" the mark "Android" as follows: "The applicant has a bona fide intention to use through the applicant's related company or licensee the mark in commerce or in connection with the identified goods and/or services." Thus, Google was seeking the exclusive right to use and license the mark "Android" in commerce or in connection with any software or hardware use or product.

**ANSWER:**   Google admits that, on or about October 31, 2007, it filed an application with the USPTO to register the mark ANDROID, which was assigned Serial No. 77/318,565, that the goods identified in the application were "hardware; software" in International Class 9, and that a copy of the application was attached as Exhibit C to the SAC.  Google denies the remaining allegations of this paragraph.

33.     On November 5, 2007, Google announced the formation of the Open Handset Alliance (the "OHA"), a partnership or business alliance consisting of dozens of firms that

9

include Aplix (www.aplixcorp.com), Ascender Corporation (www.ascendercorp.com), Audience (www.audience.com), Broadcom (www.broadcom.com), China Mobile (www.chinamohile.com), eBay (www.ebay.com), Esmertec (www.esrnertec.com), Google (www.google.com), HTC (www.htc.com), Intel (www.intel.com), KDDI (www.kddi.com), Living Image (www.livingimage.jp), LG (www.lge.com), Marvell (wwvv.marvell.com), Motorola (www.motorola.com), NMS Communications (www.nmscommunications.com), Noser (www.noser.com), NTT DoCoMo, Inc. (www.nttdocomo.com), Nuance (www.nuance.com), Nvidia (www.nvidia.com), Packet Video (www.packetvideo.com), Qualcomm (www.qualcomm.com), Samsung (www.samsting.com), SiRF (www.sirf com), SkyPop (www.skypop.com), SONiVOX (www. sonivoxrocks.com), Sprint Nextel (www.sprint.com), Synaptics (www.synaptics.com), TAT — The Astonishing Tribe (www.tat.se), Telecom Italia (www.telecomitalia.com), Telefónica (www.telefonica.es), Texas Instruments (www.ti.com), T-Mobile (www.t-mobile.com) and Wind River (www.windriver.com).

**ANSWER:**   Google admits that the November 5, 2007 press release announcing the formation of the OHA identified the following entities as the "Open Handset Alliance Founding Members":

> Aplix, Ascender Corporation, Audience, Broadcom, China Mobile, eBay, Esmertec, Google, HTC, Intel, KDDI, Living Image, LG, Marvell, Motorola, NMS Communications, Noser, NTT DoCoMo, Inc., Nuance, Nvidia, PacketVideo, Qualcomm, Samsung, SiRF, SkyPop, SONiVOX, Sprint Nextel, Synaptics, TAT - The Astonishing Tribe, Telecom Italia, Telefónica, Texas Instruments, T-Mobile, Wind River

To the extent that the allegations of this paragraph are inconsistent with that November 5, 2007 press release, Google denies those and any other remaining allegations.

34.   Since 2005, the OHA members have been working together on products relating to the Android Platform and on November 12, 2007, the OHA released the Android Software Development Kit ("SDK") as an early look to enable developers to create innovative and

compelling applications for the platform. The early look also provided developers with the opportunity to participate in the evolution of the Android Platform by providing feedback throughout the development.

**ANSWER:** Google admits that it released the Android Software Development Kit on or about November 12, 2007. Google denies the remaining allegations of this paragraph.

35. Since 2007, and continuing to the present, without permission from Plaintiffs, Google and the OHA have been releasing software, SDKs, and selling products and services under the mark "Android."

**ANSWER:** Google admits that since 2007 it has released software, including its Android Software Development Kit, in association with its ANDROID trademark, and that it has neither sought nor obtained permission from Plaintiffs to do so, as no such permission is necessary. Google denies that it has sold any products or services in association with its ANDROID trademark. Google has neither knowledge nor information sufficient to form a belief as to the remaining allegations of this paragraph and consequently denies same.

36. Wikipedia, the free online encyclopedia, reports that "Android is the brain child of Google and the flagship software of the OHA, is based on an open source license and will compete against other mobile platforms from Apple Inc., Microsoft, Nokia, Palm, Research In Motion and Symbia."

**ANSWER:** Google has neither knowledge nor information sufficient to form a belief as to the allegations of this paragraph and consequently denies same.

37. On February 14, 2008, the PTO issued an Office Action letter refusing the Google Application for registration of the trademark "Android," citing likelihood of confusion with

Plaintiffs' "Android Data" mark (the "February 14 Office Action"). A copy of the February 14 Office Action is attached hereto as Exhibit D.

**ANSWER:** Google admits that the USPTO issued an Office Action on or about February 14, 2008 initially refusing Google's application to register the ANDROID mark under §2(d) of the Lanham Act based on U.S. Registration No. 2,639,556, and that a copy of that Office Action was attached as Exhibit D to the SAC. Google denies the remaining allegations of this paragraph.

38. On August 14, 2008, Google filed a response to the February 14 Office Action. A copy of the response is attached hereto as Exhibit E.

**ANSWER:** Admitted.

39. On August 20, 2008, the PTO issued a second Office Action making the refusal of the Google Application final (the "Final Office Action"). A copy of the Final Office Action is attached hereto as Exhibit F.

**ANSWER:** Admitted.

40. In the Final Office Action, the PTO explained, among other things, that Google's use of Android encompasses a broad range of goods and/or services, including "providing e-commerce software" that can be used on mobile devices, computers, computer networks, and global communication networks. The PTO cited likelihood of confusion with Plaintiffs' mark "Android Data," determining that the marks are similar in "sound, appearance, and commercial impression" and share the dominant term, Android, and "the applicant's [Google] goods are closely related to the registrant's [Plaintiffs] goods and commonly emanate from the same source as the registrant's goods."

**ANSWER:**   Google admits that the August 20, 2008 final office action was based on a purported likelihood of confusion between Google's ANDROID mark and the ANDROID DATA mark of U.S. Reg. No. 2,639,556.  Google denies that any such likelihood of confusion existed or exists, and denies the remaining allegations of this paragraph.

41.     On September 23, 2008, one month after the PTO issued its Final Office Action refusing the Google Application, Google issued a press release announcing the release of the "Android 1.0 SDK" product.

**ANSWER:**   Google admits that, on or about September 23, 2008, a blog entry entitled "Announcing the Android 1.0 SDK, release 1" was posted on the www.android.com website. Google denies the remaining allegations of this paragraph.

42.     The following month, on October 21, 2008, Google released portions of the source code for the Android software to developers and encouraged and gave developers the ability to use the infringing Android operating system to create infringing Android applications for use with Google's infringing products.

**ANSWER:**   Google admits that, on or about October 21, 2008, it issued a press release announcing the availability of the Android OS platform source code.  Google denies the remaining allegations of this paragraph.

43.     On November 20, 2008, Google filed with the PTO a Request For Reconsideration After Final Action which requested reconsideration of the Final Office Action or, in the alternative, suspension of all further action on the Google Application.  A copy of the request is attached hereto as Exhibit G.

**ANSWER:**   Admitted.

44.     On November 20, 2008, Google also filed a Notice of Appeal to the PTO Trademark Trial and Appeal Board.  A copy of the Notice of Appeal is attached hereto as Exhibit H.

**ANSWER:**     Admitted.

45.     On November 21, 2008, the PTO's Trademark Trial and Appeal Board issued an order suspending Google's appeal pending its request for reconsideration.  A copy of the order is attached hereto as Exhibit I.

**ANSWER:**     Admitted.

46.     On November 24, 2008, per Google's request, the PTO issued its Notice of Suspension.  A copy of the Notice of Suspension is attached hereto as Exhibit J.

**ANSWER:**     Admitted.

47.     Despite the fact that the Google Application was refused, and despite the fact that Google requested that all action on the Application be suspended, Google has not taken any action to curtail its infringing activities.

**ANSWER:**     Denied.  Google has not engaged in any "infringing activities."

48.     There are millions of products on the market that specifically say "Powered by Android" or otherwise mention Google's Android products and/or services.

**ANSWER:**     Google has neither knowledge nor information sufficient to form a belief as to the allegations of this paragraph and consequently denies same.

49.     In certain promotional materials, Google and/or the OHA members have identified "Android" as a trademark and/or registered trademark of Google.

**ANSWER:**   Google admits that it has identified "Android" as a trademark of Google on its Internet website and elsewhere.  Google has neither knowledge nor information sufficient to form a belief as to the remaining allegations of this paragraph and consequently denies same.

50.   To date, Google has collected over $50 million in developer registration fees.

**ANSWER:**   Denied.

51.   The OHA members have sold over one billion dollars worth of equipment bearing the mark "Android," containing Android applications, or running on the Android operating system.

**ANSWER:**   Google has neither knowledge nor information sufficient to form a belief as to the allegations of this paragraph and consequently denies same.

52.   Google and the OHA have released over one million copies of their SDKs and several versions of the Android Platform to over one million software developers, and have participated in the creation of "Android Market," which provides Android phone users with access to more than 8,000 applications to download and install on their phones.

**ANSWER:**   Google admits that it has released several versions of its SDK to software developers, and that it has participated in the creation of the "Android Market," which provides access to applications for devices equipped with the Android OS platform.  Google denies the remaining allegations of this paragraph.

53.   On December 5, 2008, Google and the OHA released "Android 2.0 SDK."

**ANSWER:**   Google admits that, on or about December 5, 2008, a blog entry entitled "New Resources for Developers," which confirmed the release of the Android 2.0 SDK by Google, was posted on the www.android.com website.  Google denies the remaining allegations of this paragraph.

54.     On December 9, 2008, the OHA announced the addition of 14 companies to the OHA including AKM Semiconductor Inc., ARM, ASUSTek Computer Inc., Atheros Communications, Borqs, Ericsson, Garmin International Inc., Huawei Technologies, Omron Software Co. Ltd, Softbank Mobile Corporation, Sony Ericsson, Teleca AB, Toshiba Corporation and Vodafone.

**ANSWER:**     Google admits that it issued a press release on or about December 9, 2008 announcing the following new members of the OHA:

> AKM Semiconductor Inc., ARM, ASUSTek Computer Inc., Atheros Communications, Borqs, Ericsson, Garmin International Inc., Huawei Technologies, Omron Software Co. Ltd, Softbank Mobile Corporation, Sony Ericsson, Teleca AB, Toshiba Corporation and Vodafone

To the extent that the allegations of this paragraph are inconsistent with the December 9, 2008 press release, Google denies those allegations and any other remaining allegations.

55.     Since 2007, Noser Engineering Inc., a Swiss software engineering company that specializes in both embedded and mobile solutions, working in close collaboration with the OHA, has contributed core functionality to the Android Platform.

**ANSWER:**     Google admits that Noser Engineering Inc. was involved with development of the ANDROID OS platform.   Google denies any other allegations of this paragraph.

56.     On November 12, 2007: OHA member Ascender released the Droid font collection for Android; Google announced a $10 Million Android Developer Challenge; Nuance included its voice recognition software for Android SDK; Synaptics released the Touch Interface Driver for Android SDK; and Sonic Network (aka SONiVox) contributed audioINSIDE Technology to Android SDK.

**ANSWER:**   Google admits that on or about November 12, 2007 it issued a press release announcing the Android Developer Challenge.   Google has neither knowledge nor information sufficient to form a belief as to the remaining allegations of this paragraph and consequently denies same.

57.     On December 17, 2007, SiRF Technology Holdings, Inc., a leading provider of GPS-powered location platforms, announced it will rapidly implement key end-to-end location-awareness features needed to enable mobile devices powered by the Android Platform to provide an optimal location awareness experience for consumers.

**ANSWER:**   Google has neither knowledge nor information sufficient to form a belief as to the allegations of this paragraph and consequently denies same.

58.     Since July 2007, Borqs has been working with the members of the OHA designing Android-based handsets with multiple handset partners for China and other markets around the world.  In 2008, several versions of the handsets were released.

**ANSWER:**   Google has neither knowledge nor information sufficient to form a belief as to the allegations of this paragraph and consequently denies same.

59.     In February, 2008, ARM Ltd. demonstrated Android on an early prototype device at the Mobile World Conference in Barcelona, Spain and, in July, 2009, ARM, Ltd., began shipping ARM Smart Mobile Devices with Android.

**ANSWER:**   Google has neither knowledge nor information sufficient to form a belief as to the allegations of this paragraph and consequently denies same.

60.     In September, 2008, HTC launched the first Google-branded phone, known as the G-1 with T-Mobile after spending more than $10 million and almost three years in development. The handset is manufactured by Taiwan's HTC Corp. and features Qualcomm's dual-core

MSM7201A semiconductor with integrated processing, multimedia, graphics capabilities and multi-mode 3G mobile broadband connectivity.

**ANSWER:**   Google admits that the G-1 mobile phone is manufactured by HTC and works on the cellular phone system of T-Mobile.  Google has neither knowledge nor information sufficient to form a belief as to the remaining allegations of this paragraph and consequently denies same.

61.     On February 17, 2009, HTC released its first Android phone, known as HTC Magic for Vodafone.

**ANSWER:**   Google has neither knowledge nor information sufficient to form a belief as to the allegations of this paragraph and consequently denies same.

62.     On July 14, 2009, T-Mobile announced the launch of the G-2 Touch (a/k/a "HTC Saphire" or a/k/a "HTC Magic"), its second Android phone, and on September 04, 2009, T-Mobile unveiled the third Android handset from T-Mobile, the T-Mobile Pulse (a/k/a "Samsung Houdini" or "i7500").

**ANSWER:**   Google has neither knowledge nor information sufficient to form a belief as to the allegations of this paragraph and consequently denies same.

63.     On December 9, 2008, AKM Semiconductor, Inc., announced its 6-axis electronic compass hardware and software are available for use in the OHA's Android Platform.

**ANSWER:**   Google has neither knowledge nor information sufficient to form a belief as to the allegations of this paragraph and consequently denies same.

64.     On December 22, 2008, Garmin announce that it intended to release its first handset in the second quarter of 2009.

**ANSWER:**    Google has neither knowledge nor information sufficient to form a belief as to the allegations of this paragraph and consequently denies same.

65.    On February 5, 2009, Broadcom Corporation, a global leader in semiconductors for wired and wireless communications, announced that the software that controls its industry-leading Wi-Fi/Bluetooth/FM combination solution is a standard component of the latest Android operating system.  This is the first time that the Android platform includes native support for a multi-functional wireless connectivity solution (or "combo" chip).  Open access to portions of Broadcom's combo drivers provides Android developers with a head-start in designing mobile devices and applications that utilize the best in wireless connectivity solutions.

**ANSWER:**    Google has neither knowledge nor information sufficient to form a belief as to the allegations of this paragraph and consequently denies same.

66.    On February 12, 2009, Telefonica launched its first Android handset.

**ANSWER:**    Google has neither knowledge nor information sufficient to form a belief as to the allegations of this paragraph and consequently denies same.

67.    On February 16, 2009, Marvell Semiconductor, Inc. announced that it began shipping application processors for Android powered smart phones to OEM (Original Equipment Manufacturer) and ODM (Original Design Manufacturer) customers.

**ANSWER:**    Google has neither knowledge nor information sufficient to form a belief as to the allegations of this paragraph and consequently denies same.

68.    In February 2009, at the Mobile World Congress in Barcelona, Spain: NVIDIA announced that it has worked closely with Google and the OHA to unleash Android, a complete, open mobile phone software stack, with the Tegra series of "computer-on-a-chip" processors; Texas Instruments demonstrated Android on OMAP850, an integrated single chip processor, on

a live prototype handset and on its flagship applications processor; Wind River and Wind River Linux Commercialization Services demonstrated the base Android platform and native integration with the Texas Instruments OMAP3430 chipset in a new form-factor development platform called the Zoom Mobile Development Kit.

**ANSWER:**   Google has neither knowledge nor information sufficient to form a belief as to the allegations of this paragraph and consequently denies same.

69.   On February 16, 2009, PacketVideo announced the release of OpenCORE 2.0, the first upgrade to its OpenCORE multimedia sub-system for Android.   OpenCORE provides the essential media features for device development and enables playing and streaming of standard formats, recording of images and video, and more.   OpenCORE 2.0 expands upon PV's initial offering, including the release of a video telephony engine, OpenMAX encoding support and easier integration of OpenMAX cores.

**ANSWER:**   Google has neither knowledge nor information sufficient to form a belief as to the allegations of this paragraph and consequently denies same.

70.   On May 20, 2009 Atheros launched its AR6002 Android compatible products.

**ANSWER:**   Google has neither knowledge nor information sufficient to form a belief as to the allegations of this paragraph and consequently denies same.

71.   On June 16, 2009, Huawei Technologies showcased a new Android smartphone at CommunicAsia 2009 in Singapore — the Android-powered "U8230."

**ANSWER:**   Google has neither knowledge nor information sufficient to form a belief as to the allegations of this paragraph and consequently denies same.

72.   In or about June, 2009, ASUS demonstrated a prototype Android smartbook at Computex trade show.

**ANSWER:**   Google has neither knowledge nor information sufficient to form a belief as to the allegations of this paragraph and consequently denies same.

73.   On June 7, 2009, NTT DoCoMo launched its Android-powered HTC HT-03A handset accompanied by a plan, where one will be able to "access a gaggle of Google services including Google Maps, Gmail, YouTube and Picasa."

**ANSWER:**   Google has neither knowledge nor information sufficient to form a belief as to the allegations of this paragraph and consequently denies same.

74.   On July 1, 2009 Aplix Corporation released the first Java ME product enabled on commercial models on Android.

**ANSWER:**   Google has neither knowledge nor information sufficient to form a belief as to the allegations of this paragraph and consequently denies same.

75.   On August 28th, 2009, in a message sent to the Android Platform mailing list, Andrea Gallo from ST Ericsson reported that the company is in the process of porting Android to their 08500 chipset and that they have successfully made Android run on a dual core chip version of the U8500 and that they've seen no performance loss or instability with the patches they've made to the Android source code.

**ANSWER:**   Google has neither knowledge nor information sufficient to form a belief as to the allegations of this paragraph and consequently denies same.

76.   On September 14, 2009, LG Electronics, announced its first Android mobile device.

**ANSWER:**   Google has neither knowledge nor information sufficient to form a belief as to the allegations of this paragraph and consequently denies same.

77.     Since 2008, Motorola, Inc. has and continues to operate a web site dedicated to Android information, tips, and products.  It has also announced that it will begin selling Android devices in the fourth quarter of 2009.

**ANSWER:**    Google has neither knowledge nor information sufficient to form a belief as to the allegations of this paragraph and consequently denies same.

78.     Google's Android Platform was created through the collective contributions of all of the OHA members.

**ANSWER:**    Denied.

79.     Google and the OHA members have infringed on Plaintiffs' marks by creating, encouraging, and/or enabling others to create and issue for sale products, services and marketing materials using the mark "Android" on or in connection with such products, services and marketing materials.

**ANSWER:**    Denied.

80.     OHA member T-Mobile has infringed Plaintiffs' marks by, among other things, marketing and selling mobile phones and related services that use the Google and the OHA's Android software platform, and by using the mark "Android" on or in connection with such products, services and marketing materials.  Google has induced T-Mobile to engage in such infringing conduct and, despite knowing that T-Mobile was engaging in such infringing conduct, Google has continued to supply the goods, services and/or resources necessary to support such infringing conduct by T-Mobile.

**ANSWER:**    Denied.

81.     OHA member Sprint has infringed Plaintiffs' marks by, among other things, marketing and selling mobile phones and related services that use the Google Android software

platform, and by using the mark "Android" on or in connection with such products, services and marketing materials.  Google has induced Sprint to engage in such infringing conduct and, despite knowing that Sprint was engaging in such infringing conduct, Google has continued to supply the goods, services and/or resources necessary to support such infringing conduct by Sprint.

**ANSWER:**    Denied.

82.    OHA member Motorola has infringed Plaintiffs' marks by, among other things, marketing and selling mobile phones and related services that use the Google Android software platform, and by using the mark "Android" on or in connection with such products, services and marketing materials.  Google has induced Motorola to engage in such infringing conduct and, despite knowing that Motorola was engaging in such infringing conduct, Google has continued to supply the goods, services and/or resources necessary to support such infringing conduct by Motorola.

**ANSWER:**    Denied.

83.    OHA member HTC has infringed Plaintiffs' marks by, among other things, marketing and selling mobile phones and related services that use the Google Android software platform, and by using the mark "Android" on or in connection with such products, services and marketing materials.  Google has induced HTC to engage in such infringing conduct and, despite knowing that HTC was engaging in such infringing conduct, Google has continued to supply the goods, services and/or resources necessary to support such infringing conduct by HTC.

**ANSWER:**    Denied.

84.    OHA member LG has infringed Plaintiffs' marks by, among other things, marketing and selling mobile phones and related services that use the Google Android software

platform, and by using the mark "Android" on or in connection with such products, services and marketing materials.  Google has induced LG to engage in such infringing conduct and, despite knowing that LG was engaging in such infringing conduct, Google has continued to supply the goods, services and/or resources necessary to support such infringing conduct by LG.

**ANSWER:**   Denied.

85.     On April 29, 2009, Plaintiffs received a Notice Of Acceptance Of § 8 Declaration informing them that Registration No. 2,639,556 remains in force.  A copy of the notice is attached hereto as Exhibit K.

**ANSWER:**   Google has neither knowledge nor information sufficient to form a belief as to the allegations of this paragraph and consequently denies same.

86.     At no time prior to Plaintiffs' filing this infringement action has Google sought to have Plaintiffs' Registration No. 2,639,556 canceled.

**ANSWER:**   Admitted.

87.     Google has never asked Plaintiffs whether they intended to continue using the Android Data mark or any other Android Marks.

**ANSWER:**   Admitted.

88.     Prior to filing the Google Application, Google did not conduct a thorough trademark search.

**ANSWER:**   Denied.

89.     Prior to using the mark "Android" in commerce, Rubin, Sears, Miner and White did not conduct a thorough trademark search.

**ANSWER:**   Denied.

90.     Google has never requested or received Plaintiffs' permission to use the mark "Android."

**ANSWER:**     Admitted, as no such permission is necessary.

91.     Fully aware of Plaintiffs' rights to the Android Marks, Google has and is intentionally, openly, notoriously, and without Plaintiffs' authority using the infringing mark "Android" in commerce.

**ANSWER:**     Denied, as no such permission is necessary.

92.     Google, and the OHA members with Google's encouragement and assistance, are continuing to use the mark "Android" on products and in advertising, promotional materials and press releases without disclosing ADI's ownership of the Android Marks and without Plaintiffs' permission.

**ANSWER:**     Denied, as no such permission is necessary.

93.     Google and the OHA members' use of the mark "Android" on their products, and in their product promotion and advertising in print and on the internet, constitutes the use in commerce of a colorable imitation, copy and reproduction of one or more of Plaintiffs' Android Marks.

**ANSWER:**     Denied.

94.     For the reasons set forth above, Google's use of the mark "Android" was and is deceptive, confusingly similar to the Android Marks and likely to cause confusion, mistake, or deception in the minds of the public as to the source of Plaintiffs' and/or Google's goods and services.

**ANSWER:**     Denied.

95.     Google's infringement constitutes a willful and malicious violation of Plaintiffs' trademark rights.

**ANSWER:**    Denied.

96.     Upon learning of the infringing conduct alleged herein, Plaintiffs have moved as expeditiously as possible to protect the Android Marks.

**ANSWER:**    Denied.

## COUNT I

### Trademark Infringement Under Lanham Act § 3231

### (By ADI Against Google)

97.     The allegations of paragraphs 1 through 96 above are incorporated herein by reference as and for paragraph 97 of this Count I.

**ANSWER:**    Google incorporates its responses to the allegations contained in paragraphs 1 through 96, inclusive.

98.     As determined by the PTO, Google's proposed mark "Android" is identical to the dominant portion of the Plaintiffs' registered mark "Android Data" in sound, appearance, and commercial impression.

**ANSWER:**    Denied.

99.     Android Data and the other Android Marks are distinctive, protectable marks.

**ANSWER:**    Denied.

100.    The contemporaneous use by Plaintiffs and Google of the mark "Android" in commerce is likely to cause confusion among consuming public into believing that the goods they identify come from the same source.

**ANSWER:**    Denied.

101.    The PTO refused Google's application to register the mark "Android" for computer hardware and software "because of a likelihood of confusion with the mark in U.S. Registration No. 2639556."

**ANSWER:**    Google admits that the USPTO's refusal to register Google's ANDROID mark was initially based in part on a purported likelihood of confusion between Google's ANDROID mark and the mark of U.S. Reg. No. 2,639,556.   Google denies that any such likelihood of confusion existed or exists, and denies the remaining allegations of this paragraph.

102.    Both Google's mark "Android" and Plaintiffs' Android Marks may be used to identify computer hardware, software and related products and services.   The hardware and software products and services may be used in e-commerce and marketed by all parties in commercial settings and over the internet.

**ANSWER:**    Denied.

103.    To enable use of Google's Android software platform and applications that run on the platform subscribers will need to have a "data plan" with their carrier.

**ANSWER:**    Denied.

104.    It has been estimated that Google's search engine accounts for approximately 75% of all computer internet searches; Google controls how information is ranked and disseminated through its search engine.

**ANSWER:**    Google has neither knowledge nor information sufficient to form a belief as to the allegations that "Google's search engine accounts for approximately 75% of all computer internet searches" and consequently denies same.   Google also denies any remaining allegations in this paragraph. .

105.     Plaintiffs have expended considerable resources marketing, advertising and promoting goods and services under the Android Data mark and other Android Marks,

**ANSWER:**   Upon information and belief, Google denies the allegations in this paragraph.

106.     Despite that ADI had Android Data registered on the PTO Principal Register, and without authorization from ADI or any other Plaintiff, Google has in the past and is continuing to advertise, manufacture, distribute, sell, offer to sell, and encourage and induce members of the OHA and others to advertise, manufacture, distribute, sell and offer to sell, an ever increasing fine of products and services bearing the infringing mark "Android."

**ANSWER:**   Denied.

107.     This is a reverse confusion case where Google is saturating the market with infringing products and services which will undoubtedly lead to deception, confusion and mistake among the consuming public and trade creating the erroneous impression that the goods and/or services offered by Plaintiffs come from the same origin, or are some type of knockoff of goods and/or services offered or sold by Google and other members of the OHA.

**ANSWER:**   Denied.

108.     Google's actions and deception have and will continue to deprive ADI and the other Plaintiffs of the ability to control the nature and quality of the products and services they offer, the ability to license any of the Android Marks; and the ability to enter into new and emerging markets under the Android Data mark or other Android Marks, causing irreparable harm to ADI and the other Plaintiffs for which there is no adequate remedy at law.

**ANSWER:**   Denied.

109.   Google, as successor in interest to Android, Inc.'s intellectual property assets, rights and liabilities, is liable for Android, Inc.'s infringing conduct that occurred as a result of Android, Inc.'s use in commerce of the mark "Android" relating to the Android software platform.

**ANSWER:**   Denied.

110.   By reason of the foregoing acts, Google is liable to ADI for trademark infringement under 15 U.S.C. § 1114.

**ANSWER:**   Denied.

## COUNT II

### Unfair Competition Under Lanham Act § 4334

### (By Plaintiffs against Google)

111.   The allegations of paragraphs 1 through 110 above are incorporated herein by reference as and for paragraph 111 of this Count II.

**ANSWER:**   Google incorporates its responses to the allegations contained in paragraphs 1 through 110, inclusive.

112.   Google's use of the mark "Android" to promote, market, or sell products or services constitutes unfair competition in violation of 15 U.S.C. § 1125(a).  Google's use of the mark "Android" is likely to cause confusion, mistake, and deception among consumers. Google's unfair competition has caused, and will continue to cause, damage to Plaintiffs and is causing irreparable harm to Plaintiffs for which there is no adequate remedy at law.

**ANSWER:**   Denied.

## COUNT III

### Violation of Illinois Deceptive Trade Practices Act, 815 ILCS 510/2

### (By Plaintiffs against Google)

113.    The allegations of paragraphs 1 through 112 above are incorporated herein by reference as and for paragraph 113 of this Count III.

**ANSWER:**    Google incorporates its responses to the allegations contained in paragraphs 1 through 112, inclusive.

114.    Google's use of the mark "Android" to promote, market, or sell products or services constitutes deceptive practices in violation of 815 ILCS 510/2.  Google's use of the mark "Android" in the course of its business or occupation is likely to cause confusion or misunderstanding as to affiliation, connection, or association with Plaintiffs' Android Data mark or other Android Marks.  Google's deceptive practices have caused, and will continue to cause, damage to the Plaintiffs and are causing Plaintiffs irreparable harm for which there is no adequate remedy at law.

**ANSWER:**    Denied.

## COUNT IV

### Common Law Trademark Infringement

### (By Plaintiffs against Google)

115.    The allegations of paragraphs 1 through 114 above are incorporated herein by reference as and for paragraph 115 of this Count IV.

**ANSWER:**    Google incorporates its responses to the allegations contained in paragraphs 1 through 114, inclusive.

116.    The Android Marks are distinctive, protectable marks.

**ANSWER:**    Denied.

117.    Plaintiffs are entitled to protect the Android Marks against Google's infringing activities because Plaintiffs' use in commerce of the Android Marks preceded Google's use in commerce of the mark "Android."

**ANSWER:**    Denied.

118.    Google's use of the mark "Android" to promote, market and sell products or services infringers [sic] Plaintiffs' rights under common law because Google's use of the mark "Android" caused, and is likely to cause, confusion among consumers as to affiliation, connection or association with the Android Marks.  Google's infringing conduct has caused, and will continue to cause, damage to Plaintiffs and is causing Plaintiffs irreparable harm for which there is adequate remedy at law.

**ANSWER:**    Denied.

### COUNT V

**Contributory Infringement**

**(By Plaintiffs against Google)**

119.    The allegations of paragraphs 1 through 118 above are incorporated herein by reference as and for paragraph 119 of this Count V.

**ANSWER:**    Google incorporates its responses to the allegations contained in paragraphs 1 through 118, inclusive.

120.    Google has provided OHA members including, among others, T-Mobile, Sprint, Motorola, HTC and LG, with goods or services necessary to the commission of the violations described herein, with the intent that the recipient of the goods or services would put the goods or services to use in committing the violations.  Among other things, Google intentionally induced OHA members including, among others, T-Mobile, Sprint, Motorola, HTC and LG, to infringe Plaintiffs' Android Data mark and/or the other Android marks by: encouraging and

supporting their sales and marketing efforts relating to "Android" based products; and continuing to supply them with Android products and resources despite knowing that they were engaging in infringing activities.

**ANSWER:**    Denied.

121.    By reason thereof, Google is contributorily responsible for the harm that has resulted to Plaintiffs from the infringing activities of OHA members including, among others, T-Mobile, Sprint, Motorola, HTC and LG.

**ANSWER:**    Denied.

## PRAYER FOR RELIEF

**ANSWER:**    Google denies that Plaintiffs are entitled to any relief whatsoever, let alone, the relief requested.

## AFFIRMATIVE DEFENSES

Google raises the following affirmative defenses to the allegations contained in Plaintiffs' SAC.  Google incorporates the factual allegations set forth in its Counterclaim below, as providing, in whole or in part, the factual basis for Google's Affirmative Defenses.

### First Affirmative Defense

Plaintiffs' claims are barred under the doctrines of laches and/or acquiescence, arising out of Plaintiffs' knowledge of Google's open and notorious use of its ANDROID mark long before filing suit, coupled with Plaintiffs' failure to take any actions to protect any of their purported rights.

### Second Affirmative Defense

Plaintiffs' claims are barred under the doctrines of unclean hands, arising out of Plaintiffs' commission of fraud before the USPTO and engaging in acts of unfair competition directed at Google, as more fully set forth in Paragraphs 26 through 49 of Google's Counterclaim.

### Third Affirmative Defense

Plaintiff's claims are barred due to the commission of fraud before the United States Patent and Trademark Office (USPTO) by Plaintiff ADI, by intentionally filing a false Declaration with the USPTO on April 21, 2009 in connection with U.S. Trademark Registration 2,639,556.  In that Declaration, Megan Specht, purported President of ADI, falsely stated under oath that the registered ANDROID DATA mark was "in use in commerce on or in connection with all goods or services listed in the existing registration for this specific class," when Ms. Specht and ADI knew that the statement was false, as more fully set forth in Paragraphs 26 through 49 of Google's Counterclaim.  The aforementioned false statement was made with the

intent to deceive the USPTO, and the USPTO relied solely upon the aforementioned false statement in maintaining that Registration on the Principal Register.   U.S. Trademark Registration 2,639,556 is accordingly subject to cancellation under 15 U.S.C. §1064.

### Fourth Affirmative Defense

Plaintiffs' claims are barred due to the fact that Plaintiffs do not hold any valid or enforceable rights to the ANDROID DATA mark or any purported Android Marks.

### Fifth Affirmative Defense

Plaintiffs' claims are barred due to the fact that Plaintiffs' purported ANDROID DATA mark and purported Android Marks are invalid and/or unenforceable.

### Sixth Affirmative Defense

Plaintiffs' claims are barred due to the fact that Plaintiffs have abandoned any rights they may have had in the ANDROID DATA mark and purported Android Marks.

### Seventh Affirmative Defense

Plaintiffs' claims are barred due to the fact that U.S. Trademark Registration 2,639,556 is subject to cancellation under 15 U.S.C. §1064 as a result of Plaintiffs' abandonment of the ANDROID DATA mark.

### Eighth Affirmative Defense

Plaintiffs' claims are barred due to the fact that U.S. Trademark Registration 2,639,556 is subject to cancellation under 15 U.S.C. §1058 because the §8 Declaration referred to hereinabove was not filed by the actual owner of that registration, and the time for filing a §8 Declaration has since expired.

## **Ninth Affirmative Defense**

Plaintiffs cannot demonstrate that their rights in their purported ANDROID DATA mark or Android Marks have been damaged or harmed.

## **Tenth Affirmative Defense**

Plaintiffs fail to state a claim upon which relief may be granted.

Google reserves the right to state additional affirmative defenses upon the further determination of the same.

## COUNTERCLAIM

Counterclaim Plaintiff GOOGLE INC. ("Google"), in support of its counterclaim against Counterclaim Defendants ERICH SPECHT ("Specht"), ANDROID DATA CORPORATION ("ADC"), and THE ANDROID'S DUNGEON, INCORPORATED ("ADI"), sometimes collectively referred to as "Counterclaim Defendants," alleges as follows:

### PARTIES

1.  Google is a Delaware corporation with its principal place of business located in Mountain View, California.

2.  Specht is an individual, on information and belief, residing in Palatine, Illinois.

3.  ADC is an Illinois corporation having a mailing address in Palatine, Illinois.

4.  ADI is an Illinois corporation having a mailing address in Palatine, Illinois.

### JURISDICTION AND VENUE

5.  This counterclaim arises under the Declaratory Judgment Act, 28 U.S.C. §2201, the Lanham Act, 15 U.S.C. §§1051 *et seq.*, and the common law of the State of Illinois.

6.  This Court has subject matter jurisdiction over this counterclaim under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338 and 1367.

7.  This Court has personal jurisdiction over Counterclaim Defendants by virtue of, among other bases, their residence within the State of Illinois and their commission of wrongful acts within the State of Illinois, all commensurate with the United States and Illinois Constitutions, and by virtue of their having filed their Complaint and First and Second Amended Complaints in this Court, so as to submit themselves to the jurisdiction and process of this Court.

## RELEVANT FACTUAL BACKGROUND

**A.     Google's Use of the ANDROID Mark**

8.     Google, among other things, develops and maintains an Internet search engine that bears its name.

9.     In July 2005, Google acquired a start-up company known as Android, Inc., which was engaged in the development of an open-source operating system software directed to mobile devices.  As of the date of acquisition, Android, Inc. had not publicly released any software, or otherwise made any mark use of the term "Android."

10.     After acquiring Android, Inc., Google continued developing the aforementioned operating system software.  In 2007, as Google prepared for the public release of its operating system software platform, Google conducted a thorough trademark search to determine whether the mark ANDROID was available for use in association with an operating system.

11.     As part of that investigation, Google discovered U.S. Trademark Registration No. 2,639,556, for the mark ANDROID DATA alleged to be used in association with "computer e-commerce software to allow users to perform electronic business transactions via a global computer network," which had been issued to ADC by the United States Patent and Trademark Office ("USPTO") on October 22, 2002 (the "'556 Registration").

12.     Google continued its investigation to determine whether the registered ANDROID DATA mark was in fact being used in commerce.  Google's investigation found no usage whatsoever of the ANDROID DATA mark regardless of whether it was by ADC or any other entity or licensee.  Moreover, Google's investigation revealed that (i) ADC remained the owner of record of the '556 Registration, (ii) ADC was out of business, having been dissolved by the Illinois Secretary of State on May 1, 2004, (iii) ADC's former website located at

www.androiddata.com had been inactive since at least March 2005, (iv) ADC had no current website, (v) ADC had no listed business address or telephone number, and (vi) the ANDROID DATA mark was not used anywhere on the Internet.  Based on the results of that investigation, Google rightfully concluded that ADC had abandoned the ANDROID DATA mark.

13.     On October 31, 2007, Google filed an intent-to-use application to register the ANDROID mark, for use in association with computer hardware and software.  That application was accorded Serial No. 77/318,565 by the USPTO.

14.     On November 5, 2007, Google made its first public disclosure of the ANDROID mark in association with a press release announcing the development and release of the ANDROID OS platform.  Since that date, Google has widely, openly and notoriously used its ANDROID mark in commerce in association with its ANDROID OS platform.

**B.      Counterclaim Defendants' Abandonment of the ANDROID DATA Mark**

15.     Specht, ADC and ADI allege rights in the purported marks ANDROID DATA, ANDROID SERVER and ANDROID DATA WEB EDITOR (collectively, the "Asserted Marks") for use in association with computer hardware and software products and services.

16.     On June 4, 2000, ADC filed an application with the USPTO for registration of the mark ANDROID DATA in association with "computer software and internet services."  That application was assigned Serial No. 78/011,167.  On January 30, 2001, after reviving the application from abandonment, ADC amended the Identification of Goods in its application to read "computer e-commerce software to allow users to perform electronic business transactions via a global computer network."

17.     On October 22, 2002, the USPTO issued the '556 Registration to ADC.

18.     By the Fall of 2002, however, Specht and ADC had ceased doing business and ADC was no longer using the ANDROID DATA mark or any of the Asserted Marks, and Specht was actively seeking to sell off the remaining assets of ADC, which consisted primarily of software source code and related copyrights.

19.     By the end of 2002, if not well earlier, Counterclaim Defendants had ceased all use in commerce of the ANDROID DATA mark and all other Asserted Marks, and neither Specht, ADC, ADI nor any other related entity had any intent to resume the commercial use of any of the Asserted Marks.

20.     During 2003, Specht continued his efforts to sell off the remaining assets of ADC. None of the Counterclaim Defendants used the Asserted Marks in commerce in association with the sale or license of any hardware or software products or services during 2003.

21.     Specht and ADC purposefully and intentionally failed to file an annual report with the Illinois Secretary of State for the year 2003, as a result of which ADC was dissolved by the Illinois Secretary of State on May 1, 2004.  Copies of relevant Illinois Secretary of State records relating to ADC are attached as Exhibit 1 hereto.

22.     ADI was formed by Specht in 2001 for the purpose of carrying out other business endeavors in which Specht and/or his wife, Megan Specht, have been involved, particularly in the areas of Specht's music career and Megan Specht's real estate career.  On information and belief, at no time has ADI ever been involved in any *bona fide* sale or marketing of computer e-commerce software or any other computer hardware or software products or services.  Copies of relevant Illinois Secretary of State records relating to ADI are attached as Exhibit 2 hereto.

23.     Neither Specht, ADC, ADI nor any other related entity or licensee has used any of the Asserted Marks in commerce in association with the sale of any software products or related services during the period from January 1, 2003 through March 2009.

24.     Neither Specht, ADC, ADI nor any other related entity or licensee had any *bona fide* intent to resume the commercial use of any of the Asserted Marks after January 1, 2003.

25.     Moreover, to the extent that Specht, ADC, ADI or any other related entity ever acquired any common law trademark, service mark or trade name rights in association with any of the Asserted Marks, based on business activities occurring prior to the time ADC ceased all *bona fide* commercial use of the ANDROID DATA mark, any such rights were abandoned as a result of the non-use of the Asserted Marks after 2002, coupled with an intent not to resume use thereof.

### C.     Counterclaim Defendants' Unlawful Conduct

26.     Under §8 of the Lanham Act, 15 U.S.C. §1058, the '556 Registration was subject to cancellation on April 22, 2009 by the USPTO due to non-use, unless ADC filed an affidavit attesting either that the ANDROID DATA mark was in use in commerce in association with the goods identified in the '556 Registration, or that the mark was not in use in commerce due to circumstances which excused such nonuse.  Such an affidavit is often referred to as a "§8 Declaration."

27.     On information and belief, prior to April 20, 2009, while Counterclaim Defendants were aware of Google's use of the ANDROID mark, Counterclaim Defendants understood that none of them had any rights in any of the Asserted Marks, let alone the ANDROID DATA mark, and therefore Counterclaim Defendants had no intention of filing a §8 Declaration for the '556 Registration.

28.     On information and belief, on or about April 20, 2009, Specht received a telephone call from an individual named Kenneth Robblee ("Robblee"), who informed Specht that he had an interest in purchasing certain assets of ADC, including the '556 Registration.

29.     On information and belief, Specht and Robblee had several telephonic discussions on April 20 and 21, 2009, during which Robblee and Specht discussed (i) that Counterclaim Defendants had abandoned the ANDROID DATA mark well prior to 2005, (ii) that Specht believed that none of the Counterclaim Defendants had retained any rights in that mark, (iii) that the '556 Registration would be cancelled if Counterclaim Defendants did not file a §8 Declaration by April 22, 2009, the last day of the grace period, and (iv) that Google's use of the mark ANDROID in association with its Android OS platform would provide a vehicle for Counterclaim Defendants and/or Robblee to obtain considerable money.

30.     In addition, on or about April 21, 2009, Robblee called Google's legal department and left a voicemail stating that he was "working with Erich Specht," that he understood "that Google has an interest in obtaining that [trademark]," and that an agreement with Google "will determine whether or not he [Specht] renews it [the '556 Registration] or not."

31.     On information and belief, Robblee's contacting Google was to facilitate some an agreement between Counterclaim Defendants (and in turn Robblee) and Google where: 1) Google would pay Counterclaim Defendants (and Robblee) for ownership or a license of Counterclaim Defendants' purported rights in the ANDROID DATA mark; or 2) Google would pay Counterclaim Defendants (and Robblee) monetary consideration so that Counterclaim Defendants would not file an §8 Declaration.

32.     Based on Specht's discussions with Robblee, and notwithstanding his knowledge that Counterclaim Defendants did not retain any rights in any of the Asserted Marks, including

the ANDROID DATA mark, on information and belief Counterclaim Defendants, aided and abetted by Specht's brother-in-law Martin J. Murphy ("Murphy"), decided to undertake a fraudulent scheme to sell or license their non-existent rights to Google in return for monetary consideration from Google.   Counterclaim Defendants and Murphy realized that, in order to carry out this scheme, they needed to take immediate action to prevent the cancellation of the '556 Registration under 15 U.S.C. §1058, and to make it appear that Counterclaim Defendants had used the ANDROID DATA mark in commerce during the period from 2002 through 2009.

33.     On or about April 20, 2009, Specht registered the domain name <android-data.com>, and posted a new website that was identical to Specht's website from 2002 that had previously been located at the URL www.androiddata.com, which had been "offline" for at least four years.   Specht's posting of this new website at www.android-data.com did not constitute a *bona fide* use of the ANDROID DATA mark in commerce in association with any goods or services, much less the goods listed in the '556 Registration.

34.     Notably, Counterclaim Defendants made no efforts to publicize or announce the re-launch of the new website, or to otherwise inform the marketplace that any of the "Android Data" hardware or software was once again available.   Moreover, on information and belief, Counterclaim Defendants had not made any updates or revisions to the "Android Data" hardware or software, or engaged in any *bona fide* efforts to sell or license that software to any customer, since at least 2002.   Thus, the posting of the website at www.android-data.com constituted at most a "token use" of the Asserted Marks, including the ANDROID DATA mark, and did not constitute a *bona fide* use in commerce.

35.     On or about April 21, 2009, Specht submitted a Notice of Recordation to the USPTO, requesting that the USPTO record a purported assignment of the '556 Registration from

ADC to ADI.  Notably, the purported assignment document that Specht submitted to the USPTO was dated April 28, 2004 -- three (3) days prior to the date on which ADC was formally dissolved by the Illinois Secretary of State.  A copy of the Notice of Recordation submitted to the USPTO, including the purported assignment, is attached as Exhibit 3 hereto.

36.     On information and belief, the purported assignment dated April 28, 2004 is fraudulent, as evidenced by the fact that it purports to have been executed on behalf of ADI by Megan Specht, as President of ADI.  However, according to ADI's annual corporate report filed with the Illinois Secretary of State on or about July 29, 2004 (see Exhibit 5 hereto), as of April 28, 2004 Erich Specht, not Megan Specht, was the President of ADI.  Megan Specht did not become President of ADI until sometime later.

37.     On information and belief, the purpose of recording the purported assignment was to fabricate a unbroken chain of title for the '556 Registration.

38.     Moreover, even assuming that the purported assignment dated April 28, 2004 is legitimate, and not a fabrication, such an assignment would have been invalid as an assignment in gross, because, amongst other things, as of April 28, 2004 ADI was not involved in the business of selling computer e-commerce software and had no intention of selling computer e-commerce software under any of the Asserted Marks, and ADI did not acquire any assets or goodwill of ADC in association with the purported assignment.  Moreover, the purported April 28, 2004 assignment would also have been invalid because, on information and belief, no consideration was provided by ADI in return for the assignment of ADC's rights.  Accordingly, the purported April 28, 2004 assignment did not serve to transfer any rights in and to any of the Asserted Marks or the '556 Registration.

39.     On or about April 21, 2009, ADI filed a §8 Declaration for the '556 Registration with the USPTO that purports to have been electronically signed by Megan Specht, President of ADI and wife of Erich Specht (the "'556 §8 Declaration").

40.     The '556 §8 Declaration attested under oath, *inter alia*, that the ANDROID DATA mark was "in use in commerce on or in connection with **all** goods or services listed in the existing registration for this specific class; or, the owner is making the listed excusable nonuse claim."

41.     The '556 §8 Declaration purportedly executed by Megan Specht on behalf of ADI included a sworn declaration that "all statements made of his/her own knowledge are true and that all statements made on information and belief are believed to be true."

42.     The attestation in the '556 §8 Declaration that the ANDROID DATA mark was in use in commerce on or in connection with all goods or services listed in the registration was false, because as of April 21, 2009 neither ADI nor any related company or licensee of ADI was using the ANDROID DATA mark in commerce on or in connection with any, let alone all, of the goods listed in the Registration.

43.     Counterclaim Defendants knew that the aforementioned statement in the §8 Declaration was false, inasmuch as neither ADI nor any related entity had made any *bona fide* use of the ANDROID DATA mark in commerce in association with the sale or promotion of computer e-commerce software in over three years.

44.     On or about April 23, 2009, Specht filed an Application for Reinstatement of the corporate entity ADC with the Illinois Secretary of State, together with annual reports for the past six consecutive years, namely 2003, 2004, 2005, 2006, 2007 and 2008.  A copy of Specht's Application for Reinstatement is attached as Exhibit 4 hereto.

45.     On or about April 28, 2009, after having taken improper measures to prevent the cancellation of the '556 Registration by the USPTO, Counterclaim Defendants filed a Complaint in this Court, naming as defendants Google, the OHA, and each member of the OHA (although many of the OHA members were not properly identified in the Complaint).  That Complaint accused each of the then-named defendants of infringing the '556 Registration through their respective, purported use of the ANDROID mark.

46.     As of the filing of the Complaint on April 28, 2009, Counterclaim Defendants lacked a good faith basis for asserting a claim of trademark infringement against any of the then-named defendants.  Any rights which any of the Counterclaim Defendants may have possessed in the ANDROID DATA trademark had been extinguished due to the abandonment of that mark years prior to 2009, and none of the Counterclaim Defendants had made any *bona fide* use of the ANDROID DATA mark in commerce in association with computer e-commerce software for far more than three years prior to filing the Complaint.

47.     On April 29, 2009, the USPTO issued a Notice of Acceptance of §8 Declaration, indicating that the '556 §8 Declaration had been accepted by the USPTO, and therefore the '556 Registration would not be cancelled pursuant to 15 U.S.C. §1058.

48.     On or about August 5, 2009, ADI through Specht submitted a "Corrective Assignment" to the USPTO, asserting that the assignment of the '556 Registration from ADC to ADI purportedly occurred on December 26, 2002, not April 28, 2004 as previously asserted by Counterclaim Defendants and as stated on the face of the assignment which had previously been recorded by Specht.   On information and belief, the purpose of recording the purported "Corrective Assignment" was to further Counterclaim Defendants' efforts to fabricate an unbroken chain of title for the '556 Registration.

49.     Even assuming that the purported assignment dated December 26, 2002 were legitimate, and not a fabrication, such an assignment is not valid and is an assignment in gross, because as of December 26, 2002 ADI was not then, and is not now, involved in the business of selling computer hardware and software, including e-commerce software and had no intention of selling computer e-commerce software under the ANDROID DATA mark, and ADI did not acquire any assets or goodwill of ADC in association with the purported assignment.  Moreover, the purported December 26, 2002 assignment would also have been invalid because, on information and belief, no consideration was provided by ADI in return for the assignment of ADC's rights in the ANDROID DATA mark to ADI.  Accordingly, the purported December 26, 2002 assignment could not have served to transfer any rights in and to the Asserted Marks or the '556 Registration.

## COUNT I

### Cancellation of U.S. Trademark Registration No. 2,639,556

50.     Google repeats and realleges the allegations contained in the foregoing ¶1- 49.

51.     This is a claim for cancellation of U.S. Trademark Registration No. 2,639,556 (the "'556 Registration") arising under 15 U.S.C. §1064.

52.     On April 21, 2009, ADI submitted a Declaration of Use of Mark in Commerce Under §8 to the USPTO, which stated, *inter alia*, that "the mark is in use in commerce on or in connection with **all** goods or services listed in the existing registration for this specific class; or, the owner is making the listed excusable nonuse claim."

53.     ADI, through its President, Megan Specht, executed the §8 Declaration, and in so doing swore, under oath, that "all statements made of his/her own knowledge are true and that all statements made on information and belief are believed to be true."

54.     The attestation in the §8 Declaration that the ANDROID DATA mark was in use in commerce on or in connection with all goods or services listed in the registration was false, because neither ADI, nor any related entity or licensee of ADI, was making any *bona fide* use of the ANDROID DATA mark in commerce on or in connection with any of the goods listed in the Registration.

55.     Megan Specht's and ADI's false statement was made with the knowledge that the statement was false, and with the intent to induce the USPTO to maintain the '556 Registration on the Principal Register under §8 of the Trademark Act, 15 U.S.C. §1058.

56.     Reasonably relying upon the truth of that false statement, the USPTO did in fact maintain the '556 Registration on the Principal Register.

57.     In view of the foregoing, the '556 Registration is subject to cancellation under 15 U.S.C. §1064 on the basis that it was obtained or maintained fraudulently.

58.     Moreover, as of April 21, 2009, ADI was not the actual owner of the '556 Registration, because the purported December 26, 2002 and April 28, 2004 assignments of the '556 Registration from ADC to ADI were invalid due to the fact that they (i) constituted assignments in gross, unaccompanied by any assets or goodwill associated with the ANDROID DATA mark, and (ii) lacked any consideration in return for the assignment of rights in the ANDROID DATA mark to ADI.

59.     In view of the foregoing, the '556 Registration is also subject to cancellation under 15 U.S.C. §1058 on the basis that the §8 Declaration was not filed by actual owner of the '556 Registration, and the time for submitting a §8 Declaration to the USPTO has now expired.

60.     Additionally, the ANDROID DATA mark of the '556 Registration was abandoned by Specht, ADC and/or ADI through their having ceased all commercial use of that mark, coupled with their lack of any *bona fide* intent to resume using that mark commercially.

61.     In view of the foregoing, the '556 Registration is subject to cancellation under 15 U.S.C. §1064 on the basis that the registered ANDROID DATA mark was abandoned.

62.     Google has been and will continue to be damaged by the continued maintenance of the '556 Registration on the Principal Register, because ownership of the '556 Registration has been asserted as grounds for Specht's, ADC's and/or ADI's unfounded claims of trademark infringement, unfair competition, deceptive trade practices and contributory trademark infringement against Google.

## COUNT II

### Fraudulent Procurement of Registration Under 15 U.S.C. §1120

63.     Google repeats and realleges the allegations contained in the foregoing ¶¶1-62.

64.     ADI's submission of the false '556 §8 Declaration to the USPTO constituted the procurement of a registration by a false or fraudulent declaration or representation, in violation of 15 U.S.C. §1120.

65.     Google has been damaged by the submission of the false and fraudulent declaration, by at least the following: (i) incurring attorney fees and costs associated with its defense of this litigation, (ii) having its reputation impugned and damaged through widespread coverage of Specht's, ADC's and ADI's allegations in the mainstream and online media and throughout the "blogosphere," and (iii) impairment of its business relationships with members of the OHA and others.

66.     Specht's and ADI's false and fraudulent representations to the USPTO have caused irreparable harm, damage and injury to Google.

## COUNT III

### Declaratory Judgment of Invalidity and Unenforceability of Purported Trademark Rights Due to Abandonment

67.     Google repeats and realleges the allegations contained in the foregoing ¶¶1-66.

68.     This is a claim for declaratory judgment arising under the Declaratory Judgment Act, 28 U.S.C. §2201.

69.     An actual and justiciable controversy exists between Google and Counterclaim Defendants Specht, ADC and/or ADI with respect to the alleged direct and contributory infringement of the Asserted Marks and unfair competition by Google.

70.     ADI purports to own rights in the '556 Registration and has asserted those purported rights as grounds for direct and contributory trademark infringement, unfair competition and deceptive trade practices claims asserted against Google.  Specht, ADC and/or ADI also allege ownership of  common law trademark, service mark, and/or trade name rights in the Asserted Marks.

71.     Years prior to Google's adoption of the ANDROID mark, Counterclaim Defendants abandoned any rights they may have had in the Asserted Marks through express statements to others as to ceasing commercial use of the mark and the associated conduct consistent therewith.

72.     Any rights which Specht, ADC and/or ADI may have possessed in the Asserted Marks are invalid and/or unenforceable as a result of the abandonment of such mark(s). Accordingly, Google is entitled to a declaratory judgment that Specht's, ADC's and/or ADI's prior rights, if any, in the Asserted Marks are invalid and unenforceable as a result of such abandonment.

## COUNT IV

### Declaratory Judgment of Invalidity and Unenforceability of Purported Trademark Rights Due to Fraudulent Procurement of U.S. Registration No. 2,639,556 and the Equitable Doctrine of Unclean Hands

73.     Google repeats and realleges the allegations contained in the foregoing ¶¶1-72.

74.     This is a claim for declaratory judgment arising under the Declaratory Judgment Act, 28 U.S.C. §2201.

75.     An actual and justiciable controversy exists between Google and Counterclaim Defendants Specht, ADC and/or ADI with respect to the alleged direct and contributory infringement of the Asserted Marks, including the '556 Registration, and unfair competition by Google.

76.     Specht, ADC and/or ADI purport to own rights in and to the ANDROID DATA trademark, and have asserted those purported rights as grounds for trademark infringement, unfair competition and deceptive trade practices claims asserted against Google.

77.     Any rights which Specht, ADC and/or ADI may have had in the purported ANDROID DATA trademark are invalid and unenforceable due to the commission of fraud before the USPTO.  ADI's statement under oath in the §8 Declaration that the ANDROID DATA mark was in use in commerce as of April 21, 2009 was false, inasmuch as neither ADI nor any other related entity had made any *bona fide* use of the ANDROID DATA trademark in commerce in association with the goods listed in the '556 Registration since at least 2002.

78.     Moreover, Specht, ADC and ADI knew that the aforementioned statement was false, inasmuch as they were aware that neither ADI nor any related entity was making any *bona fide* use of the ANDROID DATA trademark in commerce in association with the goods listed in the '556 Registration at the time said statement was made.

50

79.     By making said false statement in the §8 Declaration, ADI intended to mislead the USPTO into maintaining the '556 Registration on the Principal Register.

80.     The aforementioned false statement was material in that the USPTO would not have accepted the §8 Declaration, and maintained the '556 Registration on the Principal Register, without a statement that the ANDROID DATA mark was in use in commerce in association with the goods listed in the '556 Registration.

81.     Despite their knowledge of the false statements being made by ADI to the USPTO regarding the ANDROID DATA mark in support of the '556 Registration, Specht and ADC seek to enforce rights under the ANDROID DATA mark.

82.     Accordingly, Google is entitled to a declaratory judgment that Specht's, ADC's and/or ADI's purported ANDROID DATA mark is invalid and unenforceable as a result of ADI's commission of fraud before the USPTO.

## COUNT V

### Declaratory Judgment of Non-Infringement of Purported Trademark Rights

83.     Google repeats and realleges the allegations contained in the foregoing ¶¶1-82.

84.     This is a claim for declaratory judgment arising under the Declaratory Judgment Act, 28 U.S.C. §2201.

85.     An actual and justiciable controversy exists between Google and Counterclaim Defendants Specht, ADC and/or ADI with respect to the alleged direct and contributory infringement of the Asserted Marks and unfair competition by Google.

86.     Specht, ADC and/or ADI purport to own rights in and to the Asserted Marks and have asserted those rights as grounds for their allegations of direct and contributory trademark infringement, unfair competition and deceptive trade practices asserted against Google.

87.     Even if Specht, ADC and/or ADI possessed any valid rights in the Asserted Marks at the time of Google's adoption of the ANDROID mark, neither Google's nor any other OHA member's subsequent use of the ANDROID mark constitutes trademark infringement, unfair competition or deceptive trade practices, inasmuch as no likelihood of confusion exists between Google's ANDROID mark and Counterclaim Defendants' Asserted Marks.

88.     Google's ANDROID mark and Counterclaim Defendants' Asserted Marks are different in terms of sight, sound, connotation and/or commercial impression, such that no likelihood of confusion can exist between the two.

89.     Further, the products and/or services offered by Google and other OHA members in association with the ANDROID mark travel in different channels of trade and are encountered by different classes of consumers than any purported products and/or services offered at any time by Specht, ADC and/or ADI under any of the Asserted Marks.

90.     No actual confusion exists or has occurred between Google's or any OHA member's alleged use of the ANDROID mark and any of the Asserted Marks.

91.     Accordingly, no likelihood of confusion exists between Google's or any OHA member's use of the ANDROID mark and Counterclaim Defendants' Asserted Marks. Accordingly, Google is entitled to a declaratory judgment that its use of the ANDROID mark has not infringed, violated, or contributed to the infringement or violation of any rights which Counterclaim Defendants may have in the Asserted Marks.

## COUNT VI

### Unfair Competition - Lanham Act

92.     Google repeats and realleges the allegations contained in the foregoing ¶¶1-91.

93.     Counterclaim Defendants have made false or deceptive representations to the marketplace, including through the media and elsewhere, regarding the scope of Counterclaim

Defendants' purported rights in the ANDROID DATA mark.   Specifically, Counterclaim Defendants have falsely represented that they enjoy exclusive trademark rights in the ANDROID DATA mark in association with computer software, and that Google's and others' use of the ANDROID mark in association with the Android software platform constitutes an infringement of those rights, when in reality Counterclaim Defendants have no such rights as a consequence of their abandonment of the ANDROID DATA mark.

94.     Said false representations regarding the scope of Counterclaim Defendants' purported rights in the ANDROID DATA mark have deceived or are likely to deceive a substantial segment of the intended audience, which includes present or potential customers and users of mobile devices utilizing the Android software platform, as well as present or potential business partners of Google, into believing that Google's use of the ANDROID mark somehow violates Counterclaim Defendants' purported rights.

95.     Google has been injured by Counterclaim Defendants' false representations in at least the following ways: (i) incurring attorney fees and costs associated with its defense of this litigation, (ii) having its reputation and the goodwill associated with its ANDROID mark impugned and damaged through widespread coverage of Specht's, ADC's and ADI's allegations in the mainstream and online media and throughout the "blogosphere," and (iii) impairment of its business relationships with members of the OHA and others.

96.     Counterclaim Defendants' false representations constitute unfair competition in violation of §43(a) of the Lanham Act, 15 U.S.C. §1125(a).

97.     The acts complained of hereinabove have caused irreparable harm, damage and injury to Google.

## COUNT VII

### <u>Unfair Competition - Common Law</u>

98.    Google repeats and realleges the allegations contained in the foregoing ¶¶1-97.

99.    Counterclaim Defendants are, and at all relevant times have been, perpetrating a scheme to fraudulently claim trademark rights in the Asserted Marks for the purpose of unfairly competing with and/or obtaining valuable consideration from Google.

100.    Counterclaim Defendants' conduct, statements, and misrepresentations alleged herein were made not for the purpose of protecting or enforcing any legitimate trademark rights, but instead for the bad faith purposes of damaging and interfering with Google's and other OHA members' efforts to commercialize and market products that utilize the Android OS platform, and extracting money from Google in return for Counterclaim Defendants' dropping their claims against Google.

101.    The conduct, statements, and misrepresentations by Counterclaim Defendants, made for such illegitimate reasons, shock judicial sensibilities and violate standards of commercial morality, and therefore constitute acts of unfair competition under the common law.

102.     The acts complained of hereinabove have caused irreparable harm, damage and injury to Google, and Google has no adequate remedy at law.

103.    As a consequence of the foregoing acts of unfair competition by Counterclaim Defendants, Google is also entitled to an award of its actual damages, together with its costs and attorney's fees, and to the disgorgement of Counterclaim Defendants' ill-gotten gains.

104.    Counterclaim Defendants' acts were in bad faith, in conscious disregard of Google's rights, and were performed with the intention of depriving Google of its rights. Accordingly, Counterclaim Defendants' conduct merits, and Google seeks, an award of punitive

damages in an amount sufficient to punish Counterclaim Defendants and deter such conduct in the future.

**WHEREFORE**, Google prays that this Court grant it the following relief:

A.      A declaration that (i) Specht's, ADC's and/or ADI's purported rights in and to the Asserted Marks are invalid and unenforceable as a result of Counterclaim Defendants' abandonment thereof, (ii) Counterclaim Defendants' purported rights in and to the Asserted Marks mark are invalid and unenforceable due to ADI's or Specht's commission of fraud on the USPTO through the knowing submission of a false §8 Declaration, and (iii) even if Specht, ADC and/or ADI possessed any valid, enforceable rights in the Asserted Marks, Google's use of the ANDROID mark does not constitute trademark infringement, unfair competition, or deceptive trade practices, nor does Google contribute to the infringement of any of Counterclaim Defendants' purported rights in the Asserted Marks.

B.      An order directing the United States Patent and Trademark Office to cancel U.S. Trademark Registration No. 2,639,556 under 15 U.S.C. §1064, on the bases that (i) said registration was maintained through the commission of fraud, (ii) Specht, ADC and/or ADI have abandoned the registered mark, and/or (iii) the §8 Declaration filed on April 21, 2009 was not filed by the owner of the '556 Registration;

C.      A finding that ADI violated 15 U.S.C. §1120 by the submission of a false and fraudulent §8 Declaration to the USPTO;

D.      A finding that Specht, ADI and ADC have engaged in unfair competition under the Lanham Act and/or common law;

E.      An award to Google of monetary damages in an amount to be fixed by the Court in its discretion as just;

F.      A finding that this is an exceptional case under 15 U.S.C. §1117(a), together with an award to Google of its attorneys' fees and its costs and expenses of litigation, pursuant to 15 U.S.C. §1117(a) and (b) and the common law;

G.      An award of punitive damages resulting from Counterclaim Defendants' acts of unfair competition; and

H.      Such other and further relief as the Court may deem just, proper and equitable under the circumstances.

Respectfully submitted,

Dated:  October 23, 2009

/s Herbert H. Finn
Herbert H. Finn (ARDC #6205685)
Richard D. Harris (ARDC #1137913)
Jeffrey P. Dunning (ARDC #6273364)
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Suite 3100
Chicago, IL  60601
(312) 456-8400

COUNSEL FOR GOOGLE INC.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the date set forth below, I electronically filed the foregoing GOOGLE INC.'S ANSWER TO SECOND AMENDED COMPLAINT, AFFIRMATIVE DEFENSES AND COUNTERCLAIM with the Clerk of Court using the CM/ECF system, which will send notification of such filings to all counsel of record.

Dated:  October 23, 2009                                    /s Herbert H. Finn