**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ERICH SPECHT, et al. | ) | |
| | ) | C.A. No. 09-cv-2572 |
| Plaintiffs, | ) | |
| | ) | Judge Leinenweber |
| v. | ) | |
| | ) | Magistrate Judge Cole |
| GOOGLE INC., | ) | |
| | ) | |
| Defendant. | ) | |

**GOOGLE'S MEMORANDUM IN SUPPORT OF ITS MOTION TO COMPEL AND FOR
SANCTIONS RELATING TO THE DEPOSITION OF MARTIN MURPHY**

## I.      INTRODUCTION

In the course of a single deposition, Plaintiffs' counsel abused the attorney-client privilege and work product doctrine to prevent the witness from testifying on clearly non-privileged issues, abused the deposition process through the use of speaking objections and outright coaching, admitted to ignoring and/or destroying relevant documents responsive to a subpoena, and conceded that Plaintiffs have mis-identified relevant fact witnesses.  To provide just one of the many egregious examples, during Mr. Murphy's deposition Plaintiffs' counsel wrote a note on a pad of paper and leaned over to discuss it with the witness ***in the middle of a question***.  Google's counsel requested that the document be preserved so that Google could approach the Court with a motion to compel its production, but Plaintiffs' counsel's refused to agree to even ***preserve*** the document, stating "absolutely not."  Plaintiffs' counsel instructed Mr. Murphy not to answer any questions about the note – to the extent of even forbidding him from confirming that he had in fact received a note from his counsel in the middle of a question.  When pressed as to whether it was "too much to ask" that he preserve the note for the Court to

address later, Plaintiffs' counsel stated "I'm not answering any of your questions."  Plaintiffs'

counsel's refusal to even ***preserve a document*** is but one example of the outrageous, inexcusable

behavior by Plaintiffs' counsel during Mr. Murphy's deposition.  (Murphy Dep., Ex. A, pp. 129-

134.)

In order to remedy this behavior and prevent similar behavior in the future, Google

requests that this Court:

(1)     Order that Mr. Murphy be made available for another deposition of no more than seven
        (7) hours, with all costs, and reasonable attorney's fees to be borne and paid by Plaintiffs.
        At this deposition:

        (a) Google shall be entitled to inquire as to Mr. Murphy's bias, because Plaintiffs have
        waived any privilege on that issue by putting Mr. Murphy forward as a fact witness.

        (b) Google shall be entitled to inquire as to the facts and circumstances surrounding Mr.
        Murphy's statements to Elizabeth Woyke of Forbes.com, because to the extent there ever
        was any privilege to begin with Plaintiffs have waived privilege with respect to that
        subject matter by virtue of the public statements made by Mr. Murphy on Plaintiffs'
        behalf.

        (c) Google shall be entitled to inquire as to the facts and circumstances of Mr. Murphy's
        pre-filing investigation and preparation of the Complaint, because Google has alleged
        that Plaintiffs committed fraud in certain acts leading up to the Complaint, and Google
        has provided substantial evidence that there may be merit to its fraud claims and that Mr.
        Murphy acted together with Plaintiffs in furthering the fraud.

(2)     Order that Mr. Murphy provide a complete production of documents in his possession,
        custody and control, and a privilege log for all withheld materials dating on or before the
        date of his conversation with Elizabeth Woyke of Forbes.com, namely April 30, 2009
        (documents after this date need not be logged).

(3)     Order that the speaking objections made at Mr. Murphy's deposition were grossly
        inappropriate, imposing a court fine of $1,000 on Plaintiffs' counsel, Mr. Fleming, for
        making those speaking objections, and imposing a future fine of $500 per inappropriate
        objection going forward.

## II.     RELEVANT BACKGROUND

On April 20, 2009, Android Data Corporation did not exist.  The company had essentially

collapsed in late 2002, and Erich Specht, the sole officer and shareholder, instructed his

accountants to dissolve the company in 2004. (See Illinois Secretary of State printout noting dissolution of Android Data Corporation, Ex. B; Note to Accountants, Ex. C.) Mr. Specht had even shut down the company's website, <androiddata.com>, and relinquished control over that domain name, which is now owned by an unrelated third party. (See WHOIS data for <androiddata.com>, Ex. D.) A trademark registration for the mark "Android Data," originally filed in the year 2000, and was set to expire automatically pursuant to 15 U.S.C. § 1058 on April 21, 2009.

That changed when a third party, Mr. Robblee, tipped off Mr. Specht that Google had developed an operating system product for mobile phones known as "Android," and that he could potentially make some money off of his long-abandoned trade name. (Robblee Dep., Ex. E, pp. 77-95.) Mr. Specht told Mr. Robblee that he had abandoned his own "Android Data" mark long ago. (Id.) Despite telling Mr. Robblee that the mark was long abandoned, Mr. Specht concocted a scheme to seek payment from Google and approximately 40 members of a trade group known as the Open Handset Alliance, which is involved with the development of Google's Android software. Thus, on April 20, 2009, Mr. Specht registered a new domain name, <android-data.com>. (WHOIS report for <android-data.com>, Ex. F.) To make it appear as if "Android Data" was an ongoing business concern, he put up some old web pages that they were no more than copies of what his website had looked like years earlier in 2002. (Compare <archive.org> printouts, Ex. G, with <android-data.com> printouts, Ex. H.) In the following days, he submitted a declaration under oath to the United States Patent and Trademark Office ("USPTO") falsely claiming that he was using his "Android Data" mark "in commerce," as required under the law to maintain a trademark registration. (Use in Commerce Declaration, Ex. I.) This false declaration is the basis of one of Google's counterclaims.

Mr. Specht's sister Wendy Murphy, and brother-in-law Martin Murphy, helped to further Mr. Specht's scheme. Shortly after the call between Mr. Robblee and Mr. Specht, Wendy Murphy performed "fact" research relating to potential defendants. (Privilege Log., Ex. J.) Mr. Murphy helped to prepare an "application for reinstatement" of Android Data Corporation, and filed backdated annual corporate reports for it on an expedited basis. (Ex. K; Murphy Dep., Ex. A, 167:21-168:1.) Though he has never litigated a trademark case, Mr. Murphy prepared and filed the Complaint in this case. (Murphy Dep., Ex. A, 176:19-177:1; Rec. Doc. No. 1.) Mr. Murphy also later assisted Mr. Specht in attempting to "correct" the defective chain of title to the "Android Data" mark (Ex. L) with the USPTO; it is unclear whether Mr. Murphy was involved in the first (unsuccessful, apparently) attempt to correct the chain of title (Ex. M).

Mr. Murphy has also made false statements to the press with the intent of damaging Google's own Android trademarks and creating pressure on Google to pay him and Mr. Specht money to settle their fraudulent claims. Mr. Murphy concluded that this Court would force Google to "sit down and work this out" (*i.e.,* pay Plaintiffs money) if he named a large roster of defendants because "no judge will want to be flooded with that much paperwork." (April 30, 2009 Forbes.com article, Ex. N.) Mr. Murphy falsely stated that the "data" portion of his client's fraudulently-renewed "Android Data" mark "gets left out" for purposes of infringement. (Id.) He falsely stated that: "it's a stolen name;" "[i]t's our trademark, and Google is using it as if it's theirs." (Id.) Mr. Murphy further falsely stated that the reason for Mr. Specht's delay in filing suit was that he did not "realize" that Google was working with software, when in fact it was Mr. Robblee's phone call that prompted Mr. Specht's actions: "He had heard about the Android phone, but thought, 'That's a mobile device.' As soon as he learned it was software, he stepped up, and we filed as fast as we could." (Id.) Despite knowing full well that Mr. Specht was not

using, offering or selling anything in conjunction with the alleged "Android Data" mark. Mr. Murphy falsely stated: "My client is trying to sell something, and it looks like a knockoff of Google." (Id.)  Apparently surprised that Google had not already showered him with riches for this scam, Mr. Murphy complained that "so far, no one's offered me anything."  (Id.)  These false statements, aimed at impugning Google and its Android mark, for the improper purpose of increasing leverage, are the subject of Google's counterclaim for deceptive trade practices.

Mr. Murphy then made himself a fact witness in this case in written discovery. Particularly, Google has been seeking through written discovery (and a motion to compel, see Rec. Doc. No. 145) *any* evidence Plaintiffs might have that they used the purported "Android Data" mark "in commerce" after Android Data collapsed. Plaintiffs listed a number of entities to whom they have purportedly provided services through 2005, but seem to be unable to corroborate any services provided after 2005 and before April 20, 2009.  Even for those entities to whom Plaintiffs purportedly provided services before 2005, most of them appear to be friends and family of Mr. Specht, raising the question of whether any of these services were provided "in commerce."  One of these entities is listed as "villageinvestments.com"[1] and, in interrogatory responses which were prepared by and bear Mr. Murphy's name as counsel, Mr. Murphy is identified as *the* person having knowledge relating to "villageinvestments.com."  (Ex. O, at pp. 20-21.)  Significantly, for other entities Plaintiffs identified multiple witnesses as having knowledge, but listed only *one* witness as having knowledge regarding "villageinvestments.com" -- Mr. Murphy.  (Id.)  Since the filing of this lawsuit, additional counsel has appeared on behalf of Plaintiffs, but Mr. Murphy has not withdrawn from the case.

---

[1] Actually, the entity is Village Realty & Investment Corporation, an Illinois corporation in which Mr. Murphy is the sole shareholder.

### III.    Mr. Murphy's Deposition

Google issued a subpoena to Mr. Murphy to secure testimony regarding any purported services provided by Plaintiffs to Village Realty & Investment Co., as well as to examine the facts and circumstances surrounding Mr. Murphy's false statements to the press on behalf of Plaintiffs. (Ex. P.)  The subpoena sought both documents and a deposition.  Plaintiffs' counsel responded with objections, but did not object to presenting Mr. Murphy for a deposition.  (Ex. Q.)  Plaintiffs' counsel produced only a single document in response to the subpoena, and did not provide a privilege log for any documents that were withheld.  (Ex. R.)

Mr. Murphy's deposition began with an announcement by Plaintiffs' counsel, Mr. Fleming, that deposition testimony should be limited to "services provided by the plaintiffs to Village Realty and Investments" and "statements that Mr. Murphy may have made to the media." (Murphy Dep., Ex. A, p. 5.)  Unfortunately, Mr. Fleming prevented any useful examination on those subjects that he had just announced would be appropriate.

Mr. Fleming's coaching of Mr. Murphy's testimony began immediately, even on mundane questions such as whether Mr. Murphy was aware that he had been designated as a relevant fact witness in this case.  First, he made a speaking objection and stated that he did not understand the phrase "relevant fact witness," after which Mr. Murphy parroted the same response.  (11:21-12:4.)[2]  Next, he announced that "any knowledge that Mr. Murphy has as to what is in dispute in this case has been derived in his capacity as counsel for the plaintiffs" and instructed Mr. Murphy not to answer on the basis of privilege.  (12:11-12:20.)  Then Mr. Fleming interrupted Mr. Murphy's answer and told him what answer he should give -- both in response to pending questions and in response to an as-yet-unasked question:

---

[2] Deposition citations from this point forward are to Mr. Murphy's deposition, unless otherwise specified.

> Q.   Sir, my original question was whether or not that you, in fact, are designated as a relevant fact witness in this case.  Do you remember that question, sir?
>
> A.   I was not listed as a fact relevant --
>
> MR. FLEMING:  No, no, no.  Stop, stop, stop, stop. The question is, do you remember he asked that question?
>
> THE WITNESS:  I remember he asked the question, yes.
>
> MR. FLEMING:  ***That's the answer you give*** because you're not going to give any testimony as to whether you are or are not a relevant fact witness. ***And you're not going to give any testimony as to whether anybody else is a relevant fact witness***.  (13:11 to 14:6, emphasis added.)

After announcing that he was going to "terminate the deposition if you continue this abusive harassing behavior," Mr. Fleming again jumped in and answered a question for the witness:

> Q.   But do you understand why you're here today as a witness, sir?
>
> MR. FLEMING:  Yeah.  Because he's been subpoenaed.  That's why he's here. You issued a subpoena, and we accepted service of the subpoena.  That's why he's here.  (15:18 to 15:24)
>
> ***
>
> Why is he here?  He's here pursuant to legal process.  That's why he's here, because you guys issued a subpoena, and we accepted service. That's why we're here.
>
> ***
>
> That's the answer. Okay.  Answer the question.  Why are you here, Mr. Murphy?
>
> THE WITNESS:  Pursuant to a subpoena.
>
> MR. FLEMING:  Right.  Okay. (Page 16:6 to 16:19, attempted discussion from opposing counsel omitted.)

Mr. Fleming then began coaching his witness to invoke privilege:

> Q.   Did you review it?
>
> MR. FLEMING:  I'm going to object to the -- stop.  I'm going to object to the form of that question.  I'm going to instruct you not to answer that question to the extent that your review of this document was in connection with you acting as counsel in this case. And I'm going to instruct you not to answer this question if it would require you to reveal protected work product information.  ***And I don't think you can answer this question without revealing what you did as an attorney in this case. So can you answer the question?*** (See 17:21-19:21, emphasis added.)

In between Mr. Fleming's coaching and objections, Mr. Murphy did manage to eke out a few answers -- including confessing that Wendy Murphy is the person most knowledgeable about the services provided by Plaintiffs to Village Realty & Investment.  (Id. at 20:17-20:22.)  This revelation came as something of a surprise to Google's counsel, since Plaintiffs' interrogatory responses drafted by Mr. Murphy list *only* Mr. Murphy as having knowledge regarding Village Realty -- and now Mr. Murphy was announcing not only that there was another, undisclosed witness, but also that the undisclosed witness likely had more knowledge than he did.  When Google attempted to determine *why* Plaintiffs withheld the identity of a fact witness and instead promoted a *less knowledgeable* witness, their *own attorney* no less, Mr. Fleming again invoked the attorney-client privilege to bar any further cross examination.  (Id. at 21:12-22:15.)

The abuse of the attorney-client privilege was pervasive and it is impossible to list every example here.  Among the more egregious examples are:

(1)     Mr. Fleming instructed Mr. Murphy not to answer whether or not Mr. Specht is Mr. Murphy's brother-in-law, as purportedly privileged.  (23:6-23:20.)

(2)     Mr. Fleming and Mr. Murphy then refused to provide the date that Mr. Murphy's purported attorney-client relationship with Mr. Specht began.  (31:4-37:2.)

(3)     Mr. Fleming instructed Mr. Murphy not to answer whether he has a financial interest in the case (50:11-56:4), with Mr. Murphy at one point even asserting privilege as to whether he would assert privilege on that subject (53:21-54:3).

(4)     Mr. Murphy refused to answer whether he has any knowledge of whether Village Realty & Investment paid for the services they purportedly received from Plaintiffs.  (86:9-86:16.)

(5)     Mr. Murphy refused to answer what "custom software services" were provided to Village Realty and Investment on the grounds that, before he was retained as counsel in this case, he did not know what the phrase "custom software services" meant, and so he could not answer the question without purportedly invading privilege.  (110:12-119:11.)

(6)     Mr. Fleming instructed Mr. Murphy not to answer any questions about whether his statements to Ms. Woyke of Forbes.com were accurate.  (145:19-166:18.)

(7)     Eventually, Mr. Murphy began refusing to answer questions on his own, without even stating an objection.  (168:15-169:23.)

(8)     Mr. Murphy refused to answer whether he had conversations with third parties on the basis of privilege.  (173:13-173:20.)

Mr. Fleming's coaching of Mr. Murphy was similarly abusive, and again too numerous to list here.  Some of the most egregious offenses are:

(1)     Mr. Fleming instructed Mr. Murphy to refuse to provide any estimates because they would be "guesses."  (42:5-47:9.)

(2)     Mr. Murphy testified that he did not know which of the Plaintiffs provided services to Village Realty and Investment.  (70:13-70:19.)  When Google inquired as to whether there are any documents that would contain that information, Mr. Fleming first objected that such information was privileged, then demanded a break while a question was pending, over opposing counsel's objection.  (70:20-78:5.)  When they returned, Mr. Murphy suddenly remembered which of the Plaintiffs purportedly provided services to Village Realty & Investment.  (78:12-79:10.)  Mr. Fleming continued coaching on this point in later testimony.  (101:18-101:20, 102:19-102:21.)

(3)     After Mr. Murphy testified that he had received a voice mail from Forbes.com contributor Elizabeth Woyke (126:4-126:5), Mr. Fleming coached Mr. Murphy to retract that testimony.  (233:4-234:9.)

(4)     In the middle of a question, Mr. Fleming leaned over to Mr. Murphy and pointed to something he had written on a pad of paper.  Mr. Fleming refused to disclose what was written there and refused to even preserve the note he handed to the witness in the middle of questioning.  (129:3-134:17.)

(5)     When the witness stated that he could not recall anything about his conversation with Ms. Woyke, Google's counsel asked Mr. Murphy to review Ms. Woyke's article and identify in anything there that appeared familiar to him, but Mr. Fleming consistently interrupted and told Mr. Murphy to state that he did not remember anything.  (135:4-145:8; see also 150:5-150:6.)

In addition to all of the coaching and inappropriate claims of privilege, Mr. Murphy also refused to provide a coherent answer as to why he only produced a single document in response to the subpoena issued to him, where documents might be located, how he searched for documents, whether he had placed his documents in a "dumping ground," or why he hadn't provided a privilege log. (Ex. A, pp. 190-226.)

Google acknowledges that it did eventually obtain answers to *some* of the questions above. But it should not have taken twenty pages of questions for Mr. Murphy to acknowledge that he knew he had been designated a fact witness, or that he is Mr. Specht's brother-in-law. Moreover, for even those questions that Mr. Murphy did eventually answer, Mr. Fleming's filibustering has effectively rendered the record utterly useless.

## II. The Relevant Legal Standards

### A. Deposition Objections

"Any objection during a deposition must be stated concisely and in a non-argumentative and non-suggestive manner. A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation directed by the court, or to present a motion under Rule 30(d)(4)." Fed.R.Civ.P. 30(d)(1). The Seventh Circuit views this rule as particularly unforgiving. In *Redwood v. Dobson*, 476 F.3d 462, 468 (7th Cir. 2007), it censured and admonished *all* counsel involved in a deposition where the witness' attorney directed his client not to answer questions such as whether he was a homosexual (which had nothing to do with the case). There the Court said:

> Gerstein would have been entitled to stalk out of the room. Webber justifiably could have called off the deposition and applied for a protective order (plus sanctions). Fed.R.Civ.P. 26(c), 30(d)(3), (4). Instead he told Gerstein not to answer, which was untenable as no claim of privilege had been advanced.

*Id*. Abusing the attorney-client privilege and using speaking objections to coach witnesses is sanctionable. In *Banco Del Atlantico, S.A. v. Woods Industries Inc.*, 519 F.3d 350, 352 (7th Cir. 2008), the Seventh Circuit upheld case-ending sanctions:

> The deposition began in January 2006, but produced virtually no information because plaintiffs' counsel interposed an inordinate number of privilege and work product objections, instructing Huerta Cova not to answer even basic questions. For instance, counsel instructed Huerta Cova not to answer this question: "Are you a witness as a representative of HSBC Mexico today?

*Id.* Indeed, counsel's behavior in *Banco Del Atlantico* is quite similar to Plaintiffs' counsel's behavior in this case, for example instructing the witness not to answer whether Mr. Specht is his brother-in-law, as being purportedly privileged.

### B. Attorney-Client Privilege and Work Product

In order for the attorney client privilege to attach, the communication in question must be made (1) in confidence; (2) in connection with the provision of legal services; (3) to an attorney; and (4) in the context of an attorney-client relationship. *United States v. BDO Seidman, LLP*, 492 F.3d 806, 815 (7th Cir. 2007).

In order for work product to attach, the evidence or testimony sought must contain "the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." Fed.R.Civ.P. 26(b)(3). But the work product immunity is a qualified one, and can be overcome by a showing of substantial need, though the Court must still protect against disclosure of mental impressions, opinions, conclusions, or legal theories. Fed.R.Civ.P. 26(b)(3). The qualified immunity afforded by the work product doctrine may be waived. See *U.S. v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975) What constitutes a waiver depends on the circumstances. *Id.*

### C. Waiver

Both attorney-client privilege and work product protection are subject to waiver. Disclosure of the purportedly privileged communication to third parties will result in waiver. *Powers v. Chicago Transit Authority*, 890 F.2d 1355, 1359 (7th Cir.1989) (citing *U.S. v. Buljubasic*, 808 F.2d 1260, 1268 (7th Cir.1987)). And as a general rule waiver of privilege with respect to one communication waives the privilege as to all other communications dealing with the same subject matter. *Blanchard v. EdgeMark Financial Corp.*, 192 F.R.D. 233, 236 (N.D.Ill. 2000); *Fujisawa Pharmaceutical Co., Ltd. v. Kapoor*, 162 F.R.D. 539, 541 (N.D.Ill. 1995)

("Voluntary disclosure of privileged information about a matter waives the privilege as to all information on the same subject matter."). A party cannot "exploit selective disclosures for tactical advantage." *In re Consolidated Litig. Concerning Int'l Harvester's Disposition of Wisconsin Steel*, 666 F.Supp. 1148, 1153 (N.D.Ill. 1987). For example, in *Vardon Golf Co., Inc. v. Karsten Mfg. Corp.*, 213 F.R.D. 528, 532 -533 (N.D.Ill. 2003), the Court found that a party's attorney's "reference to and quotation of the privileged communications waived the privilege." The attorney "selectively chose to reveal specific statements to the court and the public. Quoting from privileged documents was inconsistent with the confidential nature of the attorney-client relationship. Having selectively disclosed some of the communications, [counsel] waived Vardon's attorney-client privilege protecting those communications." *Id*. "Thus, whenever the communication is intended by the client to be made public or revealed to third persons the element of confidentiality is destroyed and with it the privilege." *In re Langswager*, 392 F.Supp. 783, 786 (C.D.Ill. 1975). "Similarly, if the same statements have been made by the client to third persons on other occasions this is persuasive that like communications to the attorney were not intended to be confidential." *Id*. (citing 8 Wigmore, Evidence § 2311 (McNaughton rev. 1961); McCormick, Evidence § 95 (2d ed. 1972); *Colton v. United States*, 306 F.2d 633 (2d Cir. 1962)).

### D. Crime/Fraud Exception to Attorney-Client Privielege

The attorney-client privilege is also inapplicable where the communications were in furtherance of a fraud scheme. *U.S. v. BDO Seidman*, 492 F.3d 806, 818 (7th Cir. 2007). The exception ensures that the privilege does not protect the confidences of wrongdoers. *Id*. "[W]hen the advice sought relates not to prior wrongdoing, but to future wrongdoing, the privilege goes beyond what is necessary to achieve its beneficial purposes." *Id*. (quotations and citations omitted). "The privilege is waived…when the client uses the attorney-client

relationship to engage in fraudulent or criminal activity rather than merely to defend against charges." *United States v. Davis*, 1 F.3d 606, 611 (7th Cir. 1993).

"[T]he party seeking to abrogate the attorney-client privilege must present *prima facie* evidence that 'gives colour to the charge' by showing 'some foundation in fact.'" *BDO Seidman*, 492 F.3d at 818 (quoting *United States v. Al-Shahin*, 474 F.3d 941, 946 (7th Cir. 2007) and *Clark v. United States*, 289 U.S. 1, 15, 53 S.Ct. 465, 77 L.Ed. 993 (1933)). "'Prima facie evidence' does not mean enough to support a verdict in favor of the person making the claim. Instead, a party has established a prima facie case whenever it presents evidence sufficient to require the adverse party, the one with superior access to the evidence and in the best position to explain things, to come forward with that explanation. The privilege will remain if the court finds the explanation satisfactory." *Medallion Products, Inc. v. McAlister*, 2008 WL 4542997, *10 (N.D.Ill. 2008) (citations and quotations omitted).

### E.     Sanctions under Rule 37

A "district court is not required to impose the least drastic sanction for a discovery violation, but we are required to impose a sanction that is proportionate to the party's violation." *Wilson v. Sundstrand Corp.*, 2003 WL 21961359, 14 (N.D.Ill. 2003) (issuing evidentiary sanctions for speaking objections and coaching during deposition). An evasive or incomplete disclosure is treated as a failure to disclose. Fed.R.Civ.P. 37(a)(4). A Court may sanction a party for failure to disclose pursuant to Fed.R.Civ.P. 37(c), which authorizes payment of expenses, including attorney's fees, stemming from the failure to disclose; informing the jury of the party's failure to disclose; directing certain facts be taken as established; prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing certain evidence; striking pleadings in whole or in part; staying further proceedings

until the order is obeyed; dismissing the action or proceeding in whole or in part; and rendering a default judgment against the disobedient party.

## III.    Argument

### A.    Mr. Murphy is a relevant, discoverable fact witness.

At the outset, because Mr. Murphy is an attorney and is counsel of record in this case, it is important to first establish that Mr. Murphy is a highly relevant fact witness. While Google and its counsel are not in the habit of deposing opposing parties' lawyers, Plaintiffs and Mr. Murphy have put Mr. Murphy forward as a fact witness on the issue of what services, if any, Plaintiffs provided to Village Realty & Investment during a relevant time period. Indeed, Mr. Murphy's own name appears in the signature block of the interrogatory responses naming him as a fact witness.[3] (Ex. O.)

Separately, Mr. Murphy has put his own statements -- on which Google's counterclaim is partially based -- at issue by giving an interview to Elizabeth Woyke of Forbes.com. In that interview he made a number of provably false statements, including statements wherein he quotes attorney-client communications. Thus, to the extent Mr. Murphy finds himself a fact witness in this case, that situation is of his and his clients' own doing.

Finally, there is substantial doubt as to whether there is *any* merit to the assertions of privilege here. Rather, it appears that Mr. Murphy's continued involvement in this case limited solely to provide an excuse to shield Mr. Murphy from testifying. Mr. Murphy and his counsel have refused to provide even the most basic information necessary to evaluate a claim of privilege, such as the date, time, and subject matter of a purportedly privileged communication. As it is Plaintiffs' burden of proof to establish privilege, Plaintiffs presumably are unable to do

---

[3] Why Plaintiffs did so – in light of Mr. Murphy's testimony that he is *not* knowledgeable about these matters and that these questions would be better directed to Wendy Murphy – is a total mystery.

so. Mr. Murphy's participation in hearings and conference calls had essentially ceased until he received a subpoena from Google. In the absence of any substantive support for Plaintiffs' claim of privilege, it appears that Mr. Murphy's renewed interest in the case is a sham.

**B.    There is no legitimate claim of privilege.**

Plaintiffs do not have a legitimate claim of privilege with respect to the two subject matter areas they agree are relevant -- services provided by Plaintiffs to Village Realty & Investment, and Plaintiffs' false statements (through Mr. Murphy) to the press.

There is nothing privileged about the relationship between Plaintiffs and Village Realty & Investment, because no attorney-client relationship exists between Village Realty & Investment and Plaintiffs. Throughout Mr. Murphy's deposition, Plaintiffs attempted to cloak simple fact evidence in privilege with the excuse that, if he learned about that fact evidence after he was retained as counsel in this case, it must be privileged or work product material. That argument lacks merit. If Mr. Murphy, as the sole shareholder of Village Realty and Investment, has reviewed factual, non-privileged documents relating to events occurring from the year 2000 to the date of this lawsuit, information he learned from those documents is not privileged merely because he also purportedly serves as counsel in this case. The documents, and Mr. Murphy's refreshed recollections, are not based upon confidential communications made for the purpose of seeking legal advice. Nor does the work product protection apply, since Mr. Murphy would have reviewed such documents anyway to refresh his recollection as a fact witness. Bare facts are simply not privileged.

Likewise, there is no privilege associated with Mr. Murphy's public statements to the press. Mr. Murphy's public statements relied almost exclusively on communications from his client, and to the extent that Mr. Murphy repeated such information to the press, Plaintiffs waived any attorney-client privileged associated with the subject matter of those statements.

Moreover, the crime-fraud exception applies here. Google has submitted substantial documentary evidence that (a) Plaintiffs were not using the mark "Android Data" in commerce before April 20, 2009, and (b) that Mr. Murphy personally assisted Plaintiffs in their scheme to defraud Google by falsely claiming that they had been using the "Android Data" mark in commerce. Mr. Murphy personally assisted in reinstating the defunct corporation, preparing the false allegations in the Complaint, and further making false allegations in the press. And the documents of record also show that Mr. Murphy was well aware of the fraudulent nature of his statements -- he attached to the Complaint documents that show that Plaintiffs' Android Data Corporation had been abandoned years earlier.

Likewise, there is no feasible claim of privilege with respect to the issue of Mr. Murphy's bias. It was Mr. Murphy who first declared himself a fact witness in this case, and whether he expects to receive a chunk of any damages award is a highly relevant and appropriate question relating to his credibility. Mr. Murphy cannot selectively breach the privilege by making public statements on his clients' behalf and then simultaneously use the privilege as a shield to prevent further discovery on those statements.

Accordingly, Plaintiffs simply do not have *any* legitimate claim of privilege associated with (a) Mr. Murphy's knowledge (or lack thereof) regarding services provided by Plaintiffs to Village Realty & Investment, (b) Mr. Murphy's false statements to the press, including his factual bases (or lack thereof) for those statements, or (c) facts that would tend to show Mr. Murphy's bias as a witness, including whether he is entitled to a percentage of any monetary recovery by Plaintiffs.

### C. Mr. Fleming's and Mr. Murphy's deposition behavior is sanctionable.

As discussed above, Mr. Fleming's and Mr. Murphy's inappropriate behavior was so pervasive it would be impossible to list every offense here. No amount of summarizing can do

justice to the onslaught of inappropriate statements, instructions, and behavior that occurred during the deposition. Mr. Fleming's speaking objections are clearly prohibited under Fed.R.Civ.P. 30. Mr. Murphy's evasiveness, and abusive use of purported attorney-client privilege, constitutes a failure to respond to a discovery request. Such behavior is plainly sanctionable under the Rules.

**D. Mr. Murphy's answers regarding document production are woefully inadequate.**

In addition to their inappropriate deposition behavior, Mr. Murphy's document production, and his answers to questions about document production, are grossly inadequate. First, Mr. Murphy clearly has (or at least had) non-privileged documents in his possession. Documents relating to his expedited filings with the secretary of state, for example, are clearly not privileged. Moreover, some of the documents in his possession might well be within the scope of the subject matter waiver of privilege associated with his false statements to the press. Without even a privilege log identifying the allegedly privileged documents in his possession, custody and control up to the date of those false statements, Google cannot even evaluate the claims of privilege.

**E. Plaintiffs withheld the identity of the *proper* witness for <villageinvestments.com>.**

Not only did Plaintiffs themselves put Mr. Murphy forward as a fact witness regarding services purportedly provided by Plaintiffs to Village Investments, but they inexplicably failed to identify the more knowledgeable witness on that issue. Google's interrogatory called for the disclosure of *all* fact witnesses for each customer that purportedly received services from Plaintiffs. (Ex. O.) Plaintiffs clearly understood this request because they listed multiple fact witness for other purported customers. (Id.) But for Village Realty & Investments, Plaintiffs

listed Mr. Murphy, and only Mr. Murphy, as having knowledge with regard to any services that

Plaintiffs provided to Village Realty & Investments.

During Mr. Murphy's deposition, it quickly became clear that Wendy Murphy -- Mr.

Murphy's wife and Mr. Specht's sister -- has greater knowledge of any purported relationship

between Plaintiffs and Village Realty & Investments:

> **Q.**   **Well, did any of the plaintiffs ever provide Village Investments with services, sir?**
> A.    To the best of my knowledge, yes.
> **Q.**   **And what individuals, besides yourself, would know about those services?**
> A.    Wendy Murphy.
> **Q.**   **Would Wendy know more or less about the services than you?**
> A.    More.
> **Q.**   **So with regard to questions about the services provided to Village Investments from March of 2001 to February of 2005, Wendy would actually have more knowledge than you?**
> A.    To the best of my knowledge.

(Murphy Dep., Ex. A, 20:13-21:10 (objections omitted)).  Why Plaintiffs submitted Mr.

Murphy to cross-examination on this subject when his wife is apparently more qualified to

answer these questions is unfathomable.

> **F.    Google has attempted to resolve this dispute without court intervention.**

While Google would certainly have been justified in seeking relief from the Court no

more than 20 minutes into Mr. Murphy's deposition, Google's counsel patiently examined each

subject matter area with Mr. Murphy to determine if there were any questions he *would* answer.

And though Google does not believe a Rule 37 conference is necessary under these egregious

circumstances, Google attempted to conduct a Rule 37 conference with opposing counsel.

Opposing counsel was not willing to agree to the relief requested herein, and refused to discuss

any substantive aspects of Mr. Murphy's deposition unless it was done on a question-by-question

basis – which would be impossible given the sheer number of inappropriate objections during the

deposition. Moreover, Google is entitled to an oral deposition, not deposition through written questions. Plaintiffs' counsel only raised one substantive case during the conference, which is not relevant because it deals with whether a party may prevent the deposition of an attorney from occurring in the first place -- a matter Plaintiffs and Mr. Murphy waived by not seeking a protective order. At least one of Plaintiffs' counsel was not even prepared, and admitted during the purported Rule 37 conference that he had not even read the deposition transcript. Instead of dealing with the conduct during the deposition, Plaintiffs' counsel attempted to steer the discussion towards their and Mr. Murphy's purported compliance under Rule 11. But Google has not alleged fraud in filing the Complaint. What Google has alleged is is fraud on the US Patent and Trademark Office and in connection with Google's unfair competition claims. Google has not raised any Rule 11 violations that may be present in the Complaint or any of the subsequent amended complaints -- at least not yet.

## IV.    REMEDIES

Each remedy sought here is carefully tailored to address Plaintiffs', and their counsel's, reprehensible behavior.

First, as set forth above, Mr. Fleming's behavior was so inappropriate and so pervasive as to render the current deposition transcript essentially useless (other than as support for this motion). What few substantive answers Mr. Murphy gave are so crowded by Mr. Fleming's filibustering that no effective cross examination could be had. Moreover, Mr. Fleming's countless inappropriate instructions to Mr. Murphy not to answer questions prevented Google's counsel not only from obtaining answers to those questions, but also from asking further follow-up questions to whatever answers Mr. Murphy might have given. The subject matter areas which Google was prevented from fully exploring include:

(1)      Mr. Murphy's potential bias as a fact witness, including whether he expects to receive money depending on the outcome of this lawsuit, and whether he is currently receiving fees for this lawsuit.

(2)      Mr. Murphy's factual basis for the public statements he made to Elizabeth Woyke at Forbes.com, including any knowledge he had of information contradicting his statements.

(3)      Mr. Murphy's document production and document retention relating to this lawsuit and to the subpoena served upon him, including whether he threw away documents relating to this lawsuit after the lawsuit was filed.

Accordingly, the Court should order Plaintiffs to make Mr. Murphy available for a second deposition, to be conducted solely at Plaintiffs' expense, including reasonable attorneys' fees, to be reimbursed to Google within fourteen days of the completion of the deposition. The Court's order should confirm that the subject areas identified above are discoverable subject matter, not subject to privilege, and that any disputes be immediately addressed to the Court by telephone.

Second, the Court should order Mr. Murphy to provide a complete document production, including a privilege log detailing documents dated on or before April 30, 2010 (the date of Mr. Murphy's conversation with Ms. Woyke). If Mr. Murphy is unable to produce documents or a privilege log, he must be prepared to testify under oath, and in detail, why he cannot prepare one.

Third, the Court should explicitly confirm that the speaking objections and privilege objections made at Mr. Murphy's deposition were grossly inappropriate, impose a court fine of $1,000 on Mr. Fleming personally, and impose a future fine of $500 per inappropriate objection going forward.

## V.     CONCLUSION

For the reasons set forth in hereinabove, Google respectfully requests that this Court grant the relief requested herein.

<div style="margin-left: 45%;">

Respectfully submitted,

</div>

Dated:  May 3, 2010

<div style="margin-left: 45%;">

/s Cameron M. Nelson
Herbert H. Finn
Jeffrey P. Dunning
GREENBERG TRAURIG, LLP
77 W. Wacker Drive, Suite 3100
Chicago, IL  60601
(312) 456-8400

Counsel for Google Inc.

</div>