**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ERICH SPECHT, et al. | ) | |
| | ) | C.A. No. 09-cv-2572 |
| Plaintiffs, | ) | |
| | ) | Judge Leinenweber |
| v. | ) | |
| | ) | Magistrate Judge Cole |
| GOOGLE INC., | ) | |
| | ) | |
| Defendant. | ) | |

**GOOGLE'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY
JUDGMENT**

## TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................1

II. BACKGROUND ........................................................................................................1

   A. The Collapse of Android Data Corporation in 2002. .......................................1

   B. Mr. Specht Did Not Use the ANDROID DATA Mark in 2003. .....................3

   C. Mr. Specht Stopped Hosting Websites For His Friends and Family in Early 2005, and Made No Use of the Asserted Marks in 2005. ...............................4

   D. Mr. Specht Failed to Use Any of the Asserted Marks After 2005 .................6

   E. Mr. Specht Took No Action Regarding His Asserted Marks Until Kenneth Robblee Contacted Him to Propose Shaking Down Google ...........................8

III. SUMMARY JUDGMENT IS APPROPRIATE WHERE, AS HERE, THERE IS NO GENUINE DISPUTE OF MATERIAL FACT. ......................................................12

IV. COUNT I: GOOGLE DOES NOT INFRINGE ANY REGISTERED MARK ...............12

   A. Plaintiffs' Have Abandoned Any Rights They May Have Had in the Registered ANDROID DATA Mark ..............................................................12

   B. Mr. Specht Has Not Used The ANDROID DATA Mark In Connection With E-Commerce Software Since 2002. ................................................................14

   C. Mr. Specht's Abandonment Of His Trademark Registration Was Intentional. ...........19

V. GOOGLE DOES NOT INFRINGE ANY OF THE ALLEGED UNREGISTERED MARKS. ...................................................................................................................22

   A. Mr. Specht Must First Prove Ownership Of A Protectable Mark Under Common Law. ................................................................................................22

   B. Mr. Specht Cannot Demonstrate Any Interest, Let Alone a Protectable Interest, In Any Of The Unregistered Asserted Marks. ..................................23

     1. Mr. Specht's website hosting for friends and family does not constitute use of the Asserted Marks. ......................................................................24

     2. Mr. Specht did not use the Asserted Marks in his work for his wife's Aunt and employer, Picket Fence Realty. ................................................26

     3. Mr. Specht's remaining alleged "uses" do not constitute trademark "use." ..............26

VI. THERE IS NO CONTRIBUTORY INFRINGEMENT OR VIOLATION OF DECEPTIVE TRADE PRACTICES BY GOOGLE ..................................................27

VII. GOOGLE IS ENTITLED TO SUMMARY JUDGMENT ON COUNTS I AND III OF ITS COUNTERCLAIM ..........................................................................................28

VIII. CONCLUSION .......................................................................................................28

TABLE OF AUTHORITIES

**Federal Cases**

*AHP Subsidiary Holding Co. v. Stuart Hale Co.*,
   1 F.3d 611 (7th Cir. 1993) ................................................................................................28

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .......................................................................................................12

*Avakoff v. Southern Pacific Co.*,
   765 F.2d 1097 (Fed. Cir. 1985) .......................................................................................17

*Burgess v. Gilman, Case No,*.
   3:03-cv-0707 (D.Nev. Feb. 23, 2006) .......................................................................15, 16

*Custom Vehicles, Inc. v. Forest River, Inc.*,
   476 F.3d 481 (7th Cir. 2007) ...........................................................................................15

*D 56, Inc. v. Berry's Inc.*,
   955 F.Supp. 908 (N.D.Ill. 1997) ......................................................................................27

*De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate Inc.*,
   440 F.Supp.2d 249 (S.D.N.Y. 2006) ........................................................................20, 22, 24

*Emergency One, Inc. .v American Fireeagle, Ltd.*,
   228 F.3d 531 (4th Cir. 2000) ............................................................................................20

*Financial Systems Software, Ltd. v. Financial Software Systems, Inc.*,
   85 F.Supp.2d 482 (E.D.Pa. 1999) ....................................................................................13

*Imperial Tobacco Ltd. v. Philip Morris, Inc.*,
    899 F.2d 1575, 1581 (Fed. Cir. 1990) ............................................................................20

*In re Longardner & Assoc., Inc.*,
   855 F.2d 455 (7th Cir. 1988) ...........................................................................................16

*ITC Ltd. v. Punchgini, Inc.*,
   482 F.3d 135, 149 n.9 (2nd Cir. 2007) .............................................................................20

*Jaffe v. Simon & Shuster Inc.*,
   3 USPQ2d 1047 (S.D.N.Y. 1987) ...............................................................................25, 26

*Matrix Motor Co., Inc. v. Toyota Jidosha Kabushiki Kaisha*,
   290 F.Supp.2d 1083 (C.D.Cal. 2003) ..............................................................................20

*McDonald's Corp. v. Burger King Corp.*,
   107 F.Supp.2d 787 (E.D.Mich. 2000) ..............................................................................23

*McKay v. Mad Murphy's, Inc.*,
   899 F.Supp. 872 (D.Conn. 1995) .....................................................................................16

*Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*,
  128 F.3d 1111 (7th Cir. 1997) ................................................................27

*Metropolitan Life Ins. Co. v. O'M & Assoc. LLC*,
  2009 WL 3015210 (N.D.Ill. Sept. 16, 2009) ............................14, 15, 19

*Micromuse, Inc. v. Micromuse, PLC*,
  304 F.Supp.2d 202 (D.Mass. 2004) .......................................................20

*Morningside Group Ltd. v. Morningside Capital Group, L.L.C.*,
  182 F.3d 133 (2nd Cir. 1999) .................................................................18

*Natural Answers, Inc. v. SmithKline Beecham Corp.*,
  529 F.3d 1325 (11th Cir. 2008) .......................................................18, 21

*S. Indus., Inc. v. Diamond Multimedia Systems, Inc.*,
  991 F.Supp. 1012 (N.D.Ill. 1998) ...............................................12, 13, 17

*S. Indus., Inc. v. JL Audio, Inc.*,
  29 F.Supp.2d 878 (N.D.Ill. 1998) ...............................................12, 17, 18

*S. Industries, Inc. v. Stone Age Equipment*,
  12 F.Supp.2d 796 (N.D.Ill. 1998) .......................1, 2, 5, 6, 7, 12, 13, 18, 19, 23, 27

*Sands, Taylor & Wood Co. v. The Quaker Oats Co.*,
  978 F.2d 947 (7th Cir. 1992) ...........................................................13, 14

*Sensient Technologies Corp. v. Sensoryeffects Flavor Co., - ,
  F.3d -  (8th Cir. 2010) ............................................................................16

*Specht v. Google, Inc.*,
  660 F.Supp.2d 858 (N.D.Ill. 2009) ...................................................18, 19

*T.A.B. Systems v. Pactel Teletrac*,
  77 F.3d 1372 (Fed. Cir. 1996) ...............................................................17

*Trans Union LLC v. Credit Research, Inc.*,
  142 F.Supp.2d 1029 (7th Cir. 2001) ......................................................27

*Warren Publishing Co. v. Spurlock*,
  No. 08-3399, 645 F. Supp. 2d 402, 2009 U.S. Dist. LEXIS 68199, 2009 WL 2412542, at *33
  (E.D. Pa. Aug. 4, 2009) ..........................................................................21

*Zazu Designs v. L'Oreal, S.A.*,
  979 F.2d 499 (7th Cir. 1992) .................................................................18

## Federal Statutes

15 U.S.C. § 1058(a)-(b) ..................................................................................8

15 U.S.C. § 1058(c) ........................................................................8, 9, 10, 11

15 U.S.C. § 1065 ...........................................................................................8

15 U.S.C. § 1127 .................................................................................................................... 14

15 U.S.C. §1064 ..................................................................................................................... 28

15 U.S.C. §1125(a) ................................................................................................................. 22

15 U.S.C. §1127 ..................................................................................................................... 19

15 U.S.C. §1927 ..................................................................................................................... 19

**Federal Rules**

Fed.R.Civ.P. 56(c) .................................................................................................................. 12

## I.      INTRODUCTION

Plaintiffs Erich Specht, Android Data Corporation, and The Android's Dungeon, Inc. all

claim rights in the mark ANDROID DATA for use in association with e-commerce software.

The Plaintiffs also alleged rights in the marks ANDROID DATA, ANDROID SERVER, and

ANDROID DATA WEB EDITOR,[1] for use with various computer related services.  In filing the

lawsuit, Plaintiffs have alleged that Google's open-source ANDROID operating system software

for mobile devices infringes Plaintiffs' purported rights – despite an utter lack of any *bona fide*

use of the Asserted Marks since at least 2002.  Because the record establishes that Plaintiffs

abandoned their rights many years ago, Google moves for summary judgment on each Count of

Plaintiffs' Second Amended Complaint.[2]

Reminiscent of the infamous Leo Stoller, Plaintiffs allege trademark infringement and

unfair competition despite knowing that they possess absolutely no evidence that they used the

asserted ANDROID DATA mark (or any of the Asserted Marks) anytime after 2002.  *See S.*

*Industries, Inc. v. Stone Age Equipment*, 12 F.Supp.2d 796, 819 (N.D.Ill. 1998) (noting Mr.

Stoller's case relied solely upon "highly questionable (and perhaps fabricated) documents,"

uncorroborated testimony from Mr. Stoller, affidavits from interested witnesses, and "otherwise

utterly inadequate evidence.").  This Court should deal with Mr. Specht's claims in the same way

that prior Courts have dealt with Mr. Stoller – by dismissing them in their entirety.

## II.     BACKGROUND

### A.      The Collapse of Android Data Corporation in 2002.

In 1998 or 1999, Erich Specht started a home-based internet business which he named

"Android Data Corporation."  (Google's Statement of Uncontested Material Facts in Support of

---

[1] Plaintiffs' alleged marks are collectively referred to as the "Asserted Marks."
[2] Because Android Data Corporation and The Android's Dungeon, Inc. are closely held companies in which Mr. Specht and his wife are the only shareholders and officers, Plaintiffs are referred to collectively as "Mr. Specht."

Motion for Summary Judgment,[3] ¶ 1.)  The "Android Data" product offered by Mr. Specht was "a suite of software that enables the remote administration of e-commerce content," comprised of a caching server, content manager, and administrator's toolkit.  (Facts ¶ 3.)  His primary client was an Illinois based business where his wife worked, called Design Toscano, and its affiliated company, Basil Street Gallery, where the Android Data product was used to process sales of goods via the company's Internet website.  (Facts ¶ 4.)  This software resided on a server that Mr. Specht controlled -- he considered it "proprietary" and did not readily share it.  (Facts ¶¶ 27-31.)  There is no evidence that the term "Android Data" ever appeared on the Design Toscano or Basil Street Gallery websites.  (Facts ¶¶ 3-4.)  Although he had a few other paying customers, Mr. Specht did not license his Android Data software suite to any of those customers.  (Facts ¶ 7.)  Mr. Specht also provided free website hosting for a few friends and acquaintances.  (Id.)

While Mr. Specht filed for a federal trademark registration for the mark ANDROID DATA for use in association with "computer e-commerce software to allow users to perform electronic business transactions via a global computer network" in 2000 (Facts ¶ 2), his business had collapsed by the time the registration issued in October, 2002 (Facts ¶¶ 2, 8-25).  Indeed, Design Toscano and Basil Street Gallery had already decided to stop doing business with Mr. Specht, and Mr. Specht had decided to shut down his business and sell all of its assets.  (Facts ¶¶ 8-10.)  By the end of 2002, Mr. Specht had: 1) laid off his only employee (Facts ¶ 13), 2) cancelled his agreement for co-locating his website hosting servers (Facts ¶ 16), 3) told friends that Android Data Corporation was "officially" dissolved (Facts ¶ 21), 4) closed Android Data Corporation's books (Facts ¶ 21), 5) disconnected his business phone line (Facts ¶ 69), and 6)

---

[3] Hereinafter Google's Statement of Uncontested Material Facts filed herewith will be referred to as "Facts."

placed ads to sell the corporation (Facts ¶ 12).[4]  Because he no longer had a client base (Facts ¶ 17), and was planning to collect unemployment payments (Facts ¶ 14), he put "most of [his] hope in a new batch of music recordings that were just about done."  (Facts ¶ 15.)[5]

**B.    Mr. Specht Did Not Use the ANDROID DATA Mark in 2003.**

In 2003, Mr. Specht made no use of the ANDROID DATA mark, or any of the other Asserted Marks; he merely wrapped up some outstanding issues relating to the closed Android Data Corporation, did some favors for friends and family, and started working full time at Reed Business.  (Facts ¶¶ 23-32.)

Mr. Specht's total revenue (outside his employment at Reed) in 2003 totaled about $4,000, which came exclusively from two sources, and he has absolutely no evidence that he used any of the Asserted Marks in connection with those sources.  (Facts ¶¶ 18, 24, 26, 33, 72.)  One paying "client" was Picket Fence Realty (his wife's aunt and employer), who paid him $100 per month for website hosting services, and approximately $2,000 for some website design work. (Facts ¶¶ 18, 20.)  The other "client" was an individual named David Finn who paid Mr. Specht to do some undefined "computer maintenance."  (Facts ¶ 72.)  Mr. Specht has produced no documents that show the use of any of the Asserted Marks in connection with either of these clients.  (Facts ¶¶ 26, 33, 43, 72.)  Indeed, at the beginning of 2003, Mr. Specht stopped billing Picket Fence as "Android Data Corporation" and began billing them as "The Android's Dungeon, Inc."  (Facts ¶ 26.)

Nor did Mr. Specht make any effort to promote or use the Asserted Marks through the handful of websites he was hosting for his friends and family.  After February of 2003, Mr.

---

[4] Mr. Specht vacillates between stating that he was selling the business, or merely the assets of the business.  In any event, any distinction Mr. Specht is attempting to draw is not material for purposes of this Motion.
[5] When Mr. Specht "entered into the web thing [he] knew that [he] was looking to do it for the short hall [sic]," and getting back into his music was what he "really" wanted to do.  (Facts ¶ 11.)

Specht was hosting websites for his sister Wendy Murphy, his friend Jonathan Sazonoff, and his brother-in-law's company, Village Realty & Investment. (Facts ¶ 19.) Of all of these sites, Mr. Specht claims (without any corroborating evidence) that only one of them mentioned ANDROID DATA -- his sister's site, which purportedly bore the tagline "Site Design by Android Data Corporation," which linked to <androiddata.com>. However, even if his sister's website did bear that language in 2003, that lone hyperlink would have been in place before Mr. Specht shut down Android Data Corporation in 2002 and is nothing more than a mere remnant of his prior work on that site prior to 2002. Indeed, during this time, Mr. Specht expressly and repeatedly confirmed that he had "shut down" Android Data Corporation. (Facts ¶ 27.)

In 2003, Mr. Specht nearly sold the assets of Android Data Corporation to Quadra Network. (Facts ¶¶ 28-31.) However, that deal collapsed when the buyer demanded to see Mr. Specht's proprietary software in operation, and Mr. Specht was either unable or unwilling to provide a working demonstration. (Facts ¶ 29.) Further, the ANDROID DATA mark had no value to Quadra in the transaction. As part of the proposed deal, Quadra insisted that Mr. Specht merely abandon, not transfer, any rights he had in the ANDROID DATA mark and registration. (Facts ¶ 30.) After the sale to Quadra fell through, Specht took a full-time job with Reed Business, where, until last month, he continued to work full-time. (Facts ¶ 32.)

C. **Mr. Specht Stopped Hosting Websites For His Friends and Family in Early 2005, and Made No Use of the Asserted Marks in 2005.**

Things remained essentially unchanged from 2004 until the first quarter of 2005. Mr. Specht continued to host a few websites for friends and family (at no charge) through March of 2005. Again, there is not a shred of evidence in the record demonstrating that he made any use of the Asserted Marks during this period. Nor is there any evidence that Mr. Specht used his "Android Data" e-commerce software suite for any of these websites -- which were not e-

commerce websites. And, of course, with the possible exception of the remnant Mr. Specht claims appeared on his sister's website, none of them bore any reference to the Asserted Marks. (Facts ¶¶ 18-19.)[6]

Throughout 2004 and early 2005, Mr. Specht further confirmed his intent to abandon Android Data Corporation and the Asserted Marks. For example, he repeatedly asked people to stop contacting him at the "erichspecht@androiddata.com" email address (Facts ¶¶ 34, 36) and repeatedly confirmed to his accountants that the Android Data Corporation business should be formally dissolved. In addition, he instructed his accountants to dissolve The Android's Dungeon, Inc.[7] as well. (Facts ¶¶ 35, 37-38.)

In March of 2005, Mr. Specht stopped hosting (free or otherwise) any websites. (Facts ¶ 41.) Further, he relinquished control over the <androiddata.com> domain name, stating that he "intentionally let that go." (Facts ¶ 42.) Even his last paying client, Picket Fence (where his wife worked), went elsewhere. (Facts ¶ 41.) Later in 2005, Mr. Specht was contacted by Jordan May (a longtime friend) of HuTech Resources regarding a potential project. (Facts ¶ 44.) Rather than accepting the work, he referred it to Andrew Sapp, the same person who was then handling Picket Fence's website. (Id.) And nowhere in any of this correspondence did any of the Asserted Marks appear.

Moreover, while Mr. Specht continued to correspond with his wife while she worked at Picket Fence during and after 2005, he provided at most only general computer advice and suggestions, did not bill for any of that advice, and -- once again -- did not use any of the

---

[6] To the extent that Mr. Specht may have generated invoices for Picket Fence Realty, they were issued under Mr. Specht's name or "The Android's Dungeon, Inc." with no use of any of the Asserted Marks. (Facts ¶¶ 18-19, 26.)
[7] While Mr. Specht and his attorneys have come up with a creative "explanation" of why he chose the term Android, the genesis for Mr. Specht's selection is clearly his fondness for certain popular TV shows -- where the Star Trek series has an android character named Data and the cartoon series The Simpsons has a comic book store named The Android's Dungeon. Mr. Specht merely attributes this similarity to a happy coincidence.

Asserted Marks in connection with that advice.  (Facts ¶ 43.)

### D.      Mr. Specht Failed to Use Any of the Asserted Marks After 2005

There is no evidence that Mr. Specht used any of the Asserted Marks after he shut down
Android Data Corporation, let alone after he took down his home hosting network in 2005, up
through the date he filed this lawsuit in April of 2009.  Android Data Corporation remained
dissolved; his business telephone line remained disconnected; and he had absolutely no sales
and/or revenue associated with computer hardware or software goods or services.[8]  The only
activity Mr. Specht can point to during this entire four-year period is (a) a purported mailing of
an unsolicited brochure to unknown recipients in December, 2007, which resulted in no business,
(b) a letter to long-time friend Jordan May in February, 2008 which resulted in no business, and
(c) conversations with another friend, Warren Crum, which resulted in no business until ***after*** Mr.
Specht filed the present lawsuit.  All during this time, Mr. Specht turned down numerous
opportunities to do programming work, and did not use or promote the Asserted Marks.

As to the brochure, Mr. Specht claims that he sent the brochure in December, 2007.  He
has identified a list of 114 ***potential*** persons/companies to whom he ***may have*** sent the brochures,
but he "[doesn't] know specifically which ones" he sent the brochure to; he can only say that the
brochures went to "at least half" of the people on that list.  (Facts ¶ 47.)  Mr. Specht has no
documents that confirm that the brochures were ever sent, has not provided forensic data
establishing a foundation for the electronic files associated with the brochures, and even admits
this purported mailing did not result in ***any*** potential client contacts.  (Id.)

As to Mr. Specht's letter to Jordan May of HuTech Resources (an Illinois company) in

---

[8] In his interrogatory answers and at his deposition, Mr. Specht attempted to cover his non-use of the marks by
claiming that his wife provided "real estate services" under the mark "Android," simply because her employer (and
aunt) wrote her real estate brokerage commission checks to "The Android's Dungeon, Inc."  This argument is too
frivolous to merit a response.

early 2008 that "offered" a modification of his "Android Data Software," HuTech did not take Mr. Specht up on his offer, and Mr. Specht did not actually do any work for HuTech at any point in time after 2002. (Facts ¶ 49.)

As to Mr. Specht's discussions with Warren Crum of Northwest Recovery[9] about a programming project, Mr. Specht never used the Asserted Marks in those discussions, and did not perform any actual work until after this lawsuit was filed in April of 2009. (Facts ¶ 52.)

Regardless of those occurrences, other activity in 2008 confirms Mr. Specht's continued abandonment of his business and the Asserted Marks. Apparently knowing her brother's lack of interest in doing work outside of his full-time employment, when his sister asked for website advice, she avoided asking Mr. Specht to help her. Rather, she asked how she could do it herself. More importantly, none of the Asserted Marks ever entered their discussions. (Facts ¶ 48.) When another acquaintance, Karen Mader, contacted Mr. Specht about setting up a website, he did not offer his own services but again suggested other companies. (Facts ¶ 50.) And, once again, neither Mr. Specht nor his potential customer made any use of the Asserted Marks. (Id.) When Mr. Specht did several months worth of volunteer web design work for the Palatine Township Democrats in the fall of 2008, he again made no mention of his Asserted Marks. (Facts ¶ 51.)

While Mr. Specht was doing nothing with the Asserted Marks, Google was busy developing its open-source operating system. Google announced its open-source Android operating system on November 5, 2007. (Facts ¶ 45.) The first phones containing the Android operating system hit the market in October, 2008. (Facts ¶ 46.) Despite Google's public introduction and Mr. Specht's knowledge of the phones, Mr. Specht remained silent until April

---

[9] Warren Crum is partial owner of Northwest Recovery, the business for which Mr. Specht's work is intended. Not coincidentally, Mr. Crum is partners in that business with Shaun Tiernan -- Mr. Specht's brother-in-law. (Facts ¶ 52.) [CITE].

of 2009.

### E. Mr. Specht Took No Action Regarding His Asserted Marks Until Kenneth Robblee Contacted Him to Propose Shaking Down Google

Despite the 2002 collapse of Android Data Corporation and Mr. Specht's nonuse of

ANDROID DATA from 2003 through 2009, Mr. Specht's federal trademark registration

remained active. It was set to be cancelled by the U.S. Patent and Trademark Office ("USPTO")

on April 22, 2009, for failure to provide evidence of continued use in commerce. (Facts ¶ 53.)

A federal trademark registration must be maintained via a "Section 8" affidavit of continuing use

filed between the fifth and sixth years from the date of registration. 15 U.S.C. § 1058(a)-(b).

After that deadline expires, there is a "grace" period of six months, during which the affidavit of

continuing use may still be filed, subject to the payment of a surcharge. 15 U.S.C. § 1058(c). If

the registrant's goods and/or services have been in continuous use for five years, the registrant

may also file an affidavit under "Section 15" to establish the mark as "incontestable." 15 U.S.C.

§ 1065. Applicants commonly file a "Combined Section 8 and 15" affidavit.

Because Mr. Specht's trademark registration for ANDROID DATA issued on October 22,

2002, as of April 20, 2009 the initial due date for declarations of continuing use had already

passed on October 22, 2008, and the six-month "grace" period was set to expire in two days, on

April 22, 2009. 15 U.S.C. § 1058(c). But on April 20, 2009, Mr. Specht received a call from

Kenneth Robblee, an individual from Tacoma, Washington, offering to purchase the ANDROID

DATA trademark registration for $1,000. (Facts ¶ 54.) While Mr. Specht contests portions of

his multiple conversations with Mr. Robblee, he agrees that the conversations occurred. Mr.

Robblee testified that Mr. Specht told him he had abandoned the ANDROID DATA mark when

he dissolved Android Data Corporation. (Facts ¶ 55.) Mr. Robblee testified that he disagreed

with Mr. Specht and suggested that Mr. Specht take action to preserve his trademark rights. Mr.

Robblee further testified that he specifically suggested putting the old Android Data Corporation website back on the Internet, and filing the necessary documentation with the USPTO to fraudulently maintain the registration. (Facts ¶ 56.) Mr. Robblee also suggested that Mr. Specht authorize him to broker a deal based on the premise that Mr. Specht was willing to let the registration be cancelled in exchange for a cash payment:

> So, you know, there's nothing illegal about it. And if I needed to, I could have one of my trademark attorneys make the approach. But it's something you'd probably want to follow up on because it's a company that is very well heeled. They've got more money than they know what to do with. But, you know, if you're going to let it expire anyways, we can just say that for some consideration, you know, either create it or let it expire and not tell them that you were going to do that anyways.

(Voice Mail Kenneth Robblee to Erich Specht; Facts ¶ 57.)

Mr. Specht denies that he authorized Mr. Robblee to approach the "well-heeled company" that Mr. Robblee mentioned in his voice mail, but Mr. Robblee did in fact contact Google and make an offer exactly as outlined in his voice mail. (Facts ¶ 58.) Mr. Specht also denies that Mr. Robblee suggested reinstating his old "Android Data" website. Yet, on that very day, just two days before the expiration of the grace period, that is exactly what Mr. Specht did. (Facts ¶ 59.) Late that night, after speaking with Mr. Robblee, Mr. Specht registered a new domain name, <android-data.com> (his former <androiddata.com> domain name was unavailable), and immediately posted a near-identical copy of the old Android Data Corporation website, which had not been live for years. (Id.)

Mr. Specht admits that he had not been aware of the need to file declarations with the USPTO and that Mr. Robblee apprised him of the impending deadlines. (Facts ¶ 60.) The very next day, on April 21, 2009, Mr. Specht filed a Section 8 Declaration of Use with the USPTO. (Id.) Mr. Specht declared that the ANDROID DATA mark was in use in commerce in

association with e-commerce software. (Id.) To support the Declaration, Mr. Specht submitted a screenshot of the newly re-created website that was identical to his 2003 website except that he had added an "order" link and changed the copyright and trademark taglines at the bottom of the page. (Facts ¶ 61.) Mr. Specht's website specimen submitted with the Declaration still described his "Android Data" software as "a suite of software that enables the remote administration of e-commerce content," comprised of a caching server, a content manager, and an administrator's toolkit. (Id.) As further "evidence" of use, Mr. Specht submitted with the Declaration an old screenshot of what purports to be the "Android Data Content Manager," that was accessible only from his personal laptop computer. (Id.)

Notwithstanding these representations to the USPTO under oath (and penalty of perjury), Mr. Specht has not produced any documents or evidence showing that he has sold or licensed his Android Data software suite since 2002. (Facts ¶¶ 22-23.) Likewise, Mr. Specht has not produced any evidence of an offer to sell the Android Data software suite since 2002, aside from the unauthenticated, unsolicited 2007 brochure, and the solitary, unsuccessful letter to his friend Jordan May in February 2008. Further, Mr. Specht cannot explain why he put his wife's name on the sworn Declaration that he prepared and filed with the USPTO, even though he could have executed the Declaration himself. (Facts ¶ 62.)

Curiously, Mr. Specht also recorded an assignment of the ANDROID DATA trademark registration on April 21, 2009. (Facts ¶ 64.) The assignment purports to be a 2004 assignment of the trademark registration from Android Data Corporation to The Android's Dungeon, Inc. But Megan Specht signed the assignment as President of The Android's Dungeon, Inc., when she was not in fact the President of that company. (Facts ¶¶ 64, 65.) While Mr. Specht claims to have drafted this 2004 assignment himself, he has not produced any drafts, files or other

documents to support that claim. (Facts ¶ 66.) Even more curious is the fact that Mr. Specht did not record this assignment with the USPTO in 2004, but did so only on April 21, 2009, one day before his registration was set to be cancelled. (Facts ¶ 64.)

In September 2009, he recorded a second "corrected" assignment – this one purporting to transfer the trademark years earlier, as of December 26, 2002. (Facts ¶ 67.) This "corrected" assignment is also suspect. While Mr. Specht claims that he executed it in 2002, and just happened to have found it more recently, he could not have executed the assignment in 2002. He again testified that he personally drafted this 2002 assignment, and that he based his draft on papers that were provided to him by his counsel in preparation for closing the deal with Quadra Networks. These documents, on which the 2002 Assignment was purportedly based, were not drafted by his attorney until almost six months later in 2003. (Facts ¶¶ 68-69.) Mr. Specht's signature on that assignment is, according to his own testimony, falsely dated at best.

After submitting the fraudulent Declaration to the USPTO, Mr. Specht, with the help of counsel Martin Murphy, then reinstated Android Data Corporation by filing ***back-dated*** annual reports with the Illinois Secretary of State. (Facts ¶ 63.) Mr. Specht provides no explanation for reinstating Android Data Corporation, other than wanting to leave his "options" open – the same options he had during 2004, 2005, 2006, 2007 and 2008 when he took no action to reinstate the corporation. (Id.) Within days of his conferences with Mr. Robblee, Mr. Specht then filed suit on April 28, 2009 against Google and members of the Open Handset Alliance, alleging (a) infringement of his registered ANDROID DATA mark for use with e-commerce software, and (b) infringement of his unregistered ANDROID DATA, ANDROID SERVER, and ANDROID DATA WEB EDITOR marks for use with computer hardware and software services including web page design, custom software application development, and consulting on software and

hardware issues. Mr. Specht's counsel, Martin Murphy, then announced to the press that the

reason he had named so many defendants was to obtain a nuisance value settlement, stating: "No

judge will want to be flooded with that much paperwork. We'll probably be asked to sit down

and work this out." (Facts ¶ 70.)

## III. SUMMARY JUDGMENT IS APPROPRIATE WHERE, AS HERE, THERE IS NO GENUINE DISPUTE OF MATERIAL FACT.

"Summary judgment is appropriate if the pleadings, depositions, answers to

interrogatories, and admissions on file…show that there is no genuine issue as to any material

fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c);

*S. Indus., Inc. v. Diamond Multimedia Systems*, Inc., 991 F.Supp. 1012, 1016 (N.D.Ill. 1998). "A

genuine issue of material fact exists for trial when, in viewing the record and all reasonable

inferences drawn from it in a light most favorable to the non-movant, a reasonable jury could

return a verdict for the non-movant." *S. Indus., Inc. v. JL Audio, Inc.*, 29 F.Supp.2d 878, 887

(N.D.Ill. 1998) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). But while the

Court must draw inferences in the non-movant's favor, if the non-movant's evidence is "merely

colorable, or is not significantly probative, or just raises some metaphysical doubt as to the

material fact, summary judgment may be granted." *Stone Age Equipment, Inc.*, 12 F.Supp.2d at

803 (citations and quotations omitted).

## IV. COUNT I: GOOGLE DOES NOT INFRINGE ANY REGISTERED MARK

### A. Plaintiffs' Have Abandoned Any Rights They May Have Had in the Registered ANDROID DATA Mark

Mr. Specht asserts infringement of the mark ANDROID DATA, as registered at the

USPTO, for use with e-commerce software. To prove infringement of a registered mark, Mr.

Specht must show (1) that the "Android Data" mark is registered; (2) that Google used the mark

in commerce without Mr. Specht's consent; and (3) that the Google's use is likely to confuse

consumers or deceive the public. *Stone Age Equipment*, 12 F.Supp.2d at 803. Mr. Specht does

currently possess a federal trademark registration for the mark "Android Data," limited to

**"computer e-commerce software to allow users to perform electronic business transactions**

**via a global computer network."** (Facts ¶ 2.) Ordinarily, the analysis would next turn to a

likelihood of confusion analysis. *Stone Age Equipment*, 12 F.Supp.2d at 804. But Google

alleges – and demonstrates below – that Mr. Specht abandoned any rights in the mark by the end

of 2002.[10]

Mere registration of a mark does not create or maintain any trademark rights; actual use

of the mark is essential. "Because trademark rights derive from the use of a mark in commerce

and not from mere registration of the mark, the owner of a mark will lose his exclusive rights if

he fails to actually use it." *Sands, Taylor & Wood Co. v. The Quaker Oats Co.*, 978 F.2d 947,

944-45 (7th Cir. 1992). "Only active use allows consumers to associate a mark with particular

goods and notifies other firms that the mark is so associated. Trademark rights are acquired by

adoption and use, not by registration. Registration itself only establishes a rebuttable

presumption of use as of the filing date." *Diamond Multimedia Systems, Inc.*, 991 F.Supp. at

1018 (citing *Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 503 (7th Cir. 1992)). "[A]ctual and

continuous use is required to acquire and retain a protectable interest in a mark." *Financial*

*Systems Software, Ltd. v. Financial Software Systems, Inc.*, 85 F.Supp.2d 482 (E.D.Pa. 1999)

Abandonment is a clearly defined statutory defense:

A mark shall be deemed to be "abandoned" if…its use has been discontinued with
intent not to resume such use. Intent not to resume may be inferred from
circumstances. **Nonuse for 3 consecutive years shall be *prima facie* evidence of**

---

[10] In earlier filings with the Court, Google has argued that abandonment occurred in 2004, the year Android Data
Corporation was involuntarily dissolved by the State of Illinois. Through further discovery, Google has determined
that the actual date of abandonment is well before 2004 and no later than December 31, 2002.

**abandonment.** "Use" of a mark means the *bona fide* use of such mark made in the ordinary course of trade, **and not made merely to reserve a right in a mark.**

15 U.S.C. § 1127 (emphasis added). Thus, three years of nonuse gives rise to a presumption of abandonment, which "may be rebutted only by 'evidence explaining the nonuse or demonstrating the lack of an intent not to resume use.'" *Quaker Oats*, 978 F.2d at 955 (*quoting Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 938 (7th Cir. 1989)). "Residual use, such as token use, use by sale of the remaining inventory containing the mark, or use merely to prevent others from using the mark, are not *bona fide* uses under the Lanham Act." *Metropolitan Life Ins. Co. v. O'M & Assoc. LLC*, 2009 WL 3015210, *3 (N.D.Ill. Sept. 16, 2009) (citations and quotations omitted).

**B.  Mr. Specht Has Not Used The ANDROID DATA Mark In Connection With E-Commerce Software Since 2002.**

Mr. Specht's federal trademark registration is limited to a single product – "Computer e-commerce software to allow users to perform electronic business transactions via a global computer network." (Facts ¶ 2.)[11] (Id.) The only product Mr. Specht allegedly sold that fits within that description is his Android Data suite of software that enables the remote administration of e-commerce activity on websites. (Facts ¶ 3.)

By his own admission, Mr. Specht has not "offered for sale, sold, licensed or distributed" his Android Data e-commerce software after 2002. In interrogatory responses, Mr. Specht identifies only three customers to whom he licensed his proprietary e-commerce software suite. (Facts ¶ 22.) The same interrogatory response reveals that Mr. Specht's relationship with each of those customers ended in 2002. (Facts ¶ 23.) Mr. Specht does not identify any other customers to whom he provided his proprietary e-commerce software suite – under the ANDROID DATA

---

[11] The lack of services in the federal registration is telling in and of itself, implying that at the time of registration Mr. Specht did not consider himself to be using the ANDROID DATA mark in connection with any services.

or any other mark. (Id.)[12] Accordingly, while it is unclear whether Mr. Specht's limited licensing of his e-commerce software product to three customers all in the state of Illinois is sufficient to acquire any trademark rights in the first place, *see Custom Vehicles, Inc. v. Forest River, Inc.*, 476 F.3d 481, 485 (7th Cir. 2007), **it is undisputed** that Mr. Specht has not "sold, licensed or distributed" his proprietary e-commerce software since 2002.[13]

Despite the clear lack of use, Mr. Specht contends that he **offered** his e-commerce software for sale after 2002. Particularly, he points to:

(a) His failed attempt to advertise and sell the assets of Android Data Corporation;

(b) His purported mailing of a brochure in 2007, **after** Google had introduced its Android operating system to the public;

(c) His letter to longtime friend Jordan May in 2008, **after** Google had introduced its Android operating system to the public; and

(d) The ongoing existence of the residual "Android Data" website at <androiddata.com> after Mr. Specht dissolved his business at the end of the 2002.

None of these purported "offers" of the ANDROID DATA mark constitute *bona fide* use of the mark in association with e-commerce software.

Mr. Specht's attempt to sell the assets of Android Data Corporation after dissolving that company is not evidence of use, but rather evidence of his intent to cease all use. *See Burgess v. Gilman*, Case No. 3:03-cv-0707, 2006 WL 449212, *5 (D.Nev. Feb. 23, 2006) (mere sale of business assets does not constitute use of mark). Mr. Specht began to plan for the sale of his business as early as May, 2002. (Facts ¶ 10.) Mr. Specht closed out Android Data Corporation's books at the end of 2002, turned off the phone line, and (if you assume the 2002 assignment is

---

[12] Mr. Specht does identify a couple of other customers for whom he purportedly provided "custom e-commerce application development." This is not the same thing as licensing e-commerce software, and in any event it occurred before 2002 and is of no import for purposes of this Motion or the Court's analysis.

[13] At his deposition, Mr. Specht attempted to re-interpret his interrogatory responses to include "e-commerce" where it never previously appears. Inasmuch as Google does not understand the basis for this meritless position, Google reserves the right to address it in its Reply brief should Plaintiffs attempt to pursue this line of reasoning in their Response.

authentic, which Google does not) transferred its assets to his other corporation, The Android's Dungeon, Inc.[14] (Facts ¶¶ 21, 74.) Throughout late 2002 and in the first half of 2003, he attempted to find a buyer for the remaining assets of Android Data Corporation. (Facts ¶¶ 12, 28-31.) He came close to closing a deal with Quadra Networks in May of 2003, where Quadra had no interest whatsoever in acquiring the Android Data trademark – the proposed contract explicitly stated that Mr. Specht would abandon the trademark. (Id.) Because Mr. Specht was attempting to divest himself of all title and interest in his e-commerce software, his attempted sale of the Android Data Corporation assets does not constitute "use" of a trademark. *Gilman*, 2006 WL 449212 at *5. Moreover, the contemplated contract with Quadra shows that Mr. Specht intended to expressly abandon the ANDROID DATA trademark, and that the trademark had no value.

Mr. Specht's purported mailing of a brochure in 2007, if it occurred at all, is also legally inadequate to establish use. *See Sensient Technologies Corp. v. Sensoryeffects Flavor Co.*, - F.3d - , 2010 WL 2836624, *5 (8th Cir. 2010) (use of mark in two presentations to customers, correspondence, press release, and website did not satisfy the requirements for use in commerce). Indeed, it is not even admissible evidence, since Mr. Specht cannot establish that the purported 2007 mailing ever existed or who, if anyone, received it. *In re Longardner & Assoc., Inc.*, 855 F.2d 455 (7th Cir. 1988) (while mail ordinarily presumed received, the presumption only applies if the proponent of the evidence can prove that the mailing was properly addressed, stamped and mailed). (Facts ¶ 47.)

Mr. Specht's only evidence of his purported mailing is a computer-generated printout of

---

[14] Further, Plaintiffs can not rely on their purported assignments (if indeed those were ever executed in 2002 and/or 2004) as purported "use." Assignment of a mark to a holding company without making any efforts to use or sell under the mark does not constitute "bona fide" use, and is not probative of an intent to resume use. *McKay v. Mad Murphy's, Inc.*, 899 F.Supp. 872, 880-81 (D.Conn. 1995).

the purported brochure bearing what purports to be a 2007 copyright date, and an electronic file

containing names and addresses, which Mr. Specht claims to be the list of 114 potential

businesses *from which he selected some unidentified subset* to send the brochure.  (Facts ¶ 47.)

Mr. Specht has not produced any original copies of the purported 2007 brochure, or any

electronic forensic data that would support his testimony.  *See Diamond Multimedia Sys.*, 991

F.Supp. at 1019-20 (finding catalog and brochure insufficient to establish use where plaintiff

"provide[d] no affirmative evidence that it ever distributed or that potential purchasers ever

received the 1988 catalog or the 1995 brochure it relies on to establish its right in the STEALTH

mark [and] likewise neglected to provide address lists or other proof that the three solicitation

letters were ever mailed").   And even if this "evidence" were admissible, it is well established

that the mere mailing of unsolicited advertising materials does not constitute use of the mark.

*See id.* ("Mere advertising of a product and documentary use of a symbol apart from the goods

does not constitute trademark use"); *Avakoff v. Southern Pacific Co.*, 765 F.2d 1097, 1098 (Fed.

Cir. 1985) (form letter solicitations sent to retailers concerning software program did not

constitute a use in commerce);  *S Indus., Inc. v. JL Audio, Inc.*, 29 F.Supp.2d 878, 887 (N.D.Ill.

1998) (A "plethora of advertising materials allegedly sent to wholesale buyers" insufficient to

constitute use; "mere advertising and documentary use of a notation apart from the goods do not

constitute technical trademark use");  *T.A.B. Systems v. Pactel Teletrac*, 77 F.3d 1372, 1375-75

(Fed. Cir. 1996) (Press releases and promotional materials bearing the mark do not qualify as

"use in commerce").

　　　　Likewise, Mr. Specht's single letter to a single potential customer in 2008 (again, <u>after</u>

17

Google began using the accused ANDROID mark)[15] is not sufficient use of a mark to maintain trademark rights. *See JL Audio*, 29 F.Supp.2d at 887 (noting that even a "plethora of advertising materials allegedly sent to wholesale buyers" was insufficient to demonstrate use); *Morningside Group Ltd. v. Morningside Capital Group, L.L.C.*, 182 F.3d 133, 138 (2nd Cir. 1999) ("Mere advertising and promotion of a mark in this country are not enough to constitute 'use' of the mark 'in commerce,' so as to bring the activity within the scope of the Lanham Act"); *Natural Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325, 1330 (11th Cir. 2008) (Putative negotiations amounting to "nothing more than an unsolicited proposal by [plaintiff] that led nowhere" is not enough to evidence use in commerce sufficient to avoid summary judgment of abandonment). Mr. Specht sent a letter to his good friend Jordan May of HuTech Resources, Inc. in early 2008, suggesting that his "Android Data" software might be customized to meet HuTech's needs. (Facts ¶ 49.) Mr. Specht's isolated use of the term Android Data in a letter to his friend is not "use" sufficient to create trademark rights, for the same reason Mr. Specht's purported 2007 mailing is not sufficient use to confer any trademark rights. *See Stone Age Equipment, Inc.*, 12 F.Supp.2d 796, 805-11 (N.D.Ill. 1998) (finding use of mark in a single catalog insufficient to give rise to trademark rights in the absence of evidence that it was followed by active use). A few sales (and there are *no* sales here) to friends are insufficient as a matter of law to give rise to any trademark rights. *Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 503 (7th Cir. 1992).

Similarly, Mr. Specht's website at <androiddata.com> was mere advertising and does not constitute a use in commerce. *Specht v. Google, Inc.*, 660 F.Supp.2d 858, 863-64 (N.D.Ill. 2009).

---

[15] Indeed, evidence of Plaintiffs' purported use of the ANDROID DATA mark after Google began using its own ANDROID mark in November 2007 is entirely irrelevant to the issue before the Court. *See Stone Age Equip.*, 12 F.Supp.2d at 811 (noting that the plaintiffs' evidence of use in December 1988 and thereafter "becomes irrelevant in light of our determination that [defendant] began using STEALTH . . . in the summer of 1988").

The mere failure to disable a residual website after 2002, when Mr. Specht had shut down Android Data Corporation and was no longer doing any business under the ANDROID DATA mark, does not somehow negate the abandonment of his mark in 2002. Mere advertising simply is not use. *Google,* 660 F.Supp.2d at 863-64 (N.D.Ill. 2009). It is clear from the record that the only purpose, if any, this website served after 2002 was to assist in the attempted sale of Android Data Corporation's assets, and Plaintiffs have presented no evidence that the website served ***any*** purpose from mid-2003 through 2005. *See Metropolitan Life Ins. Co.*, 2009 WL 3015210 at *3 (noting that residual use of a mark, such as token use, is not a *bona fide* trademark use under the Lanham Act).

In addition, Mr. Specht's purported uses in 2007 and 2008 came ***five and six years after he had already ceased all use*** of the Android Data mark, and more importantly, came ***after*** Google began using its own ANDROID mark. (Facts ¶¶ 45-46.) *See Stone Age Equip.*, 12 F.Supp.2d at 811 (noting that the plaintiffs' evidence of use in December 1988 and thereafter "becomes irrelevant in light of our determination that [defendant] began using STEALTH . . . in the summer of 1988"). Mr. Specht cannot identify any *bona fide* use of ANDROID DATA in connection with e-commerce software between the end of 2002 and Google's November 5, 2007 announcement of the ANDROID operating system. This five-year period is well beyond the three-year period of nonuse required to establish a ***presumption*** of abandonment. 15 U.S.C. §1127.

### C.    Mr. Specht's Abandonment Of His Trademark Registration Was Intentional.

Because Mr. Specht has admitted to nonuse of his registered ANDROID DATA mark in connection with e-commerce software, and because that nonuse began in 2002, Mr. Specht is presumed to have abandoned his mark. 15 U.S.C. §1927. Mr. Specht can only rebut this

presumption with evidence of intent to resume use of the mark. *Russ Berrie & Co*., 886 F.2d at 938. Moreover, that intent to resume "***must be formulated during the three-year period of non-use*.**" *ITC Ltd. v. Punchgini, Inc*., 482 F.3d 135, 149 n.9 (2nd Cir. 2007) (emphasis added)**.**

Mr. Specht now alleges that he had a subjective intent to use the ANDROID DATA mark in connection with e-commerce services at some future date. But subjective intent alone is not enough to avoid a finding of abandonment. *See Micromuse, Inc. v. Micromuse, PLC*, 304 F.Supp.2d 202, 216-218 (D.Mass. 2004) (Plaintiff's statements of a subjective intent to someday revive the company as a going concern are insufficient to avoid abandonment where plaintiff "cannot point to any use of the mark after 1994 in the rendering of goods or services in commerce"). "A bare assertion of possible future use is not enough." *De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate Inc.*, 440 F.Supp.2d 249, 273 (S.D.N.Y. 2006). Indeed, if all a party had to do to avoid a finding of abandonment was to aver that it never intended to abandon the trademark, then no trademark would ever be abandoned, no matter how long its use had been withdrawn from the market, or how inchoate and speculative any intention to resume its use. *See Imperial Tobacco Ltd. v. Philip Morris, Inc*., 899 F.2d 1575, 1581 (Fed. Cir. 1990).

Accordingly, Mr. Specht cannot defeat an abandonment claim "by simply asserting a vague, subjective intent to resume use of a mark at some unspecified future date." *Emergency One, Inc. .v American Fireeagle, Ltd.*, 228 F.3d 531, 537 (4th Cir. 2000). "Trademark rights are not established by goals and dreams. They are established only through prior use of the mark in the marketplace. . . [Plaintiff's] goals and dreams of selling a high-end passenger car do not demonstrate evidence of valid trademark rights." *Matrix Motor Co., Inc. v. Toyota Jidosha Kabushiki Kaisha*, 290 F.Supp.2d 1083, 1089 (C.D.Cal. 2003). Rather, an intent to resume use of the mark can only come from evidence that shows a genuine and substantial consideration of a

business idea where use of the mark would be resumed." *Warren Publishing Co. v. Spurlock*, No. 08-3399, 645 F. Supp. 2d 402, 2009 U.S. Dist. LEXIS 68199, 2009 WL 2412542, at *33 (E.D. Pa. Aug. 4, 2009).

Where, as here, the record unquestionably demonstrates that Plaintiffs have in no way undertaken "actual and continuous use" since 2002 to "retain" an enforceable interest in the Asserted Marks, the mark is abandoned and there is no valid trademark upon which Plaintiffs can base a claim. *Natural Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325, 1330 (11th Cir. 2008). Mr. Specht's newly found intent to resume use is soundly contradicted by the objective evidence found in his own emails and other statements, which reveal that:

(a)     Mr. Specht decided to sell his corporation as early as May, 2002 (Facts ¶ 10);

(b)     Mr. Specht had always intended to be in the computer business for the "short haul" because music was what Mr. Specht "really" wanted to do (Facts ¶ 11);

(c)     Mr. Specht cancelled his co-location internet hosting service in 2002 (Facts ¶ 16);

(d)     Mr. Specht believed Android Data Corporation to be "officially dissolved as of 12/31/02" (Facts ¶ 21);

(e)     Mr. Specht closed Android Data Corporation's books at the end of 2002 (Facts ¶ 21);

(f)     In 2003, Mr. Specht began billing his only remaining paying client, Picket Fence Realty, under the name The Android's Dungeon, Inc. (Facts ¶ 26);

(g)     In 2003 Mr. Specht told his friends to stop contacting him at his "erichspecht@androiddata.com" email address (Facts ¶ 34);

(h)     Mr. Specht confirmed his intent to abandon Android Data Corporation in November, 2003 and January, 2004 (Facts ¶ 35);

(i)     Mr. Specht again asked his friends to stop contacting him at his "erichspecht@androiddata.com" email address in 2004 (Facts ¶ 36);

(j)     Mr. Specht never filed an "assumed name" application for The Android's Dungeon, Inc. doing business as "Android Data," even though he filed a number of other assumed name applications for other ventures (Facts ¶ 71);

21

(k)     Mr. Specht stopped hosting websites for friends and acquaintances in early 2005 (Facts ¶ 41);

(l)     Mr. Specht allowed his own <androiddata.com> domain name to expire after he shut down his home hosting network (Facts ¶ 42);

(m)     Mr. Specht repeatedly turned down new work (Facts ¶¶ 44, 48, 50);

(n)     Mr. Specht took on a handful of programming projects but never used any of his Asserted Marks in connection with those projects. (Facts ¶¶ 51-52); and

(o)     Mr. Specht's took absolutely no steps to use his mark until he learned from Mr. Robblee that a "well heeled" company might be interested in the mark. (Facts ¶¶ 54-62.)

Thus, Mr. Specht's statements and actions taken over nearly a decade demonstrate not only an expressed *intent* to abandon, but the actual abandonment of the ANDROID DATA mark. That type of express abandonment cannot be undone -- and especially not by belated, specious, and unsupported expressions of intent to resume use of the mark. *See De Beers*, 440 F.Supp.2d at 273 (finding abandonment where, "[a]part from a bare assertion, defendants offered no support for their claim of an ongoing plan to resume use, [and] there is ample evidence" of abandonment).

## V.     GOOGLE DOES NOT INFRINGE ANY OF THE ALLEGED UNREGISTERED MARKS.

### A.     Mr. Specht Must First Prove Ownership Of A Protectable Mark Under Common Law.

As noted above, Mr. Specht's trademark registration covers only the mark ANDROID DATA used in association with e-commerce software - a product. While Mr. Specht also alleges in Count II, based on 15 U.S.C. §1125(a), that Google has infringed the unregistered marks ANDROID DATA (used in association with various services, which are not covered by Mr. Specht's registration), ANDROID SERVER, and ANDROID DATA WEB EDITOR, Mr. Specht bears the higher burden of proving the existence of such rights under common law, which

22

**requires a showing of continuous and bona fide use** "sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." *Stone Age Equip.*, 12 F.Supp.2d at 805. *See also McDonald's Corp. v. Burger King Corp.*, 107 F.Supp.2d 787, 789-90 (E.D.Mich. 2000) ("[T]he burden of proving common law trademark rights is greater than that simply to support registration of a mark, [and] a party establishes a common law right to a trademark only by demonstrating that its use of the mark was 'deliberate and continuous, not sporadic, casual or transitory.'"). Thus, to prevail on his claims under §1125(a), Mr. Specht must prove that he acquired prior, protectable rights in the Asserted Marks under common law. *Id*.

    **B.**    **Mr. Specht Cannot Demonstrate Any Interest, Let Alone a Protectable Interest, In Any Of The Unregistered Asserted Marks.**

Mr. Specht alleges infringement of the marks ANDROID DATA, ANDROID SERVER, and ANDROID DATA WEB EDITOR.[16] He claims to have used these Asserted Marks in association with website design services, website hosting services, website registration services, custom programming services, computer consulting services, a towing company application, and real estate services.

At the outset, the Court can disregard any purported use of these marks before January 1, 2003 and after April 20, 2009. While Google contests whether Mr. Specht ever had rights in the Asserted Marks, it is in any event clear that after January 1, 2003 Mr. Specht abandoned his business, and the Asserted Marks, entirely. Likewise, Mr. Specht's post-litigation activity is irrelevant, especially if he abandoned the marks seven years earlier in 2002. *See Stone Age Equp.*, 12 F.Supp.2d at 811 (noting that the plaintiffs' evidence of use in December 1988 and

---

[16] At his deposition Mr. Specht now attempts to assert that he owns the mark "ANDROID" alone and not in combination with any other words. He has never alleged this in any of the four (4) complaints that he filed, and as a result Google does not address it here.

thereafter "becomes irrelevant in light of our determination that [defendant] began using

STEALTH . . . in the summer of 1988"); *De Beers LV Trademark Ltd. v. DeBeers Diamond*

*Syndicate Inc.*, 440 F.Supp.2d 249, 273 (S.D.N.Y. 2006) (Defendant's revival of corporation

followed by a single sale five days later held not sufficient to establish priority in mark. "Courts

typically do not deem usage sufficient when it is obviously contrived solely for trademark

maintenance purposes.").

Once again, Google relies primarily on Mr. Specht's own interrogatory responses to

establish his lack of use. In those responses, Mr. Specht lists a number of purported "uses" of his

trademarks before the end of 2002, and after he initiated this lawsuit, but no legally recognizable

uses at any time between those dates. Accordingly, Google addresses only Mr. Specht's limited

and legally baseless allegations of use between January 1, 2003 and April 28, 2009 below.

### 1. Mr. Specht's website hosting for friends and family does not constitute use of the Asserted Marks.

Mr. Specht claims to have provided "website hosting services" in connection with his

Asserted Marks, but Mr. Specht's purported "website hosting services" have nothing to do with

the asserted ANDROID DATA, ANDROID SERVER, and ANDROID DATA WEB EDITOR

marks. Mr. Specht's ANDROID DATA, ANDROID SERVER, and ANDROID DATA WEB

EDITOR products, if they existed, were specific e-commerce software products – part of the

"Android Data" software suite he described on his website. Mr. Specht has not produced any

evidence that he actually provided these products to any of his friends or family. Indeed, even if

he used his "Android Data" software suite to run these "friends and family" websites (a fact

which Google contests), there is no evidence that he ever ***informed*** these purported "customers"

that was the case. He has not produced any correspondence with these "customers" that

indicates any commercial use of the Asserted Marks. Also, he has not provided any advertising

showing use of any of the Asserted Marks (aside from the attempted sale of his business, as addressed above).

As detailed above, Mr. Specht hosted websites for his accountant, Eide & Eide, CPA, his sister, his brother-in-law (and later counsel) Martin Murphy, and his friend Jon Sazanoff, through March of 2005. (Facts ¶ 19,) and his wife's employer and aunt. (Facts ¶ 20.) All of these websites were hosted from a computer server in his home. (Facts ¶ 16.) Mr. Specht has produced no evidence that any of these websites ran on his "Android Data" software suite. Indeed, Mr. Specht has not produced a single document showing use of any of the Asserted Marks in association with hosting ***any*** of these websites.[17]

Mr. Specht also attempts to argue use based on claims that some of his "friends and family" would access information or webmail through his <androiddata.com> domain. However, there is no evidence to support this claim, let alone the proposition that consumers associated the Asserted Marks with any particular goods or services provided by Mr. Specht. Even if Mr. Specht could support these claims, providing nominal or token services to friends and family is not the same as putting a product or service "on the market," and as a result does not give rise to trademark rights. *Jaffe v. Simon & Shuster Inc.*, 3 USPQ2d 1047, 1049 (S.D.N.Y. 1987).

Simply put, there is simply no evidence that Mr. Specht ever used any of the Asserted Marks in connection with any of these "services," and providing free advice and favors to friends and family does not constitute "actual and continuous use" of a trademark sufficient to create, much less retain, an enforceable interest in the mark.

---

[17] Indeed, when questioned about his change in invoicing from Android Data Corporation to The Android's Dungeon, Inc., Mr. Specht stated that it "didn't matter" how he billed his clients. (Facts ¶ 26.) In one sense, Google agrees – merely "billing" one's clients does not constitute use. On the other hand, the change is significant because Mr. Specht's bills are the ***only*** documents in Mr. Specht's production that purportedly show ***any*** use of even the word Android in connection with these websites.

### 2. Mr. Specht did not use the Asserted Marks in his work for his wife's Aunt and employer, Picket Fence Realty.

Mr. Specht's specious claims of use rely in large part on purported "services" he provided to Picket Fence Realty, a local real estate firm operated by his wife's aunt and employer. First, he claims to have provided "computer consulting services" in July, 2003. While he invoiced Picket Fence $280 for those services, the invoice does not reflect any of the Asserted Marks. (Facts ¶ 43.) Next, he claims to have provided "complimentary" computer consulting services at various points from 2004 through 2010, pointing to a handful of emails. (Id.) Yet, these emails do not contain even the word "Android," let alone the Asserted Marks. (Id.) Moreover, many of these emails are merely correspondence between Mr. Specht and his wife.[18] (Id.) These emails are not evidence of use of the Asserted Marks.

Mr. Specht then claims to have provided "custom web application development, [and] website hosting services," pointing to a number of invoices sent to Picket Fence Realty. Significantly, these invoices were issued by The Android's Dungeon, Inc. after 2002, and by Erich Specht personally in 2005. Again, none of these invoices contain any of the Asserted Marks, and Mr. Specht has provided no documentary or other admissible evidence that he ever used the Asserted Marks in connection with these services. (Facts ¶ 43.)

### 3. Mr. Specht's remaining alleged "uses" do not constitute trademark "use."

Mr. Specht's interrogatory responses list a handful of other purported "uses" of his marks, none of which are adequate to show that he possessed any rights in the Asserted Marks. He claims to have provided "consulting" services to a David Finn in 2003, but his invoices and correspondence with David Finn, as with all other correspondence and invoices, make no

---

[18] In one email, for example, Mr. Specht recommends that she try reinstalling Internet Explorer to correct a problem she was having with her computer. (Id.)

mention of the Asserted Marks, and he could not provide any further admissible information at his deposition. (Facts ¶ 72.) He claims to have created an application for a towing company, but again Mr. Specht has no evidence that he actually used the Asserted Marks in association with that work prior to April 2009.[19] (Facts ¶ 52.) Mr. Specht also relies on his attempts to sell Android Data Corporation's assets in 2003, the purported 2007 brochure, and the single letter to HuTech resources in 2008, all discussed above in connection with his trademark registration, none of which constitute use.

All of this evidence merely reinforces the fact that Mr. Specht made absolutely no use of any of the Asserted Marks after he shut down Android Data Corporation in 2002. While he may have occasionally provided favors to, or answered questions for, friends and family, he never used any of the Asserted Marks when performing those services. And in any event, providing favors to friends and family is not the kind of use that gives rise to trademark rights, since it does nothing to associate the mark in the mind of the public with Mr. Specht.

## VI. THERE IS NO CONTRIBUTORY INFRINGEMENT OR VIOLATION OF DECEPTIVE TRADE PRACTICES BY GOOGLE.

Mr. Specht's remaining counts (Counts III-V) for violation of the Illinois Deceptive Trade Practices Act, "common law" trademark infringement, and contributory trademark infringement all rise and fall with Mr. Specht's claims for federal trademark infringement, as each of these claims requires proof that Mr. Specht has protectable rights, and proof that there is a likelihood of confusion. *Stone Age Equipment*, 12 F.Supp.2d 796, 819; see also *Trans Union LLC v. Credit Research, Inc.*, 142 F.Supp.2d 1029, 1038 (7th Cir. 2001) (*citing Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1115 (7th Cir. 1997); *D 56, Inc. v. Berry's Inc.*, 955 F.Supp. 908, 920 (N.D.Ill. 1997); *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1

---

[19] This also ignores that the work was for another family member as well.

F.3d 611, 619 (7th Cir. 1993)).  Because Plaintiffs have clearly abandoned their registered

ANDROID DATA mark for software, and cannot prove use of their Asserted Marks sufficient to

give rise to any trademark rights under common law, their various state law claims must fall with

their Lanham Act claims.

## VII.    GOOGLE IS ENTITLED TO SUMMARY JUDGMENT ON COUNTS I AND III OF ITS COUNTERCLAIM

In Count I of its Counterclaim (Dkt. No. 136), Google seeks cancellation of Plaintiffs'

U.S. Reg. No. 2,639,556 on several bases, including on the basis that Plaintiffs abandoned the

registered ANDROID DATA trademark.  As shown above, there is no genuine factual dispute

that Plaintiffs did in fact abandon any rights the ANDROID DATA trademark long prior to

Google's first use of the ANDROID mark in 2007.  As such, Google is entitled to summary

judgment under Count I that the '556 Registration should be canceled under 15 U.S.C. §1064.

Likewise, in Count III of its Counterclaim, Google seeks a declaratory judgment that

Plaintiffs' prior rights in the ANDROID DATA mark, to the extent that any ever existed, are

invalid and unenforceable as a result of the abandonment of that mark.  Again, because there is

no genuine factual dispute with regard to abandonment, Google is likewise entitled to a

declaratory judgment of invalidity under Count III of its Counterclaim.

## VIII.   CONCLUSION

Plaintiffs' claims of trademark infringement are utterly meritless.  Plaintiffs' own

interrogatory responses admit that they hardly ever sold or licensed any e-commerce software

products, and certainly have not sold or licensed any such products since 2002.  The ancillary

claims that Plaintiffs also provided "services" in connection with his Asserted Marks are wholly

specious, as there is no evidence of record that any of those marks were ever used in connection

with ***any*** purported products or "services."  Accordingly, the Court should grant summary

judgment in favor of Google on all Counts of Plaintiffs' Second Amended Complaint, and on

Counts I and III of Google's Counterclaim.

                                       Respectfully submitted,

Dated:  August 20, 2010                  /Herbert H. Finn/
                                       Herbert H. Finn
                                       Richard D. Harris
                                       Jeffrey P. Dunning
                                       Cameron M. Nelson
                                       GREENBERG TRAURIG, LLP
                                       77 W. Wacker Drive, Suite 3100
                                       Chicago, IL  60601
                                       (312) 456-8400

                                       Counsel for Google Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on the date set forth below, I electronically filed the foregoing and GOOGLE'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT with the Clerk of Court using the CM/ECF system, which will provide a copy to counsel of record.

Dated:  August 20, 2010                                 s/ Herbert H. Finn