IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ERICH SPECHT, *et al.*,

                Plaintiffs,

      v.

GOOGLE INC.,

              Defendant.

Case No. 09 C 2572

Hon. Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Google Inc.'s ("Google") Motion for Summary Judgment for Counts I-V of Plaintiffs' Second Amended Complaint, and for Counts I and III of its Counterclaim. For the reasons stated below, Google's Motion is granted.

## I. INTRODUCTION

Trying to take part in the Internet boom of the 1990's, Erich Specht ("Specht") developed the Android Data Software Suite, an e-commerce platform designed for small business owners. In 1998, he incorporated Android Data Corporation ("ADC"), which through 2002 generated approximately $600,000 from licensing software and providing computer-related services. Specht also applied for and received a federal registration for the trademark ANDROID DATA. By mid-2002, however, ADC's revenue stream had dried up, and Specht decided to sell the company. He also formed another corporation, The Android's Dungeon, Inc. ("ADI"), and on December 26, 2002, with

no clients licensing his software, Specht transferred all of ADC's assets to ADI.

On September 4, 1998, only a few months prior to when Specht incorporated ADC, Google filed its California papers of incorporation. Google is now a Delaware corporation. Its business trajectory took a substantially different route than ADC's. Today, besides operating the world's largest and most popular search engine, Google has developed and acquired an array of products and services that make it seemingly ubiquitous for Internet users, and which generate tens of billions of dollars in annual revenue.

Despite their divergent business fortunes, Google and Specht's paths do intersect. In November 2007, Google announced Android, an open development platform for mobile devices. Google launched Android in cooperation with the Open Handset Alliance ("OHA"), a coalition of mobile device hardware and software developers. Shortly before the Android announcement, Google filed a trademark application for the mark ANDROID. The United States Patent and Trademark Office (the "USPTO") rejected this application, finding that it would create a likelihood of confusion with the ANDROID DATA mark. Despite this refusal, Google continued to use the ANDROID mark in commerce.

This use by Google provided the grounds by which Specht, ADC, and ADI (collectively, the "Plaintiffs") filed the five-count Complaint before this Court. Google filed a seven-count Counterclaim, one count of which asks for a declaratory judgment

pursuant to 28 U.S.C. § 2201 that Plaintiffs abandoned ANDROID DATA and other associated marks.  Google has moved for Summary Judgment on all Counts of Plaintiffs' Complaint and Counts I and III of its Counterclaim based on this abandonment.  Before ruling on this motion, however, a more thorough examination is necessary of how the parties reached this stage of the litigation.

### A.  Factual Background

### 1.  Plaintiffs' Development and Use of ANDROID DATA from 1998–2005

Specht is the sole shareholder of ADC, which he incorporated in Illinois on December 30, 1998.  The Palatine, Ill., resident wrote and developed the Android Data Software Suite, which allows for the remote administration of e-commerce content.  Three modules comprise the software:  the Caching Server, Content Manager, and Administrator's Toolkit.  From 1998 through 2002, ADC licensed the Android Data software to three clients:  Artistry In Printing, Design Toscano, and Basil Street Gallery of London.  From 1998 through December 2002, ADC also provided custom database and e-commerce application development; website hosting, design, and registration services; and computer consulting services to various clients, including Edge Consulting, Bonaparte Corporation, HuTech Resources, Eide & Eide CPA, NCR Customer Education, Summit Recruiting, and Village Investments.

On October 28, 1998, Specht registered the domain name *www.androidtdata.com* to use as a platform for his business, and

launched a website on this domain in 1999. The site allegedly featured information about the Android Data Software Suite, as well as contact information for ADC. On June 4, 2000, ADC filed an application for the Trademark ANDROID DATA with the USPTO. On October 22, 2002, the USPTO granted ADC a registration for the ANDROID DATA mark on the principal register in International Class 9 for "[c]omputer e-commerce software to allow users to perform electronic business transactions via a global computer network." *ANDROID DATA, Registration No. 2,639,556.*

During its corporate existence, ADC generated approximately $600,000 in gross revenue. In 2002, however, ADC lost Design Toscano and Basil Street Gallery as clients, and three of its remaining clients — O/S Services, MagnaMedia Training Solutions, and Summit Recruiting — went out of business. ADC laid off its only employee, Rick Moore, on August 28, 2002. On December 1, 2002, Specht cancelled the co-location Internet service contract he had with Genuity, and moved his server hardware to his home. In a February 23, 2003, e-mail sent to his accountant, Roger Eide, regarding the final bill for the Genuity contract, Specht wrote that he wanted the bill to be an expense for 2002, "since there's not Android Data in 2003." Specht filed a final tax return for ADC in late 2002. Effective December 26, 2002, Specht transferred all of ADC's assets, including the ANDROID DATA mark, to ADI. He did this to avoid paying annual Illinois corporation registration fees, as well as tax preparation and filing fees, for ADC. From

December 26, 2002, until the filing of this lawsuit, Plaintiffs did not issue any invoices that bore the ANDROID DATA mark. Rather, invoices to Picket Fence Realty, to whom Plaintiffs provided website hosting, maintenance, and development services, and to David Finn, to whom Plaintiffs provided computer maintenance services, came from The Android's Dungeon, Inc.

In the second half of 2002, having failed to secure new clients and not generating enough money to maintain the business as a viable entity, Specht decided to sell ADC and all its assets, including the Android Data Software Suite, the *androiddata.com* domain name, and the ANDROID DATA trademark. Starting in August 2002, Specht advertised the sale of ADC in the *Chicago Tribune*, *The New York Times*, BizBuySell, and *usbx.com*. He sent a promotional brochure and multimedia CD-ROM describing the Android Data software to parties who responded to his advertisements. He claims to have sought full-time employment in connection with the ADC sale.

Specht responded to inquiries to sell the business in late 2002 and throughout 2003. He almost sold the business to Quadra Networks in 2003. The sales contract between ADI (which controlled ADC's assets) and Quadra, dated May 27, 2003, stated that ADI agreed to "abandon the U.S. trademark in 'ANDROID DATA' and to cease it's *[sic]* use," and that it would assist in transferring the mark to Quadra. Specht terminated the negotiations with Quadra on June 5, 2003, after he traveled to British Columbia, Canada, to finalize the contract.

- 5 -

Specht alleges that he negotiated with Chris Curie to purchase ADC until April 2004.  The only documents that Plaintiffs produced concerning these negotiations with Curie are dated November 11 and November 12, 2003.

In December 2003, Specht started a full-time position with the magazine publishing company Reed Business Information.  He worked at Reed until being laid off in April 2010.

Even though he had dissolved ADC, Specht maintained the e-mail address *erich@androiddata.com*, which he used until April 2005. Additionally, he hosted *androiddata.com* and websites for clients Picket Fence Realty (*www.picketfencerealty.com*), Jonathan Sazonoff (*www.saztv.com*), Wendy Murphy (*www.wendymurphy.com*), and Village Investments (*www.villageinvestments.com*) on a server he maintained at his home.  These websites used *mail.androiddata.com* as their e-mail server, *dns.androiddata.com* as their name server, and could access monthly website activity statistical reports at *stats.androiddata.com*.  Specht ceased hosting these websites in April 2005 when it became cost prohibitive.  He allowed his registration for the *androiddata.com* domain name to expire on October 15, 2005.

### 2.  *Google's November 2007 Android Announcement*

Google announced the Android mobile device open platform and the OHA on November 5, 2007.  Thirty-four companies from around the world comprised the OHA at its inception, including T-Mobile, HTC,

Qualcomm, and Motorola.  On November 12, 2007, Google released the Android software development kit, which allowed software developers to create Android applications.  On the same day, Google announced the $10 Million Android Developer Challenge, and other OHA members introduced products, such as Ascender Corporation's Droid font collection and Synaptics's Touch Interface Driver for the software development kit.  On October 22, 2008, T-Mobile released the first Android-powered phone, the G1.

Shortly before the Android announcement, Google filed a trademark application with the USPTO for the mark ANDROID.  On February 14, 2008, the USPTO rejected Google's application pursuant to 15 U.S.C. § 1052(d), ruling that the proposed mark would create a likelihood of confusion with Plaintiffs' ANDROID DATA mark. Google responded to the rejection on August 14, 2008, but on August 20, 2008, the USPTO again rejected the proposed mark on a likelihood of confusion ground, and made the determination final. Despite this refusal, Google has continued to use ANDROID in commerce.

### 3.  *Plaintiffs Resume Use of the ANDROID DATA Mark*

In December 2007, Specht claims that he sent two mailings of a one-page brochure promoting the Android Data Software Suite to more than 100 catalog companies.  He claims that he created the brochures on December 8, 2007, and that they prominently featured the ANDROID DATA mark.  He did not generate any business from this mailing.  On February 6, 2008, Specht sent a written proposal for

an Android Data Content Management System — on letterhead that featured the ANDROID DATA mark — to Jordan May of HuTech Resources. April 20, 2009, emerges as an important date in regard to the ANDROID DATA mark. Specht received a phone call from Kenneth Robblee ("Robblee"), who inquired about purchasing the ANDROID DATA mark, as well as the company that owned the mark. Robblee told Specht about Google's use of the ANDROID mark, and also informed him that the ANDROID DATA mark would expire if ADC did not file a Declaration of Continued Use or Excusable Nonuse Under Section 8 with the USPTO by April 22, 2009. ADC filed this declaration of use on April 21, 2009; Specht's wife, Megan Specht, signed the declaration. On this date, ADC also assigned ANDROID DATA to ADI, with an April 28, 2004, execution date. ADC filed a corrective assignment on August 5, 2009, making the execution date December 26, 2002.

Specht claims that after speaking with Robblee, he conducted some Internet research and learned for the first time about Google's application for the ANDROID mark and of its intentions to use the ANDROID mark in commerce. On April 20, 2009, Specht registered the domain name www.android-data.com and launched a website at the domain with content similar to that which allegedly existed at androiddata.com. On April 23, 2009, Specht signed annual reports for ADC for the years 2003 through 2008, which, in effect, resurrected the corporation for those six years.

Plaintiffs identify numerous other recent uses of the ANDROID DATA mark in commerce.  For example, on April 26, 2009, ADI sent a proposal to Warren Crum of Northwest Recovery to create a database application using the Android Data software.  The proposal's cover page included the sentence "Android Data® is a registered trademark of The Android's Dungeon Incorporated."  An invoice to the company dated May 19, 2009, features the ANDROID DATA mark.  Other uses include a May 19, 2009, invoice to Picket Fence for website maintenance; a May 27, 2009, e-mail to Dennis Ignacek to redesign a website using Android Data software; a June 9, 2009, proposal for a website redesign to Picket Fence on Android Data letterhead; an October 3, 2009, e-mail to Design Toscano offering a license to use the Android Data software; and a July 23, 2010, proposal to Steve Rourke at CFE Media for an Android Data Content Syndication Service.

## B.  Procedural History and Issues

On April 28, 2009, Plaintiffs filed their Complaint.  In addition to Google, the initial Complaint named the OHA; Google's wholly owned subsidiary Android, Inc.; former or current Google employees Andy Rubin, Nick Sears, Rich Miner, and Chris White; and 46 other corporate defendants that comprised the OHA.  The Court dismissed all of the parties other than Google from the lawsuit on August 3, 2009.  *Specht v. Google Inc.*, 660 F.Supp.2d 858, 864-65 (N.D. Ill. 2009).  Plaintiffs filed their Second Amended Complaint on October 6, 2009.  ECF No. 134.  The Court denied Plaintiffs'

Motion to File a Third Amended Complaint on July 27, 2010, ECF No. 235, and subsequently denied Plaintiffs' Motion for Reconsideration to File a Third Amended Complaint. ECF No. 279.

In their Second Amended Complaint, Plaintiffs claim that Google infringed the registered ANDROID DATA mark pursuant to 15 U.S.C. § 1114(1)(a) of the Lanham Act. They also claim that in regard to the registered mark and the unregistered ANDROID DATA service mark and ANDROID SERVER and ANDROID DATA WEB EDITOR marks (combined, the "Asserted Marks"), Google violated the Illinois Deceptive Trade Practices Act, 815 ILCS 510/2, and is liable for unfair competition under the Lanham Act (15 U.S.C. § 1125(a)), common law trademark infringement, and contributory trademark infringement.

Google filed its Answer to the Second Amended Complaint, Affirmative Defenses and Counterclaim on October 23, 2009. ECF No. 136. In Count III of the Counterclaim, Google argues that Plaintiffs abandoned the Asserted Marks, and therefore have no rights in them. If Plaintiffs abandoned the Asserted Marks, Google would not be liable for any direct or contributory trademark infringement, unfair competition, or deceptive trade practices for using the ANDROID mark in commerce. Therefore, Google moves for Summary Judgment on all five counts of Plaintiffs' Second Amended Complaint on the ground that Plaintiffs abandoned the Asserted Marks. In addition, pursuant to Count I of its Counterclaim, if this Court finds that Plaintiffs abandoned ANDROID DATA, Google

asks the Court to order the USPTO to cancel the mark's registration.

## II. **LEGAL STANDARD**

Summary judgment is proper if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is material if it could affect the outcome of the suit under the governing law, and a dispute is genuine where the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court should not consider disputes over irrelevant or unnecessary facts. *Id.*

In ruling on summary judgment, the Court does not weigh the evidence or determine the truth of the matter, but determines whether a genuine issue of material fact exists that warrants trial. *Id.* at 249. In making this determination, the Court must view all the evidence and draw any reasonable inferences therefrom in the light most favorable to the nonmoving party. *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000). The moving party bears the burden of establishing the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party may not rest on mere allegations, but must present specific facts showing that a genuine issue exists for trial.

*Big O Tire Dealers, Inc. v. Big O Warehouse*, 741 F.2d 160, 163 (7th Cir. 1984). To support their positions that a genuine issue of material fact does or does not exist, the parties may cite to materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, and interrogatory answers, or show that the materials in the record do or do not establish a genuine dispute. Fᴇᴅ. R. Cɪᴠ. P. 56(c).

### III.  <u>DISCUSSION</u>

#### A.  Evidentiary and Procedural Motions

The Court will first rule on three pending evidentiary and procedural motions prior to analyzing Google's Motion for Summary Judgment, as the disposition of both impact the summary judgment analysis.

#### *1.  Plaintiffs' Motion to File a Response to Google's Reply to Plaintiffs' Response to Google's Statement of Material Facts*

On November 2, 2010, Google filed a Reply to Plaintiffs' Response to Google's Local Rule 56.1 Statement of Material Facts. ECF No. 289. Rule 56.1 allows a party moving for summary judgment to file a reply if the party opposing summary judgment submits additional facts in its response to the moving party's Rule 56.1 Statement. N.D. Ill. R. 56.1(a)(3)(B). Google contends that Plaintiffs submitted additional facts in their Response, and therefore Rule 56.1 afforded it the opportunity to file its Reply. Plaintiffs contend that the Rule does not allow them to file this

Reply, and that the Reply contains impermissible legal arguments. They have moved to have the Court either strike this Reply or allow them to file, *instanter*, a Brief in Response to Google's Reply. ECF No. 292.

Rather than sift through Google's eighty-page Reply and strike the contested legal arguments and determine in which paragraphs Rule 56.1 allows Google to file its Reply, the Court grants Plaintiffs' Motion and allows it to file its Response brief. The Court will consider this Response in ruling on the summary judgment and evidentiary motions.

### 2. *Google's Motion to Exclude*

The Court will first address Google's Motion to Exclude Due to Plaintiffs' Untimely Document Production and Interrogatory Responses. ECF No. 261. Written fact discovery in this case closed on March 31, 2010, and oral discovery closed on July 30, 2010. On July 21, 2010, Google conducted Specht's deposition. At the deposition, Specht indicated that Plaintiffs planned to produce some supplementary discovery. Specht Dep. 328:17–24, July 21, 2010. Following the deposition, Plaintiffs produced 3,285 additional pages of documents, and on July 30 — at the close of discovery — produced their Fourth Supplemental Answers to Google's interrogatories.

On September 28, 2010, Google filed its Motion to Exclude. The Court continued Google's Motion, giving Plaintiffs an opportunity to present an argument as to why the Court should admit

- 13 -

and consider the disputed discovery. The Court's Order set forth a specific procedure by which Plaintiffs could present the disputed discovery in its brief:

> If Plaintiffs, in their response brief to Google's Motion for Summary Judgment, rely upon or use any of the discovery to which Google moved to exclude, Plaintiffs are ordered to include this material in severable, clearly identified sections in their brief. In addition, if Plaintiffs include this material in the brief, Plaintiffs are ordered to offer an argument in a supplement to the summary judgment brief as to why the Court should consider this material in making its ruling on summary judgment.

ECF No. 264. The Order did not indicate the consequences if Plaintiffs failed to comply with this procedure.

On October 8, Plaintiffs filed their Response in Opposition to Google's Summary Judgment Motion. ECF No. 270. It did not comply with the Court's September 30 Order, despite it incorporating facts alleged in the Fourth Supplemental Interrogatory Responses, as well as late-produced discovery. Plaintiffs did not explain to the Court why they did not include this information in a severable section of their brief. They argue that the Court should consider all of the late-produced material in ruling on summary judgment, primarily because, they contend, they did not rely on this material in their Response. ECF No. 265. Google, however, has directed the Court's attention to two categories of late-produced discovery that Plaintiffs have used to show bona fide uses in commerce of the ANDROID DATA mark.

### a. *References to Specht Passing Out Business Cards*

Plaintiffs' Response opposing summary judgment, and its supporting Exhibits and Statement of Facts, reference two specific events attended by members of the Arlington Heights Chamber of Commerce in 2005 and 2006 at which Specht allegedly handed out a business card that featured the ANDROID DATA mark. *See* Pls.' Statement Material Facts ¶¶ 28, 29. Under the Federal Rules of Civil Procedure, a party who has responded to an interrogatory has an obligation to supplement his disclosures or responses "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process. . . ." FED. R. CIV. P. 26(e)(1). A violation of Rule 26(e) can result in exclusion of the discovery unless the producing party can show that its violation was either justified or harmless. *Id.* at 37(c)(1). In exercising its discretion to impose discovery sanctions, a court should consider "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003).

Google argues that the late interrogatory responses regarding the business cards violated Rule 37(c)(1) and prejudiced them, in

that it occurred after Specht's deposition, thereby denying it the opportunity to depose Specht regarding these alleged uses of the mark in commerce. The Court cannot allow Plaintiffs to disregard its September 30 Order. Plaintiffs offer no legitimate reason why they could not have disclosed Specht's business card distribution at the November 19, 2005, Hands For Habitat fund raiser at the Arlington Heights, Illinois, home of Kelly Springer, or the November 3, 2006, Golden Gala wine tasting at the Arlington Heights Historical Society prior to his deposition, especially because this occurred in 2005 and 2006. Such activity could impact the issue of abandonment. It is not rational, given Specht's limited use of the ANDROID DATA mark after 2002, that Plaintiffs would not produce this information prior to his deposition.

Plaintiffs argue that Google had the information regarding these specific instances of Specht handing out business cards from both Erich and Megan Specht's depositions. *See* Megan Specht Dep. 35:21-38:19, May 6, 2010; Erich Specht Dep. 81:2-15, July 21, 2010. However, the answers in neither of these depositions reference the specific November 19, 2005, or November 3, 2006, events that Plaintiffs cite in their Statement of Material Facts. Rather, the deposition answers merely allude to Specht sometimes passing out business cards at some unnamed events. The lack of specificity in these answers is not the equivalent of the specific events referenced in the late production, which ultimately prejudiced Google. Therefore, the Court excludes any reference to

- 16 -

Specht passing out business cards at the 2005 and 2006 events in Plaintiffs' Summary Judgment Response, Exhibits, and Local Rule 56.1 Statement of Facts, and does not consider them in ruling on summary judgment.

The Court notes, however, that even if it did consider this activity in the abandonment analysis, handing out two business cards at social events is not a bona fide use in commerce of the ANDROID DATA mark. This alleged sporadic, inconsistent, limited, and unsuccessful promotion of Specht's services is a mere token use of the mark that does not demonstrate a bona fide use in commerce. *See MB Fin. Bank, N.A. v. MB Real Estate Servs., L.L.C.*, No. 02-C-5925, 2003 WL 21462501, at *7 n.2 (N.D.Ill. June 23, 2003) ("[T]he single use of a mark in an advertisement without any services offered under that mark does not constitute 'use in commerce' under the Lanham Act.").

### b. *Website Pages Printed from the Internet Archive*

Google has also moved to exclude screen shots of several websites that Plaintiffs retrieved from the Internet Archive's Wayback Machine. The images depict the websites *www.androiddata.com*, *www.sonixms.com*, *www.designtoscano.com*, *www.basilstreet.com*, and *www.wendymurphy.com* as they appeared between 2001 and 2005. Pls.' Summ. J. Exs. 7, 13, 14, 44A, 44B, 58, 72. As an initial matter, Exhibit 72, which features printouts from the Design Toscano and Basil Street Gallery of London websites with copyright dates of 2001, does not appear to be from the

Internet Archive. The domain name on the bottom of the pages is not "*web.archive.org*," which signifies that the pages came from the Internet Archive. Rather, the pages in the Exhibit feature the domain names of their respective websites. In addition, the pages have Bates stamps on them, which demonstrates that Plaintiffs produced these in discovery. The Court, therefore, considers Exhibit 72 in ruling on summary judgment.

Moving to the other contested Exhibits, the Internet Archive provides users screen shots of websites that allegedly depict how the website appeared at a particular time. Internet Archive: Wayback Machine, *http://www.archive.org/web/web.php* (last visited Dec. 13, 2010). For example, Exhibit 13 shows numerous pages of *androiddata.com*, which are allegedly true and accurate screen shots of the site from March 2005. Pls.' Summ. J. Ex. 13. The screen shots do not come from Plaintiffs' own files.

According to Google, Plaintiffs produced these screen shots at the close of discovery, and were subject to the Court's September 30 Order. It alleges that the late production deprived them of the opportunity to explore the reliability of the Internet Archive's files, or ask Specht about them at his deposition. Additionally, the screen shots were not authenticated by an officer or employee of the Internet Archive, but rather through declarations of Specht for *androiddata.com* and *wendymurphy.com*, and Philip Cacioppo for *sonixms.com*. Pls.' Summ. J. Ex. 1 ¶¶ 5, 8, 46, Ex. 44 ¶¶ 5-6. This is an improper method to authenticate screen

shots from the Internet Archive. *See Audi AG v. Shokan Coachworks, Inc.*, 592 F.Supp.2d 246, 278 (N.D.N.Y. 2008) (indicating that pages from Internet Archive search results can be submitted into evidence only by authentication of a "knowledgeable employee" of the Internet Archive); *St. Luke's Cataract & Laser Inst., P.A. v. Sanderso*n, No. 06-CV-223, 2006 WL 1320242, at *2 (M.D. Fla. May 12, 2006) ("Plaintiff must provide the Court with a statement or affidavit from an Internet Archive representative with *personal knowledge* of the contents of the Internet Archive website.") (emphasis in original). A court in the Northern District of Illinois found that a party properly authenticated web pages retrieved from the Internet Archive when it included an affidavit from an Internet Archive employee to verify the pages. *Telewizja Polska USA, Inc. v. Echostar Satellite Corp.*, No. 02-CV-3293, 2004 WL 2367740, at *6 (N.D.Ill. Oct. 15, 2004).

Because Plaintiffs did not properly authenticate them, the Court will not consider the Internet Archives printouts from Plaintiffs' Summary Judgment Exhibits 7, 13, 14, 44A, 44B, and 58.

### 3. Plaintiffs' Motion to Strike Google's Statement of Material Facts

Under Local Rule 56.1, the party moving for summary judgment shall file and serve "a statement of material facts as to which the moving party contends there is no genuine issue and that entitles the moving party to a judgment as a matter of law, and that also includes: (A) a description of the parties, and (B) all facts

supporting venue and jurisdiction in this Court." N.D. Ill. R. 56.1(a)(3). Plaintiffs argue that because Google's Local Rule 56.1 Statement of Uncontested Material Facts (ECF No. 256) does not include separate sections with descriptions of the parties, or facts supporting venue or jurisdiction, the Court should strike the statement in its entirety. ECF No. 277.

The Court can require strict compliance with Rule 56.1, and refuse to accept a Rule 56.1 statement even if it substantially complies with the Rule. *See Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004). The Court, however, has discretion to overlook noncompliance. *See Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995). In this case, while the Court recognizes that Google did not strictly comply with the Northern District's straightforward filing rule, this failure does not come close to justifying the Court striking Google's entire Statement of Material Facts. First, this failure does not prejudice or hinder the Court's ability to rule on summary judgment. Additionally, over the course of litigation, no dispute has arisen in regard to jurisdiction or venue. Finally, Google did include a description of Plaintiffs in the opening paragraphs of its Statement of Material Facts; it admittedly failed to include a description of its own corporate status. This failure, however, is not a sufficient ground to strike the entire Statement. Therefore, the Court denies Plaintiffs' Motion to Strike Defendant's Statement of Material Facts.

Plaintiffs, in the alternative, seek to strike certain unauthenticated summary judgment exhibits — and the facts that rely on them — from Google's Statement of Facts. ECF No. 277. Procedures exist to ensure the reliability of the facts before the Court for its summary judgment ruling. *See Martz v. Union Labor Life Ins. Co.*, 757 F.2d 135, 138 (7th Cir. 1985). These facts can be established through depositions, interrogatories, admissions, affidavits, or through an exhibit if it is "identified by affidavit or otherwise made admissible in evidence." *Id*. Plaintiffs have moved to strike eight exhibits from Google's Statement of Material Facts.

### a. Exhibits 5 and 52

Google's Summary Judgment Exhibits 5 and 52 are screen shots of Plaintiffs' website at *www.android-data.com*, captured on August 10, 2010, and August 13, 2010, respectively. Because Google did not authenticate these exhibits through an affidavit, the Court strikes them from Google's exhibits. However, Plaintiffs have submitted identical screen shots from *android-data.com*, captured October 5, 2010. Plaintiffs' own exhibits show the same evidence as Google's exhibits, as no evidence exists that Plaintiffs altered the website from August 2010 until October 2010. This moots the effect of striking Exhibits 5 and 52, as the Court still has this evidence before it to rule on summary judgment.

### b. Exhibit 31

Google's Exhibit 31 consists of four pages of documents produced by Specht's accountants, Eide & Eide. While Google has submitted these without an affidavit, some of the documents are admissible pursuant to Federal Rule of Evidence 901(b)(1). Roger Eide, the principal of Eide & Eide, gave a deposition on July 7, 2010, at which he testified that two of the documents in Exhibit 31 were from his files. Eide Dep. 104:23-109:23, July 7, 2010. He acknowledged under oath the authenticity of a handwritten note (EIDE0000268) and an e-mail (EIDE0000270). Google has authenticated these two documents, so they are admissible. The other two documents in the Exhibit — EIDE0000269 and EIDE0000271 — have not been authenticated, and will be stricken.

### c. Exhibits 40 and 41

Plaintiffs also move to strike two press releases. Exhibit 40 is a November 5, 2007, press release from Google that announces the development of the Android open platform for mobile devices. It also introduces the OHA and explains how this coalition collaborated on Android. Exhibit 41 is an October 22, 2008, press release from T-Mobile that announces the launch of the T-Mobile G1 Android-powered phone.

Plaintiffs' objection to these Exhibits is frivolous. Plaintiffs' Complaint details when and how Google unveiled the Android platform and the OHA, as well as the release of the G1 phone. Second Am. Compl. ¶¶ 33, 60. While Plaintiffs do not

reference the actual press releases in the Complaint, they do reference the events and products the press releases discuss. "Allegations in a complaint are binding admissions." *Jackson v. Marion Cnty.*, 66 F.3d 151, 153 (7th Cir. 1995). While Plaintiffs do not allege all of the contents in the two press releases in their Complaint, they do allege — and therefore admit — the primary and most significant purposes and facts in the documents. Namely, they admit that Google made the November 5, 2007, announcement about Android and the OHA, what the Android platform and OHA are, and that T-Mobile released the G1 phone. The Court will not splice the two press releases to determine the portions to which Plaintiffs have admitted, and the portions to which they have not. This would be a frivolous exercise that diverts the Court's attention from the dispositive issue at hand. Therefore, Exhibits 40 and 41 are authenticated and admissible.

### d.  Exhibits 50 and 51

Google's Exhibits 50 and 51 are certified transcripts of voice mail messages. Exhibit 50 is a voice mail that Robblee left with Specht on April 20, 2009. At his July 21, 2010, deposition, Specht testified that he received a voice mail message from Robblee on April 20. Specht Dep. 144:4–12, July 21, 2010. Specht also reviewed the transcript of the voice mail—the same one in Exhibit 50 — and confirmed that it appeared to be a transcript of the message. *Id*. at 155:12–22. Specht authenticated the transcript in his deposition, so it is admissible.

- 23 -

The transcript in Exhibit 51 comes from a voice mail message that Robblee left with Google on April 20, 2010.  At Robblee's deposition, Google's attorney presented Robblee with an unofficial transcript of the voice mail message, as well as played the audio recording of the message to Robblee.  Robblee Dep. 111:24-112:8, Nov. 5, 2009.  Robblee confirmed that the voice on the message was his, that he left this message with Google, and that the unofficial transcript, which is almost identical to the certified transcript in Exhibit 51, accurately portrayed the contents of the message. *Id.* at 112:10-24.  Because Robblee authenticated a nearly identical transcript in his deposition, Exhibit 51 is admissible.  FED. R. EVID. 901(b)(1).

### e.  *Exhibit 57*

Plaintiffs' final objection concerns Google's Exhibit 57, a copy of a story published on the website *Forbes.com*.  The story, by Elizabeth Woyke, discusses the lawsuit currently before this Court, which was filed two days prior to the story's April 30, 2009, publication date.  The story is not a self-authenticating document because it is not a printed newspaper or periodical.  FED. R. EVID. 902(6).  The increasing legitimacy of web-based publications does not affect this rule.  The rule exists because of the high magnitude of work and expense involved printing a serial newspaper or magazine.  Such a publication is unlikely to be a forgery.  On the other hand, a printout from a website does not require the same work or expense as a printed publication, and as an electronic

file, it can be easily manipulated. It lacks the same degree of authenticity as its printed counterpart.

The *Forbes.com* story, however, is admissible through Rule 901(b)(1). The story quotes Specht's attorney, Martin Murphy. Google's counsel showed Murphy the article at Murphy's deposition. Murphy recalled talking to Woyke for the story, as well as seeing and reading the article after its publication. Murphy Dep. 123:4-128:18, 134:19-135:22, Apr. 8, 2010. Plaintiffs do not argue that Google has altered or produced an incomplete version of the article. Murphy's deposition testimony concerning the existence of the article rebuts the argument concerning the Exhibit's authenticity. The Court will consider it as evidence.

In summary, Plaintiffs' Motion to Strike is granted in part and denied in part. The Court strikes Google's Exhibits 5 and 52, as well as documents EIDE0000269 and EIDE0000271 from Exhibit 31. The Court will consider the other contested exhibits in ruling on summary judgment.

### B. Whether Plaintiffs' Rights to ANDROID DATA Tack to Their Use of ANDROID'S DUNGEON

Plaintiffs argue that their rights to ANDROID DATA tack on to their use of the ANDROID'S DUNGEON mark. As an initial matter, ANDROID'S DUNGEON is not one of the marks under which Plaintiffs allege in their Complaint that they sold software or rendered services. Second Am. Compl. ¶ 10. Plaintiffs, however, state that they transferred all of the assets from ADC to ADI on December 26,

2002, and that under this new corporate identity continued to provide their products and services. Essentially, Plaintiffs argue that because ADI maintained some of the same clients as ADC, and that both names included the word "Android," ANDROID'S DUNGEON creates the same commercial impression as ANDROID DATA.

Courts are split on whether tacking is a question of law or fact. The Northern District of Illinois and the Ninth Circuit treat it as a question of fact. *See Navistar Int'l Trans. Corp. v. Freightliner Corp.*, No. 96-CV-6922, 1998 WL 786388, at *5 (N.D. Ill. Nov. 6, 1998); *Quiksilver, Inc. v. Kymsta Corp.*, 466 F.3d 749, 759 (9th Cir. 2006). Other courts hold that it is a question of law. *See Van Dyne-Crotty, Inc. v. Wear-Guard Corp.*, 926 F.2d 1156, 1159 (Fed. Cir. 1991); *Data Concepts, Inc. v. Digital Consulting, Inc.*, 150 F.3d 620, 623 (6th Cir. 1998); *The Wet Seal, Inc. v. FD Mgmt., Inc.*, Opp'n No. 91,157,022, 2007 WL 458529, at *5 (T.T.A.B. Feb. 9, 2007). The issue hinges on whether the circuit treats likelihood of confusion as a question of law or fact. *See Navistar Int'l Trans. Corp.*, 1998 WL 786388, at *5. The Seventh Circuit treats likelihood of confusion as a question of fact. *See Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1428 (7th Cir. 1985). This Court, therefore, considers the tacking issue as a question of fact. *See Navistar Int'l Trans. Corp.*, 1998 WL 786388, at *5. The Court can resolve a question of fact on summary judgment "only if the evidence is so one-sided that there can be no doubt about how

the question should be answered." *AutoZone, Inc. v. Strick*, 543 F.3d 923, 929 (7th Cir. 2008) (internal quotation omitted).

A stringent standard exists for a mark owner to prove tacking, and a court should rarely grant it. *See Van Dyne-Crotty*, 926 F.2d at 1160. Under this strict standard, "'[t]he marks must create the same, continuing commercial impression, and the later mark should not materially differ from or alter the character of the mark attempted to be tacked.'" *Quiksilver*, 466 F.3d at 758 (quoting *Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1048 (9th Cir. 1999)). In other words, if the new mark is the legal equivalent of the old mark — either indistinguishable from or creating the same commercial impression as the old mark — use of the new mark does not abandon the old mark. *See Van Dyne-Crotty*, 926 F.2d at 1160. Minor differences between marks, such as an inconsequential modification or modernization, would serve as a basis for tacking, because a consumer would consider the marks the same. *See The Wet Seal*, 2007 WL 458529, at *5.

In acquiring the ANDROID DATA mark, Plaintiffs disclaimed the exclusive right to use the word "data" in conjunction with the mark. The word "android" serves as the dominant portion of the mark. Plaintiffs rely on the Seventh Circuit case *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947 (7th Cir. 1992), to argue that because "android" is the dominant portion of their mark, ANDROID'S DUNGEON is a small modification of ANDROID DATA that does not abandon it. In particular, they cite to the following language

to support their position: "So long as the owner continues use of the key element of the registered mark, courts generally will not find abandonment. Further, the dropping of a non-essential word from a mark has been held not to constitute abandonment." *Id.* at 955 (internal quotations and citations omitted).

*Sands*, however, is not consistent with the facts in this case. In *Sands*, the plaintiff owned the trademark THIRST-AID "First Aid for Your Thirst." *Id.* In registering the mark, the mark owner disclaimed ownership to the phrase "First Aid for Your Thirst" apart from the mark. *Id.* The mark owner, however, had not used the entire trademarked phrase since 1949. *Id.* The court held that because THIRST-AID was the primary, commercially memorable element of the registered mark, plaintiff's use of it without the modifying phrase did not constitute abandonment of the mark. *Id.*

Of significance in *Sands* is that the *only* change the mark owner made to the mark was dropping the disclaimed portion. *Id.* The case did not involve dropping the disclaimed phrase and replacing it with a new word that has an entirely different meaning. In the case before this Court, however, Plaintiffs dropped the disclaimed word ("data"), made the dominant portion of the mark possessive, and added the word "dungeon" to the dominant portion. These modifications prove critical to the Court's tacking analysis. "Data," as used by Plaintiffs in ANDROID DATA, presumably suggests the definition of "information in numerical form that can be digitally transmitted or processed." *Merriam-*

- 28 -

*Webster's Collegiate Dictionary* 293 (10th ed. 1996). "Android,"
considering the robot logo that Plaintiffs use with the mark,
suggests a meaning of "a mobile robot usu[ally] with a human form."
*Id.* at 44. The word "dungeon," however, has an entirely different
meaning: "a dark usu[ally] underground prison or vault." *Id.* at
359. Plaintiffs have altered their original mark—which created a
computer services or products impression — and created a mark with
allusions to robotic prisons, futuristic vaults, or a number of
other meanings about which the Court will not speculate.

Additionally, Plaintiffs justifiably do not argue that ANDROID
DATA qualifies as a famous mark for which more substantial
alterations could possibly maintain a similar commercial
impression. *See* 15 U.S.C. § 1125(c)(2) (providing the criteria for
which a mark can be deemed famous for a trademark dilution claim);
*see also, Ferrari S.p.A. Esercizio Fabbriche Automobili e Corse v.
McBurnie*, 11 U.S.P.Q.2d 1843, 1849 (S.D. Cal. 1989) (finding that
the public maintained a strong association of the DAYTONA SPYDERS
mark with Ferrari because of the car's fame, despite Ferrari having
ceased manufacturing the vehicle in 1974). The record does not
show widespread recognition within the United States's general
consuming public that Plaintiffs offered products or services under
the ANDROID DATA mark. Thus, a reasonable consumer would not
equate ANDROID'S DUNGEON as the source designator of the ANDROID
DATA products and services on account of the fame of ANDROID DATA.
Plaintiffs did not just continue to use the dominant portion of the

mark, which is what occurred in *Sands*. Rather, they modified the dominant portion of the mark and added a word to it that had an entirely different commercial impression as the disclaimed part.

*Sands* does not stand for the proposition that a mark owner has expansive rights to new marks that contain the dominant portion of the mark. Rather, *Sands* would possibly grant Plaintiffs rights to ANDROID on its own — a minor change of dropping the disclaimed word — or perhaps replacing the word "data" with a word or phrase with a similar meaning or impression. Plaintiffs did not do this when they started using ANDROID'S DUNGEON as their new mark. Rather, they materially altered the mark, which does not provide tacking rights. *See Paris Glove of Canada, Ltd. v. SBC/Sporto Corp.*, Cancellation No. 92,044,132, 2007 WL 2422997, at *6 (T.T.A.B. Aug. 22, 2007). Plaintiffs' trademark rights to ANDROID DATA simply do not tack on to any combination of words that contain the word "android."

Therefore, the Court rules that ANDROID'S DUNGEON is not the legal equivalent of ANDROID DATA. Because Plaintiffs' rights to ANDROID DATA do not tack to their use of ANDROID'S DUNGEON, the Court will not consider Plaintiffs' use of ANDROID'S DUNGEON in analyzing whether Plaintiffs abandoned ANDROID DATA.

### C.   When Google Established Rights to the ANDROID Mark

Before discussing whether Plaintiffs abandoned the ANDROID DATA mark, the Court must first determine when and if Google established its rights to the ANDROID mark. If Google's use of the

ANDROID mark commenced after Plaintiffs abandoned their mark, their use would not constitute trademark infringement. *See Rust Env't & Infrastructure v. Teunissen*, 131 F.3d 1210, 1215 (7th Cir. 1997) (finding that use of an abandoned mark does not violate the Lanham Act). This date will serve as a cut off in determining which evidence of alleged use by Plaintiffs of ANDROID DATA the Court should consider, because if the owner of an abandoned mark resumes using the mark after another party has established rights to the mark, the owner of the abandoned mark is considered the junior mark user. *See De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate Inc.*, 440 F.Supp.2d 249, 273 (S.D.N.Y. 2006).

Plaintiffs claim to have used ANDROID DATA in commerce numerous times since late 2007, including a mass mailing of brochures promoting the Android Data software and that bore the ANDROID DATA mark in December 2007; a letter to a potential client on ANDROID DATA letterhead from February 6, 2008, that discussed using the Android Data software; a proposal and other correspondence with a potential client for a custom database installation; an e-mail regarding a price quote for a new website to a potential client from May 27, 2009; and a proposal on Android Data letterhead, dated June 9, 2009, to redesign a website using Android Data 6 as the content management software. Pls.' Summ. J. Ex. 1 ¶¶ 52-59, 61-63. Google, on the other hand, claims it acquired trademark rights to the ANDROID mark on November 5, 2007, with its press release announcing the development of the Android

- 31 -

mobile device open platform, as well as the formation of the OHA. It claims that this was a bona fide use in commerce of ANDROID that established its rights to the mark.

Plaintiffs argue that Google has not supported its claim that it used ANDROID in commerce in November 2007 with admissible evidence. However, as previously stated, the Court accepts into evidence the press release Google submitted announcing Android and the OHA. Def.'s Summ. J. Ex. 40. In addition, Plaintiffs' Complaint admits that Google used ANDROID in November 2007. It provides details about the Android platform and lists many of the companies that formed the OHA, and mentions Google's November 12, 2007, release of the Android Software Development Kit and announcement of the $10 Million Android Developer Challenge. Second Am. Compl. ¶¶ 33, 34, 56. No genuine issue of material fact exists that Google used the ANDROID mark in commerce starting in November 2007 because "[a]llegations in a complaint are binding admissions." *Jackson*, 66 F.3d 151 at 153. The issue is whether this was a bona fide use in commerce of the ANDROID mark.

The Lanham Act defines a "use in commerce" as "the bona fide use of a mark in the ordinary course of trade." 15 U.S.C. § 1127. The Act states that when placing the mark on the actual goods would be impracticable, a mark owner can affix the mark to documents associated with the goods or their sale. *Id*. The sale and promotion of an open platform for mobile devices do not fit neatly into the definition provided by the Lanham Act. In this situation,

- 32 -

the Court looks at the totality of the circumstances to determine whether a party has established protectable rights in a mark.  *See Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F.3d 427, 433 (7th Cir. 1999).  A party can acquire protectable trademark rights only through use of the mark in connection with its product.  *See id.*  However, actual sales are not necessary to establish trademark rights.  *See id.* at 434.  Rather, the party seeking trademark right must show appropriation of the mark and "'use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of [the adopter of the mark].'"  *See id.* at 433-34 (quoting *New West Corp. v. NYM Co. of Cal., Inc.*, 595 F.2d 1194, 1200 (9th Cir. 1979)).

Google's November 5, 2007, Android and OHA announcement presumably generated news attention, but neither party presented evidence of such coverage.  The Court, however, can take judicial notice of facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b).

The Court's research through searches on Westlaw and LexisNexis produced a significant quantity of stories from major newspapers across the United States that reported on Google's announcement.  *See, e.g.,* John Markoff, *I, Robot: The Man Behind the Google Phone,* N.Y. Times, Nov. 4, 2007, at Sec. 3, Pg. 1; Kim Hart, *Google Teams Up With Cellphone Industry*, Wash. Post, Nov. 6,

2007, at D1; Kevin J. Delaney, *Google, Bidding for Phone Ads, Lures Partners*, Wall St. J., Nov. 6, 2007, at A1; Jefferson Graham, *Google Formed a Cellphone Alliance, So What Does it Mean?*, USA Today, Nov. 6, 2007, at 5B; Michael Liedtke, *Google Takes the Leap into Cell Phones*, St. Louis Post-Dispatch, Nov. 6, 2007, at D4; Tricia Duryee, *Google Aims to Open Mobile*, Seattle Times, Nov. 6, 2007, at F1; Elise Ackerman, *Not One GPhone, 'A Thousand'—Google to Give Away Software for Cell Phone Firms to Build On*, San Jose Mercury News, Nov. 6, 2007, at 1A; Ryan Kim & Verne Kopytoff, *Google Bids to Shake Up the World of Cell Phones*, San Francisco Chron., Nov. 6, 2007, at A1; Eric Benderoff, *Google Lays Out Mobile Strategy*, Chi. Trib., Nov. 6, 2007, at C1.

The Court takes judicial notice of the existence of these newspaper articles, not of the facts contained therein. Newspaper articles can offer evidence concerning whether the public identifies a mark as the source designator of a party's goods or services. *See Johnny Blastoff*, 188 F.3d at 434. Such public use is considered to be on behalf of the mark owner. *See id*. Given the extent of newspaper stories generated by Google's November 5, 2007, announcement—major newspapers from across the country devoted attention to it—the evidence supports Google's assertion that its rights to the ANDROID mark began on November 5, 2007. The press release, the subsequent release of the Android development kit and announcement of the $10 Million Android Developer Challenge, and

the media reports that these announcements generated constitute uses in commerce that give Google trademark rights to ANDROID as contemplated by the Lanham Act. These rights are contingent, of course, on whether Plaintiffs had abandoned ANDROID DATA and the other Asserted Marks by this date. If Plaintiffs abandoned these marks, then Google became the senior user on November 5, 2007, and any subsequent use by Plaintiffs infringed Google's trademark.

### D. Plaintiffs' Abandonment of the ANDROID DATA Mark

The Court now turns to the issue of abandonment. In review, the Court does not consider Plaintiffs' ANDROID'S DUNGEON mark the legal equivalent of the ANDROID DATA mark, and therefore Plaintiffs' use of it does not factor into the abandonment analysis. Further, the Court will not consider any use by Plaintiffs of ANDROID DATA that occurred after November 5, 2007, in the abandonment analysis if Plaintiffs had abandoned their mark prior to this date, as this is when Google secured rights to the ANDROID mark. The key determination that the Court must make is whether Plaintiffs abandoned ANDROID DATA and the other Asserted Marks prior to November 5, 2007.

An abandonment analysis must begin with the statutory definition of trademark abandonment. Under the Lanham Act:

> A mark shall be deemed to be "abandoned" . . . [w]hen its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made

- 35 -

in the ordinary course of trade, and not made
merely to reserve a right in a mark.

15 U.S.C. § 1127. A party seeking to show that a mark owner has
abandoned the mark must show actual cessation of use as well as
intent not to resume using the mark. *Roulo v. Russ Berrie & Co.,
Inc.*, 886 F.2d 931, 938 (7th Cir. 1989). Google has the burden to
prove by a preponderance of the evidence that Plaintiffs abandoned
their marks. *Id.*

### 1. When and If Plaintiffs Ceased Using
### the ANDROID DATA Marks

On October 22, 2002, the USPTO granted registration on the
principal register for the trademark ANDROID DATA. Pls.' Summ. J.
Ex. 38. Plaintiffs registered the mark in International Class 9
for "computer e-commerce software to allow users to perform
electronic business transactions via a global computer network."
*Id.* Plaintiffs' rights pursuant to this registration cover only
the sale of goods as described in the registration. Plaintiffs
also claim they possess common law rights to provide services under
the ANDROID DATA mark, as well as common law rights to provide
goods and services under the ANDROID SERVER and ANDROID DATA WEB
EDITOR marks. Second Am. Compl. ¶ 10. To determine if and when
Plaintiffs abandoned using their marks — and if they ever possessed
common law rights to them — the Court will break down Plaintiffs'
use of the marks into relevant time periods.

> *a. 1998–2002: Plaintiffs Create Android Data Software, Establish Android Data Corporation, and Build a Computer Software and Services Business*

The undisputed facts show that Specht established a business in 1998 that used the ANDROID DATA mark. He developed the Android Data Software Suite, which provided Internet e-commerce solutions. In 1998, he incorporated ADC in Illinois and registered the domain name *androiddata.com* as a vehicle to market his business. He subsequently licensed the Android Data software to three clients, and in 2002 he secured a registration on the principal register for the ANDROID DATA mark. ANDROID DATA, Registration No. 2,639,556. Registration of a mark offers prima facie evidence that the registrant has the exclusive right to use the mark in commerce. *See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 197 (1985). Pursuant to this registration, Plaintiffs have prima facie evidence of their right to use ANDROID DATA as a trademark for computer e-commerce software.

A question exists, however, whether Plaintiffs possess common law rights to ANDROID DATA as a service mark, as well as common law rights to the ANDROID SERVER and ANDROID DATA WEB EDITOR marks. To establish both federal and state common law rights to a mark, "one must win the race to the marketplace to establish exclusive use of the mark." *Zazú Designs v. L'Oréal, S.A.*, 979 F.2d 499, 503 (7th Cir. 1992). This "use" is a term of art, as to qualify for trademark rights "the mark must be attached to the product or service sold to the public, and the use must be continuous and bona

- 37 -

fide." *DSMR, LLC v. Goldberg*, No. 02-C-5203, 2004 WL 609281, at *4 (N.D.Ill. Mar. 25, 2004). Common law rights exist only when a party establishes that its use of the mark was "deliberate and continuous, not sporadic, casual or transitory." *Circuit City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1054-55 (6th Cir. 1999) (internal quotation omitted). The determination of sufficient activity to constitute use is a factual question, in which the use must be enough so that "an appropriate segment of the public mind" identifies the mark as a source designator of the products or services. *S Indus., Inc. v. Stone Age Equip., Inc.*, 12 F.Supp.2d 796, 805 (N.D. Ill. 1998) (internal quotation omitted). It warrants repeating that the Court can resolve a question of fact on summary judgment "only if the evidence is so one-sided that there can be no doubt about how the question should be answered." *AutoZone*, 543 F.3d at 929.

In this case, Plaintiffs have established that they acquired common law rights to ANDROID DATA as a service mark. ADC's marketing materials indicate that it assists its clients in designing websites. Pls.' Summ. J. Ex. 9. The licensing agreements with Artistry In Printing, Design Toscano, and Basil Street Gallery include fee schedules and agreements concerning services that ADC would provide, including website hosting and development. *Id*. at Ex. 12. In addition, Plaintiffs have produced numerous invoices sent to Picket Fence Realty, Artistry In Printing, Bonaparte Corporation, Daily Herald, HuTech Resources,

- 38 -

Motorola, O/S Services, Summit Recruiting, and other clients for services rendered by ADC from 1998 to 2002. *Id.* at Exs. 19, 26. This evidence shows deliberate and continuous use by Plaintiffs of ANDROID DATA as a service mark from 1998 to 2002.

The analysis differs in regard to Plaintiffs' common law rights to the ANDROID SERVER and ANDROID DATA WEB EDITOR marks. In fact, Plaintiffs' own Statement of Material Facts shows the inconsistent and varied uses of these marks. For example, Plaintiffs claim that they used ANDROID WEB, ANDROID DATA WEB, ANDROID DATA WEB EDITOR, and ANDROID EDITOR for products and services since 1998. Pls.' Statement Material Facts ¶ 8. This inconsistent use of the mark does not establish common law rights. ADC's licensing agreements with Design Toscano, Artistry In Printing, and Basil Street Gallery refer to Android Editor software, not Android Data Web Editor software. Pls.' Summ. J. Ex. 12. Its marketing materials also refer to Android Editor. *Id.* at Exs. 8, 9. Not until 2002 and 2003, with Specht's attempts to sell ADC and its assets, does the admissible evidence name a product called Android Data Web Editor. *Id.* at Ex. 16. This is not the type of use from which Plaintiffs would acquire common law rights to the mark. In addition, in a sales letter to Chris Curie, Specht describes Android Data Web Editor Version 4 as "the previous version of what has become known as the Content Manager." *Id.* Plaintiffs' own evidence contains a statement that the consuming

public did not recognize ANDROID DATA WEB EDITOR as a source designator of Plaintiffs' products or services from 1998 to 2002.

Plaintiffs' marketing materials with a copyright date of 2002 refer to a product called Caching Server, which it calls "the heart" of the Android Data Software Suite. *Id*. at Exs. 10, 27. This use does not provide Plaintiffs with common law rights to the ANDROID SERVER mark. Its marketing materials from 2007 also refer to the Caching Server software module. *Id*. at Ex. 18. Plaintiffs have not produced any admissible evidence showing a bona fide use in commerce of the ANDROID SERVER mark from 1998 through 2002. Therefore, the Court finds that while Plaintiffs did establish common law rights to the ANDROID DATA service mark from its use of the mark from 1998 through 2002, they did not establish common law trademark or service mark rights to the other two Asserted Marks — ANDROID SERVER or ANDROID DATA WEB EDITOR — in this time period.

    *b.   August 2002–April 2004: Efforts to Sell ADC and*
            *Its Assets, Including the ANDROID DATA Mark*

Plaintiffs admit that ADC ceased doing business by the end of 2002, and attempted to sell the business and its assets from mid-2002 until April 2004. Google contends that the attempted sale of ADC, which included the sale of the ANDROID DATA mark, was not a bona fide use in commerce of the mark. Plaintiffs, of course, argue to the contrary. Google relies upon two related cases from the District of Nevada — not binding precedent on this Court — to assert that the sale of a business, including its trademark, is not

a bona fide use in commerce of a mark. *Cash Processing Servs. v. Ambient Entm't*, 418 F.Supp.2d 1227 (D. Nev. 2006); *Burgess v. Gilman*, No. 3:03-CV-0707, 2006 WL 449212 (D. Nev. Feb. 23, 2006). These cases involved the United States government auctioning off assets on eBay from the defunct Mustang Ranch legal brothels that it obtained from a forfeiture order after convicting the brothels' operators of racketeering. The Nevada court found that the government's auctions of the brothels' personal property, in which goods other than the brothels' services were sold, constituted mere promotional or token use of the MUSTANG RANCH mark, and did not toll the period of nonuse of the mark for purposes of abandonment. *Cash Processing Servs.*, 418 F.Supp.2d at 1232; *Burgess*, 2006 WL 449212, at *5.

The facts of these cases are distinguishable from those in the case before this Court. Specht attempted to sell the ANDROID DATA mark and the goodwill associated with it in conjunction with the sale of the entire ADC business. He never attempted to sell ADC piecemeal, and his sales efforts began while ADC still functioned. The sales pitches that Specht sent to prospective buyers specifically mentioned the trademark as an asset in the sale. In *Burgess* and *Cash Processing Services*, the government first auctioned off Mustang Ranch personal property on eBay in 2002, more than three years after it seized the brothels. It then unsuccessfully attempted to sell the business's real property. Finally, in 2003, more than four years after the brothels had

- 41 -

ceased operations, the Government sold a Mustang Ranch building and the MUSTANG RANCH mark on eBay. The court's use in commerce holdings apply to only the 2002 auctions in which personal property that bore the MUSTANG RANCH mark, not the actual sale of the mark in 2003. *Cash Processing Servs.*, 418 F.Supp.2d at 1232. The Court is not persuaded that these cases stand for the proposition that the sale of an entire business, including its mark, is not a bona fide use in commerce of the mark.

While other case law does not directly speak to the fact pattern in this case, it does provide guidance on the issue of whether a sale of a business is a use in commerce of the business's marks. In *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037 (2d Cir. 1980), the state of New York stopped bottling water under the SARATOGA GEYSER mark, closed down its bottling plant, and laid off its employees after its sales declined upon learning that its mineral water was partially radioactive. *Id.* at 1039. After ceasing its bottling operation, however, the state filed an application with the New York Secretary of State to register the SARATOGA GEYSER trademark, tried to sell the business along with its goodwill and trademark, and eventually, in 1976, entered into a licensing agreement with a company to sell water under the SARATOGA GEYSER mark. *Id.* The Second Circuit found that the state's efforts to sell the business were inconsistent with an intent to abandon the mark when "New York's non-use was caused by the decision of the legislature to have the State withdraw from the

mineral water business, and the State thereafter sought continuously to sell the business with its good will and trademark." *Id.* at 1044. *Saratoga* appears to stand for the proposition that as long as a business continues to exist in some form, and it has a legitimate reason for the nonuse of its mark, it does not abandon its mark when it proactively seeks to sell or license the mark in conjunction with its business. Additionally, the case addressed only the intent prong of an abandonment analysis, rather than if the attempts to sell the business were bona fide uses in commerce of the mark. *Saratoga Vichy Spring Co.*, 625 F.2d at 1044. (The Court acknowledges that the intent to abandon as used by the Second Circuit in 1980 differs from the intent not to resume use that the Court applies in its analysis of the second prong of the abandonment test in this Opinion.)

Plaintiffs are correct in that a mark owner's decision to stop business operations does not strip it of trademark rights or the goodwill associated with the mark. *See Defiance Button Mach. Co. v. C & C Metal Prod. Corp.*, 759 F.2d 1053, 1062 (2d Cir. 1985). A failing, yet ongoing, business does not abandon its marks as long as it remains in business. *See Electro Source, LLC v. Brandess-Kalt-Aetna Grp., Inc.*, 458 F.3d 931, 939–40 (9th Cir. 2006) ("Even a declining business retains, may benefit from, or may continue to build its goodwill until it shuts its doors or ceases use of its marks."). However, whether Plaintiffs possessed rights to the ANDROID DATA mark during the time they attempted to sell ADC and

- 43 -

whether this attempted sale constituted a bona fide use in commerce of the mark are separate issues.

The law is clear that trademark rights exist only in connection with an existing business. *See United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97 (1918) ("There is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed."); *Electro Source, LLC*, 458 F.3d at 939 ("Trademark use requires an existing business."). The registration of a mark with the USPTO does not alter this principle. *See Basile, S.p.A. v. Basile*, 899 F.2d 35, 37 n.1 (D.C. Cir. 1990) ("Although [a mark's] registration is a predicate to its protection under the Lanham Act, the underlying right depends not on registration but rather on use.").

Plaintiffs did not possess rights to ANDROID DATA separate from the operation of their software and computer services business. However, a party that purchased ADC and the ANDROID DATA mark during the period in which Specht attempted to sell it could have revived the ANDROID DATA mark by using it in commerce, and therefore could have gained valid and protectable rights to the mark. The clock began to tick on the three-year period of nonuse that would raise a presumption of abandonment, however, when ADC ceased operations, discontinued licensing of the Android Data Software Suite, and started billing clients and rendering services as Android's Dungeon. (In the next section, the Court addresses

whether the *androiddata.com* website that remained on the Internet after 2002 was a bona fide use in commerce of the mark.)  The sale of ADC and the ANDROID DATA mark were not done in conjunction with the sale or licensing of e-commerce software or the rendering of software programming or other computer-related services.

Accordingly, the Court finds that Plaintiffs' efforts to sell ADC and its assets did not constitute a bona fide use in commerce of the ANDROID DATA mark.  These efforts will not prevent the Court from finding that Plaintiffs abandoned the ANDROID DATA mark.

### c.  Use of Androiddata.com E-mail Address and Website Administrative Tools

Plaintiffs contend that Specht's use of *erich@androiddata.com* as an e-mail address until April 2005, as well as his hosting several websites from a home server that used the *mail.androiddata.com* e-mail server, *dns.androiddata.com* name server, and *stats.androiddata.com* as a portal to access website activity statistical reports, constituted a bona fide use in commerce of ANDROID DATA.  This argument fails, because on its own, the use of a domain name or e-mail address to identify an Internet host computer does not constitute a bona fide use in commerce.  The use of a website address containing a trademark is not the same as use of the mark.  *See Mashantucket Pequot Tribe v. Redican*, 403 F.Supp.2d 184, 191 (D. Conn. 2005).  Plaintiffs never sought nor received registration for ANDROIDDATA.COM as a trademark or service mark, nor do not claim that they possess common law trademark

rights to the domain name. While a domain name can serve as protectable mark in some circumstances, the domain name *androiddata.com* as Plaintiffs used it merely indicated the Internet location where the website appeared, and thus did not have its own trademark rights. *See In re Eilberg*, 49 U.S.P.Q.2d 1955, 1957 (T.T.A.B. 1998).

### d. Residual Use of Androiddata.com Website

Whether a three-year period of nonuse of the ANDROID DATA mark exists to create a rebuttable presumption of abandonment hinges on if Plaintiffs' maintenance of the website at *androiddata.com* after ADC ceased operations was a bona fide use in commerce of the mark. Plaintiffs launched the *androiddata.com* website in 1998, and took it down in early 2005. The parties dispute the contents of the website. Pursuant to the Court's ruling above on Google's Motion to Strike Certain Exhibits, the Court does not consider in its analysis the screen shots of the website from the Internet Archive. Plaintiffs claim that the website featured an Android Data logo on every page, information about Specht and his companies, contact information, and from March 2001 forward information about the Android Data Software Suite and a form to request a brochure about the software. Pls.' Statement Material Facts ¶ 7. Because Plaintiffs have not submitted other admissible evidence showing the contents of the website, Google disputes the site's contents. Def.'s Resp. Pls.' Statement Material Facts ¶ 7.

Regardless of the dispute, Plaintiffs do not claim that the site provided a means for a visitor to order software, nor do they claim that the site offered information about ADC's services. Surprisingly, the parties do not cite to any case law, and the Court could not locate any in its research, directly on point whether a passive website that a business does not take down from the Internet after it ceases business operations constitutes a bona fide use in commerce of a mark on the site. A line of decisions from the Trademark Trial and Appeal Board (the "TTAB"), however, regarding registrations of marks, provides guidance as to whether the *androiddata.com* site, as Plaintiffs claim it existed, was a bona fide use in commerce of the ANDROID DATA mark. These cases are analogous as the definition of "use in commerce" for registration and abandonment purposes is the same. 15 U.S.C. § 1127; *see also Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 131–41 (2d Cir. 2009) (providing analysis of the meaning of "use in commerce" in Section 1127 as compared to a "use in commerce" that amounts to trademark infringement).

*In re Dell Inc.*, 71 U.S.P.Q.2d 1725 (T.T.A.B. 2004), involved the issue of whether a single page from a website on which a mark was used was an acceptable specimen of use in commerce for registration purposes. The TTAB recognized that in today's electronic commercial world, web pages are "electronic displays which are associated with the goods." *Id*. at 1727. It established a three-prong test to determine if a web page sufficiently

demonstrated a use in commerce to serve as the necessary specimen for trademark registration: "(1) it includes a picture of the relevant goods; (2) it shows the mark sufficiently near the picture of the goods to associate the mark with the goods; and (3) it includes the information necessary to order the goods, (*e.g.*, a phone number, mailing address, or e-mail address)." *Id.*

*In re Genitope Corp.*, 78 U.S.P.Q.2d 1819 (T.T.A.B. 2006), elaborated upon the *In re Dell* test. Here, the mark applicant's page submitted as a registration specimen indicated how a visitor to the page could obtain "'more information on personalized immunotherapy and our product.'" *Id.* at 1822. The page did not offer a link on which a visitor could click to order the product or an explanation on how to order it. *Id.* Rather, it offered only the company's name, address, and phone number. *Id.* The TTAB deemed the page mere advertising, and refused the mark's registration. *Id.*

As this Court has previously stated, mere advertising is not a bona fide use in commerce of a mark. *Specht*, 660 F.Supp.2d at 863–64; *see also Cent. Mfg., Inc. v. Brett*, 492 F.3d 876, 882 (7th Cir. 2007); *Miyano Mach. USA, Inc. v. MiyanoHitec Mach., Inc.*, 576 F.Supp.2d 868, 881 (N.D. Ill. 2008) ("Neither residual nor token use nor mere promotional use of goods in a different course of trade constitute proper 'use' under the Lanham Act.").

Plaintiffs have not offered any evidence that *androiddata.com* as it existed from the end of 2002 through until April 2005 amounted to any more than the "mere advertising" that the TTAB found was not a bona fide use in commerce. *See In re Genitope*, 78 U.S.P.Q.2d at 1822. Plaintiffs do not claim that the site provided a mechanism by which a user could order the software. Understandably, the Android Data software is not the type of product that is generally subject to point-of-sale purchasing from a website. However, Plaintiffs also do not claim that the site provided any price information about the Android Data software, information about how a visitor to the website could license the software, or detailed information and pricing on ADC's services. The absence of this information is significant, because elements such as these could have helped to persuade the Court that the website was a point-of-sale display, and therefore could have been a bona fide use in commerce of ANDROID DATA. *See In re Dell*, 71 U.S.P.Q.2d at 1727.

Of additional significance is the undisputed fact that ADC did not exist as an operating entity from December 26, 2002, through the time Plaintiffs removed *androiddata.com* from the Internet. Plaintiffs did not license or sell the Android Data Software Suite during this time. They have not offered any evidence that they responded to any inquiries submitted through *androiddata.com* during this time, nor have they provided evidence that they rendered any services under the ANDROID DATA mark during this time. The

*androiddata.com* website served as a remnant of a closed business. A "ghost site" such as this is not a bona fide use in commerce that can prevent the abandonment of a mark. The cost is small to maintain a domain name registration and host a several-page promotional website without e-commerce functionality, such as that which Plaintiffs contend existed at *androiddata.com*. *See* Create a Website|Network Solutions, *http://www.networksolutions.com/create-a-website* (last visited Dec. 13, 2010) (showing that a website with 5 GB of storage space and 50 GB of monthly bandwidth, which includes a domain name registration, can cost $6.95 per month). Allowing a mark owner to preserve trademark rights by posting the mark on a functional yet almost purposeless website, at such a nominal expense, is the type of token and residual use of a mark that the Lanham Act does not consider a bona fide use in commerce. *See MB Fin. Bank,* 2003 WL 21462501, at *9. Therefore, the appearance of the ANDROID DATA mark on *androiddata.com* from December 26, 2002, through April 2005 does not prevent the Court from finding that Plaintiffs abandoned the mark.

   e.  *Plaintiffs' Use of ANDROID DATA After November 5, 2007*

   As explained in Section C., Google's rights to the ANDROID mark began on November 5, 2007, with the press release announcing the Android mobile device platform and OHA.  Plaintiffs have presented abundant evidence showing use in commerce of the ANDROID DATA mark after this date, including uses on invoices, business proposals, a website at *android-data.com*, promotional materials,

and contracts. In ruling on summary judgment, however, the Court should not analyze irrelevant facts. *Anderson*, 477 U.S. at 248. Accordingly, the Court will not consider Plaintiffs' evidence concerning its use in commerce of ANDROID DATA after November 5, 2007, in ruling whether Plaintiffs abandoned the mark.

Viewing the evidence in a light most favorable to the nonmoving party, Plaintiffs stopped using the ANDROID DATA mark in commerce on December 26, 2002, when ADC ceased operations and transferred all of its assets to ADI. A rebuttable presumption of abandonment occurred at the end of 2005. *See* 15 U.S.C. § 1127; *Roulo*, 886 F.2d at 938. None of Plaintiffs' uses of the mark from 2006 forward is relevant in determining if Plaintiffs ceased using the mark for the statutory three-year abandonment period.

Plaintiffs have not presented evidence of a bona fide use in commerce of ANDROID DATA or the other Asserted Marks in 2003, 2004, or 2005. Google has satisfied the first prong of the trademark abandonment test. A rebuttable presumption exists that Plaintiffs abandoned their marks.

### 2. *Plaintiffs' Intent Not to Resume Use of ANDROID DATA*

Next, the Court analyzes whether Plaintiffs stopped using ANDROID DATA but intended to resume its use within the reasonably foreseeable future. While evidence of the initial nonuse prong may be easier to obtain by the party seeking an abandonment holding, proving the subjective intent of the mark owner not to resume use may prove burdensome. *See Grocery Outlet Inc. v. Albertson's Inc.*,

497 F.3d 949, 954 n.3 (9th Cir. 2007) (McKeown, J., concurring).
Intent not to resume use may be presumed, however, when a mark
holder does not engage in a bona fide use of the mark for three
consecutive years. *See Roulo*, 886 F.2d at 938-39 (holding that the
intent could be presumed after a two-year period of nonuse, the
statutory period of time that triggered a presumption of
abandonment until the GATT amendment that went into effect on
January 1, 1996).

Despite this presumption, the moving party still has the
burden of persuasion to show the intent not to resume; the mark
owner must only produce evidence that it had an intent to resume
use in the reasonably foreseeable future to rebut the presumption.
*See id.* at 938. This evidence from the mark owner, however, must
amount to more than intent of mere token use of the mark to reserve
rights in it. It must be an intent for a bona fide use in the
ordinary course of the trade. *See Emergency One, Inc. v. Am.
FireEagle, Ltd.*, 228 F.3d 531, 536-37 (4th Cir. 2000); *see also* 3
J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*
§ 17:21 (4th ed. 2010) ("[T]he 1989 Trademark Law Revision Act can
be seen as a codification of the prior case law which required a
rebuttal of the statutory presumption to consist of evidence
showing an intent to resume meaningful commercial-scale use of the
mark. . . ."). The mark holder must formulate the intent during
the three-year period of nonuse. *See ITC Ltd. v. Punchgini, Inc.*,
482 F.3d 135, 149 n.9 (2d Cir. 2007) ("An intent to resume use of

- 52 -

the mark formulated after more than three years of non-use cannot be invoked to dislodge the rights of another party who has commenced use of a mark—thereby acquiring priority rights in that mark—after three years of non-use."); *Imperial Tobacco Ltd., Assignee of Imperial Grp. PLC v. Philip Morris, Inc.*, 899 F.2d 1575, 1581 (Fed. Cir. 1990) ("The registrant must put forth evidence with respect to what activities it engaged in during the nonuse period or what outside events occurred from which an intent to resume use during the nonuse period may reasonably be inferred.").

Evidence of intent sufficiently rebuts the presumption of abandonment if it could support a reasonable jury finding that the presumed abandonment did not occur. *See ITC*, 482 F.3d at 149. The Court views the evidence in a light most favorable to Plaintiffs. However, the only evidence Plaintiffs produced of an intent to resume use during the nonuse period is in their Statement of Material Facts: "With his new day job intact, Specht's interest in selling Android Data's assets significantly lessened. By May 2004, he decided to keep the assets with every intention of further developing the Android Data Software Suite and returning the Android Data business to profitability at the earliest opportunity." Pls.' Statement Material Facts ¶ 25. This statement of Specht's subjective intent, on its own, does not rebut the presumption, as it is a "purely subjective intention in the abandoner's mind to re-engage in a former enterprise at some

indefinite future time. . . ." *Am. Photographic Pub. Co. v. Ziff-Davis Pub. Co.*, 135 F.2d 569, 573 (7th Cir. 1943). This statement does not identify any concrete plans that Specht had developed to actually use the ANDROID DATA mark in commerce.

Other evidence Plaintiffs present concerning intent to resume use of the mark occurs after the nonuse period, which also does not defeat the presumption. For example, Plaintiffs allege that in late 2006 Specht "resumed his efforts to develop the Android Data Software Suite and other new project ideas with an eye toward returning to his business full-time." Pls.' Statement Material Facts ¶ 30. Again, this statement does not identify any specific plans to actually use the ANDROID DATA mark. Also, the only evidence produced to document this renewed intent to develop the Android Data software are some undated, handwritten notes by Specht concerning a programming idea; several programming questions Specht posted on Internet message boards in 2008; and a receipt from *Amazon.com* for a programming book sent to Megan Specht. Pls.' Summ. J. Exs. 45, 47, 48. Moreover, the ANDROID DATA mark does not appear on any of these exhibits. *Id.*

Accordingly, as Plaintiffs have not produced evidence showing that they had an intent to resume use within the three-year period of nonuse, no genuine issue of material fact exists that Plaintiffs abandoned the ANDROID DATA mark. The Court finds that Plaintiffs abandoned the registered ANDROID DATA mark, and any common law rights that they had to it, as well as the other Asserted Marks, on

- 54 -

December 26, 2005, three years after the date ADC ceased operations and transferred its assets to ADI.

### E.  Google's Rights as the Senior User of the ANDROID Mark

Once a mark is abandoned, it enters the public domain and another party can appropriate it. *See Indianapolis Colts, Inc. v. Metro. Baltimore Football Club Ltd. P'ship*, 34 F.3d 410, 412 (7th Cir. 1994).  Google started using the ANDROID mark on November 5, 2007.  With no other parties using ANDROID for related products or services in International Class 9, Google became the senior user of the mark.  *See Sengoku Works v. RMC Int'l,* 96 F.3d 1217, 1219 (9th Cir. 1996) ("It is axiomatic in trademark law that the standard test of ownership is priority of use.").

Accordingly, Plaintiffs' Lanham Act trademark infringement claims fail, as they do not possess a trademark right upon which to base this claim.  *See Natural Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325, 1330 (11th Cir. 2008); *see also* 1-3 Anne Gilson LaLonde, *Gilson on Trademarks* § 3.05[2] (Matthew Bender & Co. 2010) ("A party may not rely on an abandoned mark to bring a trademark infringement claim because, as it is not in use, it is not a valid mark and cannot be infringed.").

Likewise, because the Court uses the same analysis as the Lanham Act infringement claim for Plaintiffs' unfair competition claim (Count II) and common law trademark infringement claim (Count IV), Plaintiffs cannot prevail on these claims.  *See Trans*

*Union LLC v. Credit Research, Inc.*, 142 F.Supp.2d 1029, 1038 (N.D.Ill. 2001). Plaintiffs' claim under the Illinois Deceptive Trade Practices Act (Count III) also fails, as Illinois courts resolve these claims under the same standard as the Lanham Act. *See MJ & Partners Rest. Ltd. P'ship v. Zadicof,* 10 F.Supp.2d 922, 929 (N.D. Ill. 1998). Finally, Google cannot be liable for contributory infringement from OHA members' use of the ANDROID mark if no infringement of the mark occurred. Therefore, Count V fails as well. The Court grants summary judgment for Google on all claims in Plaintiffs' Second Amended Complaint.

Moving to Google's Counterclaim, pursuant to the analysis above, Google is entitled to a declaratory judgment that Plaintiffs abandoned ANDROID DATA and the other Asserted Marks. Plaintiffs do not possess valid or enforceable rights to the marks. The Court grants Google summary judgment on Count III of its Counterclaim. In regard to Count I of the Counterclaim, a party that believes it may suffer harm because of a trademark that has been abandoned by its owner may move to have the registration cancelled. *See* 15 U.S.C. § 1064(3). Google became the senior user of the ANDROID mark when it began using it in commerce on November 5, 2007. Plaintiffs, however, resumed use of ANDROID DATA as the junior user after Google acquired its rights to ANDROID. Plaintiffs' use in commerce of ANDROID DATA creates a possible likelihood of confusion with Google's ANDROID mark pursuant to 15 U.S.C. § 1114(1)(a), as well as possible dilution by blurring of Google's mark under 15

U.S.C. § 1125(c). In addition, Plaintiffs have used their registration as a sword to pursue their claims against Google. Therefore, the Court grants Summary Judgment in favor of Google on Count I of the Counterclaim and orders the USPTO to cancel U.S. Trademark Registration No. 2,639,556 for the ANDROID DATA trademark.

## IV. CONCLUSION

For the reasons stated herein, Defendant Google's Motion for Summary Judgment is granted for Counts I-V of Plaintiffs' Second Amended Complaint, and for Counts I and III of Google's Counterclaim.

**IT IS SO ORDERED.**


_____
Harry D. Leinenweber, Judge
United States District Court


**DATE:** 12/17/2010